Joanna Ardalan (SBN 285384)
Email: jardalan@onellp.com
Peter R. Afrasiabi (SBN 193336)
Email: pafrasiabi@onellp.com
David W. Quinto (SBN 106232)
Email: dquinto@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Telephone:   (949) 502-2870
Facsimile:    (949) 258-5081

Attorneys for Defendants,
BACKGRID INC., BACKGRID USA, INC., and
SHUTTERSTOCK, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THIBAULT MAUVILAIN, an individual; HENRI MAZARI, an individual; JEREMY DUPLAQUET, an individual; ROBERT CHRISTIAN WOLF, an individual; MICHEL BOUTEFEU, an individual; STEPHANE KYNDT, an individual; and JOSEPH MEHDI, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>FLYNET PICTURES, LLC, a California limited liability company; FAMEFLYNET INC., a California corporation; BACKGRID INC., a California corporation; BACKGRID USA, INC., a California corporation; SHUTTERSTOCK, INC., a Delaware corporation and DOES 1–10, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-2757-FLA-MAA<br>Hon. Fernando L. Aenlle-Rocha<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS BACKGRID USA, INC. BACKGRID INC., AND SHUTTERSTOCK INC.'S MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**<br><br>**Date:**      **August 28, 2026**<br>**Time:**      **1:30 p.m.**<br>**Crtrm:**     **6B**<br><br>*[Notice of Motion; Declaration of Joanna Ardalan; Declaration of Alex Kantif; Request for Judicial Notice; and Notice of Lodging filed concurrently herewith]* |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................1

II.     STATEMENT OF FACTS ....................................................................1

        A.    Plaintiffs' Pleading Always Failed as a Matter of Law. ........................ 1

        B.    Plaintiffs' Evidence Was Obtained Unlawfully, In Contempt of a Court Order, or Was Spoliated. .........................................................3

        C.    Plaintiffs Continued this Dispute After Being Informed That They Had Less Than $2,931.16 In Actual Damages for All *Seven* Plaintiffs *Total* and After Those Plaintiffs Were Paid by BackGrid. .........................................................................................6

        D.    Plaintiffs Made this Lawsuit Unnecessarily Expensive...........................6

III.    LEGAL STANDARD .........................................................................7

        A.    Sanctions under 28 U.S.C. § 1927. ....................................................... 7

        B.    Sanctions under the Court's Inherent Authority. ...................................7

IV.     COUNSEL AND PLAINTIFFS VEXATIOUSLY AND UNREASONABLY CAUSED DEFENDANTS EXCESS COSTS AND FEES WHILE RELYING ON UNLAWFULLY OBTAINED AND SPOLIATED EVIDENCE TO SUPPORT THEIR FRIVOLOUS LEGAL THEORIES, AMONG OTHER BAD FAITH CONDUCT ......................................................................8

        A.    Counsel Doubled Down on an SAC Based on Frivolous Legal Theories After Receiving Notice. ...........................................................8

              1.    The Copyright Infringement Claim Could Never Prevail and Relied on Counsel Manufacturing a "Condition Precedent" Theory. .........................................................................8

              2.    The Termination Theory Had No Legal or Factual Basis, Yet They Pursued It and Even Deposed Defendants' Litigation Lawyer Regarding the Same After Notice.................11

i

3.    The 1202 Claim Could Never Prevail Without Infringement and Plaintiffs Could Never Prove the Double Scienter Requirement.................................................. 12

B.    Counsel and Plaintiffs Continued to Pursue this Case When They Had Notice that the Actual Damages were Less than $2,931.16 and After Plaintiffs Were Paid. ....................................................... 13

C.    Counsel Filed This Suit Without Having Lawfully Obtained Evidence of Infringement............................................... 14

D.    Plaintiffs Knowingly Relied on Evidence Obtained Through Fraud. .............................................................. 15

E.    Counsel and Plaintiffs Represented that the Files Produced Were the Same Files Submitted to the Agencies—They Were Not; Produced Files Were Spoliated. ........................................... 15

F.    After Confronted with the Spoliated Evidence, Five Plaintiffs Unilaterally Dismissed Their Claims Without Prejudice and the Lawyers Withdrew. ................................................. 17

G.    Counsel Repeatedly Alleged Written Agreements in the First Amended Complaint, but Later Admitted That No Such Agreements Existed. ................................................. 18

H.    Counsel Served Three Rule 37 Joint Stipulations on Overlapping Issues that Contained Serious Misrepresentations; the Third Joint Stipulation Related to Discovery That Judge Audero Said She Was "Not Convinced" by Plaintiffs' Arguments and Attempted to Take Advantage of Judge Audero's Retirement............................. 18

I.    Plaintiffs Engaged in Thousands of Instances of Contempt of Judge Audero's Order, Which Counsel Participated in by Failing to Timely Produce the Files and by Failing to Designate Them as Confidential Per Court Order................................................ 20

J.    Counsel Improperly Added Copyright Registrations to the SAC Without Leave to Do So and In Violation of *Fourth Estate*................. 21

K.    Counsel Did Not Participate in Judge Audero's Procedures................ 22

ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL

L.    Counsel Unilaterally Took Kyndt's Deposition Off Calendar, Less Than 24 Hours Before the Agreed Upon Date, and Misrepresented the Status of Kyndt's Visa............................................22

V.    CONCLUSION ........................................................................22

iii

# TABLE OF AUTHORITIES

**Cases**

*Cadkin v. Loose*,
   569 F.3d 1142 (9th Cir. 2009) .......................................................................18

*Cooke v. United States*,
   267 U.S. 517, 45 S. Ct. 390, 69 L. Ed. 767 (1925) ..............................................7

*In re Facebook, Inc. Consumer Priv.*,
   655 F. Supp. 3d 899 (N.D. Cal. 2023)..................................................................7

*Fink v. Gomez*,
   239 F.3d 989 (9th Cir. 2001) ..............................................................................7

*Fourth Estate v. Wall-Street.com, LLC*,
   586 U.S. 296 (2019) ..........................................................................................21

*Lahiri v. Universal Music & Video Distribution Corp.*,
   606 F.3d 1216 (9th Cir. 2010) .............................................................................7

*McGillvary v. Vonkurnatowski*,
   2024 WL 6847412 (C.D. Cal. 2024) ..................................................................21

*Moore v. Keegan Mgmt. Co.*,
   78 F.3d 431 (9th Cir. 1996) .................................................................................7

*Vedatech, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   2005 WL 1513130 (N.D. Cal. June 22, 2005) ......................................................7

**Statutes**

17 U.S.C. § 203...........................................................................................2, 3, 11, 12

17 U.S.C. § 504....................................................................................................1, 6

17 U.S.C. § 505...................................................................................................1, 17

17 U.S.C. § 1202........................................................................................................12

17 U.S.C. §§ 1202(a), (b) .........................................................................................12

28 U.S.C. § 1927........................................................................................................7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL

**Rules**

Rule 15 .................................................................................................................21

Rule 37 ............................................................................................................18, 19

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

## I.    **INTRODUCTION**

After over a year of motion practice, written discovery, redundant discovery motions, and depositions, five of the seven plaintiffs unilaterally dismissed this lawsuit *without* prejudice, attempting to avoid an attorneys' fees judgment under 17 U.S.C. § 505. After the dismissal, counsel withdrew. The remaining two plaintiffs are now *pro se*. Five Plaintiffs and their counsel filed their dismissal or request to be substituted out as counsel of record, respectively, after confronting the serious problems this case had all along, which were explained to counsel repeatedly since this case was filed. The problems with this lawsuit can be broken down into four categories: 1) every iteration of the complaint always failed as a matter of law, 2) Plaintiffs' key evidence was obtained through fraud, by violating a court order, and is spoliated, 3) Plaintiffs continued this dispute after they were informed that their actual damages were $2,931.16, at best, and they had no theory of infringement supporting statutory damages under 17 U.S.C. § 504, and 4) Plaintiffs made this lawsuit—a case better suited for the LA Superior Court, Small Claims Division, given the amount in controversy—unnecessarily expensive. Plaintiffs manufactured federal claims that should never have evoked the jurisdiction of this Court.

After finally being convinced that this case was without merit, five of the seven plaintiffs unilaterally dismissed their claims against each Defendant.

## II.    **STATEMENT OF FACTS**

### A.    **Plaintiffs' Pleading Always Failed as a Matter of Law.**

Plaintiffs' problems with this lawsuit started—but did not end— with the pleadings.

(1) Plaintiffs pleaded the existence of a license, which would ordinarily be a complete defense to infringement, but attempted to plead infringement based on the notion that a condition precedent existed in the parties' license agreements. *See* Dkt. 21 ("FAC") at ¶¶ 30-31, Dkt. 80 ("SAC") at ¶¶ 27, 29, 32. If there really were a condition precedent to the license, then failure to satisfy that condition would make

1

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

the usage an infringement— as opposed to a breach of contract—which would potentially open the door to attorneys' fees and statutory damages. But that avenue was always foreclosed because Plaintiffs did not have timely copyright registrations. Dkt. 35-1 at 3:20-28; 9:6-10:14; Dkt. 84-1 at 5:13-9:4; Request for Judicial Notice ("RJN") Exs. 2-49.

(2) Plaintiffs could never plead infringement or their removal/falsification of Copyright Management Information ("CMI") claims as a matter of law. In every iteration of the Complaint, Plaintiffs acknowledge that the photos were submitted for the purpose of licensing the photos. Dkt. 35-1 at 13:21-14:26; Dkt. 84-1 at 15:1-17:6; Ardalan Decl. Ex. 1.

(3) Plaintiffs' theory that they terminated the licenses could never be adequately pleaded because the licenses were issued less than 35 years ago, i.e., it would not be possible for termination to occur under the inflexible statutory framework of 17 U.S.C. § 203. FAC ¶ 44; SAC ¶¶ 3, 40, 48, 61, 67, 100.

In their Complaint and FAC, Plaintiffs were not forthcoming about the fact that the condition precedent that they relied on for the infringement and CMI claims was based on conduct. They pleaded that the agreements between the parties were partially in writing, partially oral, and partially implied by conduct, including standard industry practice. FAC ¶¶ 29-31. After being confronted with an Order dismissing the FAC, without prejudice (Dkt. 79), Plaintiffs tried again, this time omitting allegations that the agreements were in writing and conceding that the "conditions precedent" were created by course of dealing and course of performance, and "standard custom and practice"—a legal unlikelihood. SAC ¶¶ 27-32; Dkt. 84-1 at 7:24-9:4.

Notably, after the Court granted Defendants' Motion to Dismiss the FAC and gave Plaintiffs another chance to plead the claims, and specifically the breach of contract claim because the contract claim was "so intertwined" with the other claims, Plaintiffs did very little to amend. *See* SAC. They made no attempt to further

2

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

allege the agreement other than to omit the allegation that it was in writing and concede that standard custom practice and course of dealing created the purported condition precedent. They made no attempt to explain how Flynet and FameFlyNet, the same agencies they claim ***formed*** the course of dealing, could simultaneously ***breach*** that same provision. Dkt. 84-1 at 4:1-9:4.

The pleadings even show that Plaintiffs complained that their photos were not up on BackGrid's system—meaning they alleged Defendants engaged in wrongful conduct because the photos were not being licensed by BackGrid to clients—which is consistent with testimony given at deposition. FAC ¶34 ("This omission has deprived Plaintiffs of revenue opportunities, as these images were effectively withheld from potential media clients, diminishing their licensing potential."); Ardalan Decl. Ex. 25 (Boutefeu) at 118:12-119:13. If they want the content up, then certainly no infringement occurred, and the case falls apart. And, Plaintiffs alleged that contributors continue to license photos to BackGrid USA. FAC ¶¶37, 39; Ardalan Decl. Ex. 22 (Mauvilain) at 315:14-19 ("Q  When was the last time you submitted a set to Backgrid?  A  Two weeks ago, I would say.  Q  [] Why do you continue to submit sets to Backgrid?  A  Because it's still a leading agency. []").

Finally, termination of the licenses was a legal impossibility given the statutory framework of 17 U.S.C. § 203, and that the licenses were issued within 35 years. *See* RJN Exs. 2-49.

**B.    Plaintiffs' Evidence Was Obtained Unlawfully, In Contempt of a Court Order, or Was Spoliated.**

The Complaint and FAC identify neither the works at issue nor the infringement. Plaintiffs finally identified the works they had in their possession on October 29, 2025, after being confronted with scheduling an IDC regarding the same. (Ardalan Decl. Ex. 8 (Oct. 29, 4:12 PM); *cf.* Ex. 6). It was apparent why Plaintiffs did not include the works they identified in those pleadings: Plaintiffs obtained the evidence through fraud. Ardalan Decl. ¶¶ 3-4 and Exs. 3, 4, 5; Kantif

3

Decl., ¶¶ 9-10 and Exs. C-E. Prior to filing suit, Plaintiff Mauvilain emailed BackGrid's sales team, pretending to be "Emily Carter," a production assistant for a Netflix documentary "Hollywood Uncovered," and requested access to BackGrid's Confidential Client Portal for "research." *Id.* For 14 months, Plaintiff Mauvilain had access to BackGrid's Confidential Client Portal, where he collected evidence for this case, on behalf of himself and the other Plaintiffs. Ardalan Decl. Ex. 4; Kantif Decl. ¶ 10 and Ex. D. BackGrid cut off access when Plaintiffs finally produced documents and BackGrid was able to match "Emily Carter's" IP address against Mauvilain's IP address. *Id.* at ¶ 10. Plaintiffs were incentivized to delay producing documents so they could continue accessing the portal, likely knowing that their fraud would be discovered and access cut off—and they did delay as much as possible. Ardalan Decl. ¶ 3. The evidence of alleged infringement was not produced until Defendants insisted on an IDC (Ardalan Decl. Ex. 8; *cf.* Ex. 6), which was held and continued to an in-person IDC that finally occurred on December 11 ("IDC 1") to address the identity of the "Copyrighted Works" at issue in this lawsuit. *Id.* at Ex. 10.

During IDC 1, the Defendants, at the Court's suggestion, agreed to give Plaintiffs access to its Confidential Client Portal once more. Dkt. 66 ("Dec. 17 Order"). Plaintiffs were given three weeks of access, but there were strict limitations because BackGrid had concerns about Plaintiffs' misuse of the portal. Plaintiffs were ordered by the Court to take ***only*** screenshots of the portal. The Dec. 17 Order expressly prohibited Plaintiffs from downloading or saving content from the portal and they were required to produce any saved content from the portal by no later than January 12, 2026, under a "Confidential" designation. Plaintiffs violated the order **7,508** times. They saved **7,508 JPEG files** from the Confidential Client Portal during their three weeks of access, failed to timely produce them, and failed to designate them as Confidential. Ardalan Decl. ¶ 8; *e.g.*, Ex. 33, Ex. 23 (Mazari) at 266:7-14 (acknowledging he saved 1,803 files), 275:18-276:3 ("I drag and drop the image because there was a glitch who permitted to do it and because **you basically**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

**didn't want us to upload the image or download the image, download the image**, and read all the information that we need to prove that those pictures have CMI removal. And when I drag and drop those image, I got all the information I need to -- to show that there was a removal of CMI on my image. And also that my image were there when they're not supposed to be there."); 272:10-273:3; Ex. 22 (Mauvilain) at 179:11-180:7 ("what really strike[s] me the most is, you really played the system well because **you gave us a limited access, without the ability to download, which you didn't grant.** We wouldn't have been able to prove the metadata had been altered if it wasn't for your glitch. [] No one should be able to go on a website, drag a photo, and read the metadata. It was just poorly designed, thank God. And thanks to that, we didn't need your download access. I think what -- what a surprise. What a -- I was the first one shocked. Because you want to know the truth? I was on the website for two weeks before I even tried and realized. It didn't even occur to me that it could show me what's inside. So I -- I could only see the photos on there without proving the metadata change. And one day, for some reason, I was just on the computer and I thought, what if I drag it on the desktop? Can I read anything on that photo? And when I realized I could, I was just like, no way. That was nice surprise.").

Finally, Plaintiffs relied on spoliated files, which they falsely contended were the same files they submitted to Flynet or FameFlyNet. They were not. These spoliated files contained updated metadata which Plaintiffs relied on as a basis for their removal or alteration of CMI. Ardalan Decl. Ex. 7; Kantif Decl. ¶ 11; *see* Section IV(E); *cf.* Ardalan Decl. Exs. 8, 9 (representing that the native files submitted in discovery were the same as those provided to the Defendant Agencies).

5

**C.**    **Plaintiffs Continued this Dispute After Being Informed That They Had Less Than $2,931.16 In Actual Damages for All *Seven* Plaintiffs *Total* and After Those Plaintiffs Were Paid by BackGrid.**

After Defendants pushed for an IDC on the identity of the "Copyrighted Works," Plaintiffs produced the screenshots taken by Mauvilain while he had access to the Confidential Client Portal which he obtained through fraud. On December 10, 2025, Defendants disclosed those sets totaled $1,910 in licensing sales, and all of the sales occurred before the copyright registrations issued, meaning there was no factual basis for statutory damages under 17 U.S.C. § 504. Ardalan Decl. Exs. 10 (served 12/11/2025), 11 (produced 12/10/2025); ¶12 and Ex. 1.

After Plaintiffs had three weeks of access to the Confidential Client Portal per the December 17 Order, Plaintiffs disclosed the identity of those sets they claim were also the "Copyrighted Works." Plaintiffs were told that now the amount of sales across all seven plaintiffs was $2,931.16 **total.** Again, none of the newly identified sets were licensed after the date of the copyright registrations, and these license fees reflect the total license fee. Plaintiffs are entitled to, at most, a 70% commission on the license fee. *Id.*, Ex. 23 (Mazari) at 23:16–24:16.

**D.**    **Plaintiffs Made this Lawsuit Unnecessarily Expensive.**

This is a small claims breach of contract claim. Ardalan Decl. Ex. 1. It was never a copyright infringement case, but Defendants were forced to file two motions to dismiss and endure extensive discovery on infringement claims that were dead on arrival. In addition, Plaintiffs made choices that caused unnecessary expense even after discovering the value of this case generously maxed out at $2,931.16. Among other things, Plaintiffs served a joint stipulation on overlapping discovery issues three times while violating Judge Audero's procedures, Plaintiffs added in copyright registrations to the Second Amended Complaint without leave from the Court to do so, and in violation of Supreme Court precedent, deposed BackGrid's litigation

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL

lawyer on their termination theory, which could never be legally viable, and finally, Plaintiffs misrepresented the status of a Plaintiff's visa to avoid deposition.

## III.  LEGAL STANDARD

### A.  Sanctions under 28 U.S.C. § 1927.

"Any attorney [] admitted to conduct cases [] who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions under section 1927 require a finding that counsel acted recklessly or in bad faith. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 436 (9th Cir. 1996). Section 1927 applies broadly to unnecessary filings and tactics once a lawsuit has begun. *Id.* at 435. Recklessness has been found where an attorney raised frivolous legal arguments. *Vedatech, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2005 WL 1513130 (N.D. Cal. June 22, 2005).

### B.  Sanctions under the Court's Inherent Authority.

A court also may impose sanctions under its inherent authority. A court's inherent powers "derive from the absolute need of a trial judge to maintain order and preserve the dignity of the court." *Cooke v. United States*, 267 U.S. 517, 539, 45 S. Ct. 390, 69 L. Ed. 767 (1925). Federal courts have inherent power to impose sanctions "'if the court specifically finds bad faith or conduct tantamount to bad faith' [such as] 'willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose.'" *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001). Sanctions under the inherent authority may be imposed against the parties, counsel, and the law firm. *In re Facebook, Inc. Consumer Priv.*, 655 F. Supp. 3d 899, 926-27 (N.D. Cal. 2023).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

IV. **COUNSEL AND PLAINTIFFS VEXATIOUSLY AND UNREASONABLY CAUSED DEFENDANTS EXCESS COSTS AND FEES WHILE RELYING ON UNLAWFULLY OBTAINED AND SPOLIATED EVIDENCE TO SUPPORT THEIR FRIVOLOUS LEGAL THEORIES, AMONG OTHER BAD FAITH CONDUCT**

A. **Counsel Doubled Down on an SAC Based on Frivolous Legal Theories After Receiving Notice.**

By the time Defendants met and conferred with the Plaintiffs regarding their motion to dismiss the FAC, counsel and Plaintiffs were on notice that their legal theories were frivolous, yet, pursued them anyway.

1. **The Copyright Infringement Claim Could Never Prevail and Relied on Counsel Manufacturing a "Condition Precedent" Theory.**

Plaintiffs always alleged that they had licensed the photos to the Agencies. FAC ¶¶ 29-31; SAC ¶¶ 27-30. Indeed, on May 16, 2025, Defendants explained during the meet and confer for the motion to dismiss the FAC that Plaintiffs complain that the photographs are "missing from the Backgrid website library" and "[d]espite being assured by Backgrid and its predecessor entities that such images would be included [] thousands of works have been excluded" (¶ 34), making it clear that Plaintiffs wanted their works sublicensed by Backgrid and the other Defendants. Dkt. 35-3.

Plaintiffs manufactured a "condition precedent" theory to transform a breach of contract claim into a copyright infringement claim. If a term really were a condition precedent to the license, and that term was not satisfied, then no license existed. Plaintiffs never had evidence to establish the same. The FAC was purposely vague as to how these conditions precedent existed, but after being forced to amend the complaint, the SAC conceded that this "condition precedent" was created through custom and practice. But, without more, that theory is implausible.

8

Plaintiffs themselves then testified to the opposite of their lawyers' pleading. That is, they did not testify that any condition precedent existed: Ardalan Decl. Ex. 23 (Mazari) at 23:16-24:16 (acknowledging the only term for the agreement was payment of 70% of the license fee); Ex. 25 (Boutefeu) at 109:22-110:3 (describing the obligation to him as "To license and then to make -- make some [sales] and, like that, I have some money. [] That's it. It was simple."); 113:1-114:16 (describing the terms of agreement with FameFlyNet); 191:15-194:2 (the obligations for an agency changes depending on agencies "you believe" and agencies you do not); Ex. 24 (Wolf) at 141:13-142:17 (describing conversation with BackGrid USA, Inc. about the terms) and 89:10-90:25 ("I just wanted to be sure that he was going to, you know, manage my copyright information properly and meticulously and thoroughly and ethically.  And -- and I told him any number of times, 'I want to get paid every penny that I have earned.'").

Mauvilain even met with Wolf the day before Wolf's deposition to influence his testimony on this issue and others. Ardalan Decl. Ex. 24 (Wolf) at 122:24-124:24 (describing an in-person meeting two days after Mauvilain's deposition and two days before Wolf's deposition); 137:14-23 ("Q  [] Did Thibault Mauvilain speak to you about BackGrid's obligation to enforce copyright at your meeting on Wednesday?  A  Well, yeah.  I think in the general terms of that they were obligated to represent me ethically.  And they didn't."); 138:10-17 ("Well, [Mr. Mauvilain] said they have a -- they have an industry standard practice obligation to protect my copyright, to manage my copyright, to collect my -to -- to archive and -- and keep track of sales and licenses.").

Even so, different plaintiffs had different ideas of what custom and practice is regarding attribution, which was different from the allegations in the SAC. Ardalan Decl. Ex. 22 (Mauvilain) at 80:25 ("The byline doesn't matter."); 130:11-12 ("The byline doesn't matter. It's the contributor code that matters."); 131:24-132:2 ("So whoever has the contributor code is the one getting paid. So you don't have your

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

contributor code on your picture, you're getting screwed.");[1] Ex. 23 (Mazari) at 57:16-22 ("Q:  [] So it's more important to you to get the license out and the money than it is to have the byline included? A:  Yeah. It's not an ego situation. []"); Ex. 24 (Wolf) at 109:1-22 (magazines (i.e. licensees) tend to include the syndication agent (e.g. BackGrid) in the byline, not the photographer for old, nonexclusive photos); *cf.* SAC ¶ 29 ("That attribution was conveyed through the byline and through IPTC metadata distributed with the image file. That practice was a condition of Flynet's right to distribute and sublicense the photographs."). And they had a serious misunderstanding of standing in an infringement lawsuit and how Defendants' alleged bad acts affected their right to sue. Ardalan Decl. Ex 22 (Mauvilain) at 132:3-9 ("Q  [] Other than for purposes of payment, how else is the contributor code used as far as you know?  A  Again, copyright ownership. So technically, right now, if you claim a FAFL Picture [the FameFlyNet Contributor Code, as opposed to the photographer contributor code] has been infringed upon by a client, you can go sue them because you're going to claim you own a copyright because it says FAFL on your system."); *cf.* Ex. 25 (Boutefeu) at 215:18-20 ("Q  Do you know whether Flynet used a contributor code to track your sales? A  I don't know how they do. Q  Okay. Do you know whether FameFlynet uses a contributor code to track their sales?  A  I have no idea."); Ex. 23 (Mazari) at 117:2-14 (does not know whether Flynet used a code on their website); 44:19-24 (does not know whether Mauvilain used a code to track Mazari's photos that were submitted to Mauvilain's own photo agency, BAC Photos, which undermines the notion that the code is industry practice).

     But contributor codes, which are codes used to track sales, are clearly not copyright attributions. They are simply codes used to track who gets paid for the

---

[1] Mauvilain was the VP of Sales for FameFlyNet and a contributor to it, and oversaw all its licensing efforts. *Id.* at 26:13-20.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

license—which is not always the author or owner of the work. Kantif Decl. ¶¶ 2, 4. Indeed, photographers regularly combine sets ("pooling" sets), and both contributors' codes are used (*i.e.*, if Mauvilain and Boutefeu both take photos of the same celebrity on the same day), they can combine the sets, so they do not compete with each other. Ardalan Decl. Ex. 25 (Boutefeu) at 243:6-246:9. If Boutefeu's photo gets licensed, Mauvilain will split the contributor share with Boutefeu, despite the fact that Mauvilain did not author the licensed photo. As such, the code does not identify the author or the owner—it simply identifies who has an economic interest in the licensing of the photo. Ardalan Decl. Ex. 22 (Mauvilain) at 75:3-76:6.

Moreover, while the pleadings complain about "© BackGrid" being listed in connection with the client portal, Mauvilain testified that this is "no problem" because "they're the syndication agency of record for me [and] [i]t allows the client to identify who to call to buy the photo." Ardalan Decl. Ex. 22 (Mauvilain) at 195:13-21.

### 2. The Termination Theory Had No Legal or Factual Basis, Yet They Pursued It and Even Deposed Defendants' Litigation Lawyer Regarding the Same After Notice

Plaintiffs alleged that they terminated the licenses even after they knew that there was no possibility that termination could be plausible. SAC ¶¶ 2, 3, 40, 47, 48, 59, 61. At the very least, by the 7-3 conference and by the Motion to Dismiss the FAC, Plaintiffs were on notice that termination under 17 U.S.C. § 203 is only permitted 35 years after the issuing of the license. All of the photos at issue were authored less than 35 years before the purported termination, so this theory is dead on arrival.  *See* RJN Exs. 2-49. Despite this, Plaintiffs deposed BackGrid's litigation lawyer, who responded to the Plaintiffs' pre-suit correspondence.[2] Ardalan Decl. Ex. 13. Plaintiffs represented that there was a phone call between Ms. Ardalan and

---

[2] Only some Plaintiffs sent pre-litigation correspondence. Ardalan Decl. Ex. 14.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

Plaintiffs' lawyer, Virginie Parant, and during that call Ms. Parant orally terminated the licenses, but never confirmed the same in writing. FAC ¶ 44. Of course, even if Ms. Parant had made such an oral termination (or even a written one), it would be legally unenforceable. Still, it did not stop Plaintiffs from deposing Ms. Ardalan, even though the testimony is immaterial. The e-mail correspondence between Ms. Ardalan and Ms. Parant only corroborates that no termination occurred. Ardalan Decl. Exs. 14, 15, 19.

Mazari also alleged termination through a letter, but has no supporting evidence of such letter being sent, and Mazari testified that he mailed it to the wrong address anyway.[3] Ardalan Decl. Ex. 23 (Mazari) at 183:13-184:8 (mailed the letter); 184:13–185:3 (no receipt); 191:3-194:5 (did not send to the right address; *cf.* RJN Ex. 1); 194:6-195:8 (did not follow-up). Plaintiff Mehdi alleged he terminated his license orally with Flynet in 2012, but never followed up to determine if the uses were terminated. Ardalan Decl. Ex. 26 (Mehdi) at 143:23-146:20 (ending the relationship orally with FlyNet); 148:10-149:9 (not confirming the conversation in writing or following up). Either way, this testimony is immaterial—there is no legally plausible way to terminate a copyright license under section 203.

**3.      The 1202 Claim Could Never Prevail Without Infringement and Plaintiffs Could Never Prove the Double Scienter Requirement.**

There is no federal law prohibiting the removal or falsification of CMI alone. Removal or falsification of CMI becomes unlawful when a plaintiff can prove the additional elements of 17 U.S.C. § 1202, which include, among other things, intent to "induce, enable, facilitate, or conceal ***an infringement***." 17 U.S.C. §§ 1202(a), (b). Intent aside, Plaintiffs could never prove a 1202 claim because there was no

---

[3] The SAC alleged that termination occurred by email. SAC ¶ 40. Mazari testified it was not sent by email, but by letter.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

infringement. And, there was no infringement because they pleaded and admitted to the existence of licenses—and even complained that the license was not being followed enough by offering the photos for license (the literal opposite of infringement). To the extent they rely on termination of those licenses, that theory is dead on arrival. *See* Section IV(a)(ii).

Remarkably, when asked what BackGrid did wrong, Boutefeu even complained at deposition that he did not see his archived photos on the portal for license. Ardalan Decl. Ex. 25 (Boutefeu) at 118:12-119:13 ("You want your FameFlynet and Flynet era photos on the client portal, correct, BACKGRID's client portal?  A  Yeah.  Q  That's a yes?  A  Yeah, I want. I want."), cf Ardalan Decl. Ex. 22 (Mauvilain) at 81:8-82:4.

**B.**      **Counsel and Plaintiffs Continued to Pursue this Case When They Had Notice that the Actual Damages were Less than $2,931.16 and After Plaintiffs Were Paid.**

Plaintiffs were on notice that their copyright registrations were not timely filed and that the CMI claim was dead on arrival. Dkt. 35-3; Ardalan Decl. Ex. 1. By December 10, 2025, Plaintiffs had identified the alleged infringement, which had been discovered through fraud, and Defendants informed Plaintiffs that the total license fees for those photos were $1,910 and provided business records showing the same. *Id.* at Ex. 10. Despite having 14 months of access, Defendants agreed to give Plaintiffs three more weeks of access to the client portal to identify the works at issue, subject to important limitations by Court Order. *Id.* at Exs. 3-5. After that three-week period, Plaintiffs identified additional works on January 12, 2026. On January 29, Defendants served documents showing the license fees for those additional sets. *Id.* at Ex. 12. The total license fees at issue in this case are $2,931.16. On January 16, 2026, Defendants also served Plaintiffs a notice explaining that, given the potential actual damages in this case, it is unreasonable for

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

the case to go forward and even offered Plaintiffs a walk away to avoid potential 1927 sanctions. *Id.* at Exs. 1, 2.

On December 3, 2025, BackGrid asked Plaintiffs if they would like the sets identified to be updated with their credit information. Ardalan Decl. Ex. 16. Plaintiffs responded, but did not address the request. *Id.* Defendants asked again on March 4, 2026, after Plaintiffs identified additional sets after being given three more weeks on the Confidential Client Portal. Plaintiffs did not respond. *Id.* at Ex. 17.

Finally, when Defendants found out they owed each Plaintiff, at most, a few hundred dollars, they paid them. Kantif Decl. ¶ 8 and Ex. B. The Plaintiffs attempted to return the money. *Id.*

The important takeaway is this: Plaintiffs were offered to have updated credit in BackGrid's system, they were paid the trifle amount of money owed to them, and they were offered a walk away. They declined, and instead forced Defendants to spend hundreds of thousands of dollars in defending a small claims case based on fraudulently obtained and even spoliated evidence, as explained herein.

**C.    Counsel Filed This Suit Without Having Lawfully Obtained Evidence of Infringement.**

Neither the Complaint nor the FAC identified the works at issue or the infringement—a basic pleading and pre-investigation filing requirement. Defendants served on Plaintiffs an interrogatory as follows: "IDENTIFY each infringement of the WORKS. "IDENTIFY" [] means: (i) identify the location of the infringement; (ii) identify the WORK infringed; (iii) identify any DOCUMENTS REFLECTING the infringement; (iv) identify who caused the infringement." Ardalan Decl. Ex. 18. On August 25, 2025, Plaintiffs responded, "Responding Party is without sufficient personal knowledge as to the information requested as such information is in the exclusive control of Propounding Party and the other co-Defendants in this litigation." *Id.*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

While it is unthinkable to file a FAC while not having any of this basic information about the alleged infringement, Plaintiffs in fact had, but concealed, evidence they obtained through fraud. While Defendants cannot know whether Plaintiffs informed their counsel of the fraud at the time this response was written, this response demonstrates that counsel either understood they had no evidence supporting infringement or, if they did, and represented otherwise, they likely did so to cover up the fact that the evidence was discovered unlawfully and hoped that Defendants would eventually have to produce the evidence that their case relied on. Either path supports sanctions.

**D.      Plaintiffs Knowingly Relied on Evidence Obtained Through Fraud.**

On December 11, 2025, Defendants disclosed that they knew that Plaintiffs had accessed BackGrid's Confidential Client Portal through fraud. Ardalan Decl. Ex. 10. The Confidential Client Portal is a password-protected portal where clients can look for photographs and license them. Kantif Decl. ¶ 3. To get credentials, a potential client must request them from BackGrid's sales department. *Id*. Here, BackGrid explained it knew Mauvilain had posed as "Emily Carter," a production assistant asking for access to the portal for a new Netflix documentary. The IP addresses for Emily Carter overlap with some of the IP addresses used by Mauvilain to upload the photographs to BackGrid. Ardalan Decl. Exs. 3-5. (Mauvilain continued to submit photos to BackGrid even after he filed this lawsuit, *id*. at Ex. 5.) Mauvilain admitted to creating this fictitious person to get access. Ardalan Decl. Ex. 22 (Mauvilain) at 172:3-173:16. At the time the lawsuit was filed and at the time of filing of the FAC, the only evidence of alleged infringement was obtained by fraud.

**E.      Counsel and Plaintiffs Represented that the Files Produced Were the Same Files Submitted to the Agencies—They Were Not; Produced Files Were Spoliated.**

Plaintiffs represented that the native files produced by Plaintiffs "are the photos that were submitted to the agencies[,]" (Ardalan Decl. Ex. 8 at 10-14-25,

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

2:31 PM); "[a]ll the native photographs we disclosed previously contain the original IPTC metadata." (*id.* at 10-29-25, 4:12 PM). The Plaintiffs' discovery responses were supplemented to reflect that the native files already produced and the text files produced reflected the metadata submitted to the Agencies. Ardalan Decl. Exs. 9-1, 9-7.

Given these representations in October 2025, Defendants prepared this case based on the notion that the native files produced were the same as those provided to the Agencies. This is significant because these files purportedly submitted to the Agencies included metadata that contained the CMI—the same information that was purportedly removed or falsified as part of Plaintiffs' CMI claim.

But during depositions, Defendants learned that:

1. Plaintiffs did not produce the same files as those submitted to the Agencies,

   a. Ardalan Decl. Ex. 26 (Mehdi) at 170:1-15 (Q: "Do you know whether you have submitted those original files you submitted over the FTP to FlyNet to Defendants in this action?  A: "I don't think so. []").

   b. Ardalan Decl. Ex. 25 (Boutefeu) at 173:12-17 (submitted only edited photos to the Agencies but produced raw files in the litigation).

2. Or, worse yet, Plaintiffs produced files that were intentionally spoliated.

   a. Ardalan Decl. Ex. 24 (Wolf) at 165:11-15 ("Well, all I know is that I had -- those were my JPEG pictures and I have the original JPEGs from my camera, with my camera metadata on every one of them. And every one of them is my picture that I shot and that I sent a FlyNet."); 164:12-13 ("[Mauvilain] put all those files into a format that included all my proper data."); 164:16-20 ("I think [Mauvilain] included all the data that he thought was necessary to present these

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

pictures as mine, without any doubt.  Even though they were the same JPEGs that I've been able to produce from my external hard drive and with my camera metadata."). Remarkably, all of Wolf's native files photos reflect IPTC data that includes Hans Castrop—a byline Wolf testified he used only once and regretted. Ardalan Decl. Ex. 24 (Wolf) at 108:1 ("I used [Hans Castrop] one time on one set of pictures"); 107:19 ("I wish I hadn't."); 154:16-19 (denying putting 'Hans Castop' in camera metadata); 184:13-15 (denying updating metadata with Hans Castrop); 196:24-197:16; 198:18-202:7 (no idea how Hans Castrop appeared in metadata) 204:11-22 (Wolf is unable to explain how IPTC data included "Hans Castrop" and does not know if Mauvilain put it in).

b.  Ardalan Decl. Ex. 27 (Duplaquet) at 169:4-13; 171:11-14; 173:15-20; 177:16-178:14 (admitting to adding an address in the metadata as an explanation for a recent "Metadata Date" in the metadata information). The Court should note that the address added was a Los Angeles address; Duplaquet currently resides in France. *Id.* at 9:10-11, 24.

**F.    After Confronted with the Spoliated Evidence, Five Plaintiffs Unilaterally Dismissed Their Claims Without Prejudice and the Lawyers Withdrew.**

On June 12, the same day Defendants sent their ***sixth email message*** about evidence spoliation, Plaintiffs filed an improper and frivolous joint stipulation, dismissed five plaintiffs without prejudice, and their counsel moved to withdraw from representing the remaining two. Ardalan Decl. Ex. 7; Dkts. 113-117.

Plaintiffs did so to avoid the consequences of this lawsuit. Under 17 U.S.C. § 505, a prevailing party may be entitled to attorneys' fees and costs. Plaintiffs were most certainly facing exposure for the same. However, the Ninth Circuit requires

17

that there be a dismissal with prejudice or other judicial finding for fees to attach. *Cadkin v. Loose,* 569 F.3d 1142, 1149-50 (9th Cir. 2009) (dismissal without prejudice is not a material alteration which requires a judicial preclusion and hence no prevailing party). By unilaterally dismissing without prejudice, Plaintiffs do not confront the numerous abuses they committed against this Court and Defendants.

**G.    Counsel Repeatedly Alleged Written Agreements in the First Amended Complaint, but Later Admitted That No Such Agreements Existed.**

As early as August 25, 2025, Plaintiffs contended that the agreements at issue were not in writing. Ardalan Decl. Ex. 18 at 7(iii)-11(iii). They made no effort to correct their FAC or to notify the Court while the motion to dismiss the FAC was pending. The Court dismissed all claims because the breach of contract claim was not adequately pleaded and was so "intertwined" with the other claims. The Court permitted amendment, but did so likely relying on allegations that written agreements exist, although they were not adequately pleaded. Had the Court known that there were no written agreements to plead, then the Court may have viewed the ability to amend differently, considering the "conditions precedent" to the license agreements relied on custom and practice, as later alleged in the SAC,  which is implausible. Dkt. 84-1 at 7:24-9:4.

**H.    Counsel Served Three Rule 37 Joint Stipulations on Overlapping Issues that Contained Serious Misrepresentations; the Third Joint Stipulation Related to Discovery That Judge Audero Said She Was "Not Convinced" by Plaintiffs' Arguments and Attempted to Take Advantage of Judge Audero's Retirement.**

The First Joint Stipulation was withdrawn because, on May 6, Judge Audero granted Defendants relief from responding. Dkt. 94. On May 6, Defendants had another IDC scheduled because Plaintiffs refused to provide deposition dates despite the impending discovery cutoff, so Defendants requested and received relief then.

18

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

The Parties attended an IDC on May 13 that resolved almost all of Plaintiffs' discovery concerns. Dkt. 102.

The Second Joint Stipulation was filed after the May 13 IDC, when the Plaintiffs had notice that they had agreed to resolution on RFPs 14, 15, 17, 18, 27, 50, on supplementing responses to Requests for Production, on the search terms, and on the "discovery on discovery" dispute. Indeed, Defendants sent an email confirming what they agreed to at the IDC. Dkt. 112-21; *cf.* Dkt. 112-22. The Joint Stipulation was ***served later that same day***, without meaningfully addressing Defendants' email message and without giving Defendants an opportunity to perform as agreed.

After Judge Audero issued the minute order, Plaintiffs attempted to withdraw the portions of the Second Joint Stipulation that were improperly raised, but did not withdraw their hefty sanctions request, which includes time for the withdrawn First Joint Stipulation, for time spent before the IDC that permitted the discovery to proceed, and for the issues withdrawn and resolved. Dkt. 112-22.

The Second Joint Stipulation contained numerous and substantial misrepresentations to the Court, all of which were outlined in Defendants' response (Dkt. 112-20 at 71-76), which was timely served to Plaintiffs, but never filed. Plaintiffs unilaterally filed the Second Joint Stipulation, taking the position that Defendants' portion was due exactly seven days after service—to the minute—and not 11:59 p.m. seven days after service. Dkts. 112-17 through 112-20. Defendants filed a request to strike the improperly filed Second Joint Stipulation. Dkt. 107.

Despite this, Plaintiffs then withdrew the improperly filed Second Joint Stipulation, knowing that it would be unsuccessful because it was unilaterally filed and did not account for all prefiling time required under Local Rule 37. The withdrawal was after Defendants spent approximately 15 hours opposing the joint stipulation. Dkt. 112-14 ¶ 24.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

Plaintiffs tried again in a Third Joint Stipulation. Defendants expressly asked Plaintiffs if they would like to further confer on these remaining issues, but Plaintiffs declined the request and opted to serve this joint stipulation *five* days later, citing a concern about timing. Dkt. 112-23.

Defendants had to endure three joint stipulations on the same issues for which Judge Audero did not believe any further relief should be given. Dkt. 112-21.

**I.     Plaintiffs Engaged in Thousands of Instances of Contempt of Judge Audero's Order, Which Counsel Participated in by Failing to Timely Produce the Files and by Failing to Designate Them as Confidential Per Court Order.**

The Dec. 17 Order was issued to accommodate Plaintiffs in identifying the works at issue in this case. This Order was a result of IDC 1, which **_Defendants_**, not Plaintiffs, requested for the purpose of moving discovery along because they did not know what works were at issue in this case.

Of course, Defendants did not want Plaintiffs in their confidential client systems, where they could gather and misuse the information that should be available for real clients only. As such, the parties agreed and the Court Ordered that the access was subject to certain limitations.

The Dec. 17 Order provided:

3.     [] Plaintiffs and their counsel shall use the access for the sole purpose of searching for and identifying their works. Plaintiffs and their counsel may create screenshots of the BackGrid client portal solely for the purpose of identifying the works at issue in this litigation. The screenshots shall be treated as "confidential" materials under Stipulated Protective Order previously entered in this case. **Plaintiffs are not permitted to download or otherwise save or store materials from the Client portal. All materials created as a result of access to BackGrid's client portal will be produced to Defendants by January 12, 2026.**

20

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

Dkt. 66 (emphasis added).

Despite this Order, Plaintiffs saved each of their photos from the Client portal in native files, which contained additional data and failed to produce them by January 12, 2026. Ardalan Decl. ¶ 8.

At least Plaintiff Mauvilain did so knowingly. He "told [Wolf] to make the - - that sequences of commands and – and screenshots." Ardalan Decl. Ex. 24 (Wolf) at 215:2-15 (he dragged and dropped the files). He advised Wolf at a meeting before Wolf's deposition that Defendants complained that they dragged and dropped files from the Confidential Client Portal. However, Defendants had not raised the violations of the Dec. 17 Order with any Plaintiff or their counsel at this time. The issue was first raised at Mazari's deposition, **after** the meeting between Mauvilain and Wolf, which occurred at 1:00 p.m. on Wednesday, May 20, 2026. Ardalan Decl. ¶ 8 and Ex. 24 (Wolf) at 216:3-218:14; *cf.* Ex. 23 (Mazari) at 266:1 (questions regarding the Court Order started at 6:07 PM on May 20); Ex. 28.

**J.      Counsel Improperly Added Copyright Registrations to the SAC Without Leave to Do So and In Violation of *Fourth Estate*.**

The Court dismissed the FAC in full, but gave Plaintiffs leave to amend so that they could attempt to plead a claim. Plaintiffs never sought leave under Rule 15 to add new copyright registrations and new works, but slipped new registrations and works into the SAC anyway. *See* SAC Ex. A; RJN Exs. 2-49 (showing the date the works were registered). Significantly, the SAC was filed on March 19, 2026, long after the October 24, 2025, deadline to hear motions to amend pleadings. Dkt. 50. Moreover, *Fourth Estate v. Wall-Street.com, LLC*, 586 U.S. 296 (2019), requires that the copyright registrations be obtained before a civil action is instituted. *See McGillvary v. Vonkurnatowski*, 2024 WL 6847412, at *3 n.4 (C.D. Cal. 2024) ("Registration [] is required prior to the initiation of the subject action, rather than filing of an amended pleading.").

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

**K.    Counsel Did Not Participate in Judge Audero's Procedures.**

Plaintiffs did not participate in Judge Audero's IDC request procedure, causing Defendants to provide an additional declaration per her rules. Ardalan Decl. Ex. 6. Stunningly, this IDC request was for Plaintiffs to meaningfully identify the "Copyrighted Works," so that Defendants could meaningfully respond to discovery. *Id.*

**L.    Counsel Unilaterally Took Kyndt's Deposition Off Calendar, Less Than 24 Hours Before the Agreed Upon Date, and Misrepresented the Status of Kyndt's Visa.**

Kyndt was scheduled to appear at deposition on June 12, which was ***agreed upon*** by the parties to accommodate an issuance of a visa to travel to the US. Ardalan Decl. Ex. 20. On May 15, counsel represented the visa was ***granted***, but less than 24 hours before the deposition, on June 11, Plaintiffs represented the visa was ***not granted*** to justify his non-appearance. *Id.* at Exs. 20, 21.

**V.    CONCLUSION**

Defendants request that the Court grant this motion in full, dismiss the case with prejudice, and award Defendants their fees and costs.

Dated: July 31, 2026                    **ONE LLP**

By: /s/ Joanna Ardalan
    Joanna Ardalan
    Peter R. Afrasiabi
    David W. Quinto
    Attorneys for Defendants BackGrid Inc., BackGrid USA, Inc., & Shutterstock, Inc.

22

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**

## CERTIFICATE OF COMPLIANCE (L.R. 11-6.2)

The undersigned, counsel of record for Defendants BackGrid Inc., BackGrid USA, Inc., & Shutterstock, Inc., hereby certifies that this brief contains 6,975 words, which complies with the word limit of L.R. 11-6.1.


By: /s/ Joanna Ardalan
Joanna Ardalan

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL**