# Exhibit 13

# In the Matter Of:

## MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.

2:25–cv–2757–FLA–MAA

---

### JOANNA ARDALAN

May 25, 2026

---



COALITION
Court Reporters

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THIBAULT MAUVILAIN, an individual; )<br>HENRI MAZARI, an individual; )<br>JEREMY DUPLAQUET, an individual; )<br>ROBERT CHRISTIAN WOLF, an )<br>individual; MICHEL BOUTEFEU, an )<br>individual; STEPHAN KYNDT, an )<br>individual; and JOSEPH MEHDI, an )<br>individual, )<br> )<br>　　　　　Plaintiffs, )<br> )<br>　　　vs. )<br> )<br>FLYNET PICTURES, LLC, a California )<br>limited liability company; )<br>FAMEFLYNET INC., a California )<br>corporation; BACKGRID INC., a )<br>California corporation; BACKGRID )<br>USA, INC., a California )<br>corporation; )<br>SHUTTERSTOCK, INC., a Delaware )<br>corporation; and DOES 1-10, )<br>inclusive, )<br> )<br>　　　　　Defendants. )<br> ) | Case No.:<br>2:25-cv-2757-FLA-MAA<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>CERTIFIED COPY |

VIDEO-RECORDED REMOTE DEPOSITION OF JOANNA ARDALAN

Via Zoom Videoconferencing

Monday, May 25, 2026

REPORTED BY:
IREENE GODOY
CSR No.: 14817

JOB NO.: 218979

APPEARANCES:    (All parties appearing remotely)


For PLAINTIFFS:

        Sergenian Law, P.C.
        BY: David A. Sergenian, ESQ.
        800 Wilshire Boulevard, Suite 200
        Santa Monica, CA 90401
        Tel: (213) 435-2035


For DEFENDANTS:

        One LLP
        BY: David W. Quinto, ESQ.
        3007 Franklin Canyon Drive
        Beverly Hills, CA 90210
        Tel:  (213 604-1777



Also Present:

        Kim Benedict, Videographer

INDEX

EXAMINATION

WITNESS: JOANNA ARDALAN                                    PAGE

BY: Mr. Sergenian                                            6


INDEX TO EXHIBITS

MARKED                DESCRIPTION                    PAGE

Exhibit 1        June 27, 2024 letter from          13
                 V. Parant to J. Lapham

Exhibit 2        July 3rd, 2024 letter from         13
                 J. Ardalan to V. Parant

Exhibit 3        7/3/24 to 8/12/24 e-mail           13
                 between J. Ardalan and V. Parant


OF SPECIAL NOTE: Confidentiality designation        40
                 (partial) per stipulation

BE IT REMEMBERED that on Monday, 25th day of May 2026, at the hour of 10:01 a.m., of said day, via Zoom Videoconferencing, before me, Ireene Godoy, a Certified Shorthand Reporter, CSR No. 14817, State of California, personally appeared Joanna Ardalan, who was examined as a witness in said cause.

THE VIDEOGRAPHER:  Good morning.  We are on the record at 10:01 a.m.  All present are attending remotely via Zoom. Todays' video-recorded deposition of Joanna Ardalan is taken on Monday, May 25th, 2026 in the matter of Mauvilain, et al. versus Flynet Pictures, LLC, et al.  Case number 2:25-cv-02757-FLA-MAA.

My name is Kim Benedict with Coalition Court Reporters of Los Angeles.  Will all present, please, identify yourselves beginning with the witness, Ms. Ardalan?

THE WITNESS:  Good morning.  Yes, can you hear me?

THE VIDEOGRAPHER:  Yes.

THE WITNESS:  My name is Joanna Ardalan.  I represent Defendants, Shutterstock, Inc., BackGrid Inc. and BackGrid USA Inc.  I'm here today as a witness.

THE VIDEOGRAPHER:  Thank you.

MR. QUINTO:  Good morning.  David Quinto with One LLP. I represent the same parties as Joanna Ardalan.  And today I am defending Ms. Ardalan's deposition.

MR. SERGENIAN:  Good morning.  David Sergenian.  I'm representing the Plaintiffs in this action.

THE COURT REPORTER:  Good morning.  Ireene Godoy.  CSR 14817.

THE VIDEOGRAPHER:  Thank you.  Will the reporter please swear in the witness and we can begin.

--o0o--

Joanna Ardalan,

called as a witness on behalf of the Plaintiffs and having been first duly sworn by the court reporter to state the truth, the whole truth, and nothing but the truth testified as follows:


THE WITNESS:  Actually, before we get started, I'd like to just put something on the record.  It's something we discussed via e-mail message and in-person.  But I just want to make sure it's very clear on the record that as we all know it's very unusual for a lawyer to be deposed in a litigation where the lawyer is representing the parties.

We've agreed to do this today because the Plaintiffs contend that there is a communication between me and their former counsel, or I think former counsel, Virginie Parant before the litigation began and they're entitled to discovery on it.  They think it's an important communication for them.

So we're giving them that opportunity to do discovery on those communications between me and Virginie Parant. There's one on the phone and there's e-mail communications. That's fine. That's what we're here to do. But again it's very unusual. And to the extent this deposition is being used in any way to gather information outside of those communications, we object to that. We've told you that in writing. We've told you that in-person.

I just want to make sure it's on the record again here today. We are also not waiving any sort of work product or attorney-client by being here. And we are only testifying as to things that are not work product or attorney-client privilege. Thank you.

EXAMINATION

BY MR. SERGENIAN:

Q.   Can you state your full name for the record?

A.   Joanna Ardalan.

Q.   You are a partner at One LLP; correct?

A.   Correct. This is starting to go outside of the scope of the communications that we agreed to testify on. But, yes, I will go ahead and respond to that. But again we're here to discuss the communications between Ms. Parant and myself. And we object to any discovery that's being done outside of the scope of those communications.

Q.    When were you admitted to the California Bar?    10:04:57

MR. QUINTO:  Objection.  Relevance.  Outside the scope.    10:05:05

BY MR. SERGENIAN:    10:05:07

Q.    Ms. Ardalan, you can answer.    10:05:07

A.    So again we instructed you that we are not going to give testimony outside of the scope of the communications between Ms. Parant and myself.  So to the extent you're trying to seek discovery on me as a lawyer, me as a person, my relationship with my clients, or anything else, that's off limits.    10:05:13 10:05:15 10:05:20 10:05:26 10:05:29 10:05:32

MR. QUINTO:  And, Counsel, it's a matter of public record anyway.    10:05:34 10:05:36

BY MR. SERGENIAN:    10:05:37

Q.    Are you refusing to answer the question?    10:05:38

MR. QUINTO:  The witness will follow my instruction.    10:05:42

MR. SERGENIAN:  What is your instruction, Counsel?    10:05:44

MR. QUINTO:  Not to answer.    10:05:46

MR. SERGENIAN:  On what grounds?    10:05:49

MR. QUINTO:  It's outside the agreed scope of the deposition.    10:05:50 10:05:54

MR. SERGENIAN:  Well, there was no agreement that I couldn't ask background questions.  So I disagree with that.  But is that -- your objection is solely that it's outside the scope of a purported agreement?    10:05:54 10:06:01 10:06:05 10:06:08

MR. QUINTO:  Yes.    10:06:13

MR. SERGENIAN:  And, Ms. Ardalan, will you follow that instruction?

THE WITNESS:  Yes.

BY MR. SERGENIAN:

Q.  So you are litigation for counsel for BackGrid USA Inc., BackGrid Inc., and Shutterstock, Inc. in connection with the photographers' claims at issue in this case; correct?

A.  Yes.

Q.  When did you first begin representing each entity in connection with those claims?

A.  I'm sorry.  I actually don't understand your question.  In respect to which claims?

Q.  Do you understand that my clients have claims against your clients in this lawsuit?

A.  Yes, I do.

Q.  Okay.  And when did you first begin representing BackGrid USA Inc. in connection with those claims?

A.  So your question is a bit vague and ambiguous and I'm happy to explain.  One issue is that I did represent BackGrid USA before the lawsuit was filed.  The lawsuit as filed has different claims than what was articulated prior to what -- it was different than what was articulated in the communications prior to the litigation and also not all of the plaintiffs articulated claims or were presented as

having claims prior to the litigation.

So in that sense, your question is vague and ambiguous. If you can clarify your question, I'm happy to answer it.

Q. Well, let's start with the communications before this lawsuit was filed. Do you understand?

A. Okay.

Q. When did you begin representing BackGrid USA Inc. with regard to those communications?

A. Are you talking about with regards to the communications from Virginie Parant?

Q. Correct.

A. And you are speaking with respect to only certain photographers but not all of them; correct?

Q. I'm speaking with regard to any of the photographers that are plaintiffs in this case.

A. Okay. Well, in that sense, then, I would say that my representation of them started in late -- with respect to these claims and the photographers later disclosed, probably around late June 2024.

Q. And are you referring to representations solely of BackGrid USA Inc. or any other clients?

A. That's a good question. I think it was both Shutterstock and BackGrid USA Inc. It was certainly BackGrid USA Inc.

Q. And obviously you represent both BackGrid USA Inc. and Shutterstock Inc. in this litigation; correct?    10:09:16 10:09:20

A. Correct.    10:09:24

Q. And with respect to BackGrid Inc., did you represent that entity with respect to any of the claims by any of the plaintiffs in this case prior to the lawsuit being filed?    10:09:26 10:09:29 10:09:35 10:09:38

A. No.    10:09:38

Q. And we've already alluded to it, but you had some communications with Virginie Parant of ARTech Law about certain claims of my clients in 2024; correct?    10:09:51 10:09:47 10:09:53

A. Of certain of your clients, correct. Not all of your clients, some of them.    10:10:00 10:10:03

Q. And those communications were by letter, by e-mail, and telephone; correct?    10:10:05 10:10:08

A. Incorrect.    10:10:10

Q. What's incorrect about that?    10:10:18

A. I don't believe anything was sent between us by letter. I believe it was sent by e-mail. And we had a telephone call. Unless you consider a letter, like, an attachment letter, like, an attachment to an e-mail. But letter in the sense that it was sent by mail, no.    10:10:20 10:10:24 10:10:29 10:10:32 10:10:35

Q. Okay. Fair enough.    10:10:38

MR. SERGENIAN: I am going to put what should be all the exhibits in this deposition into the chat. And I'm    10:10:43 10:10:47

going to ask you to start with authenticating these.  So        10:10:50

I'll ask you specific questions about it.  But please let me     10:10:55

know when you've been able to download exhibits 1 through 3.     10:10:58

THE WITNESS:  Do you want me to download all three of            10:11:01

them?                                                           10:11:05

MR. SERGENIAN:  Yes.  I think it would be easier just           10:11:05

to authenticate them at the beginning.                          10:11:07

THE WITNESS:  Okay.  Just one second.  I don't know if          10:11:10

there's an issue with -- hold on.  It's giving me an issue       10:11:11

saving it.  It's saying I don't have permission to save it.     10:11:31

Is this an issue with the chat box by chance?                   10:11:31

MR. SERGENIAN:  I can just e-mail them to you if that's         10:11:37

easier.                                                         10:11:38

THE WITNESS:  Yeah, just e-mail them.  I think that's          10:11:39

easier.                                                         10:11:40

THE VIDEOGRAPHER:  Excuse me.  This is the                     10:11:43

videographer.  Can you download them to your computer,          10:11:43

Counsel, to your download file?  It doesn't open it yet, it     10:11:46

just downloads it into your download file.                      10:11:48

THE WITNESS:  That's what I tried to do and it says I          10:11:53

don't have permission to do that.                               10:11:56

THE VIDEOGRAPHER:  Oh.                                         10:11:58

THE WITNESS:  It says I don't have permission to save          10:11:58

in this location.  I think maybe there's something --           10:12:02

THE VIDEOGRAPHER:  You can download it because I just          10:12:06

downloaded the first one. You can download it. It goes to your downloads on your computer. It's a file.

THE WITNESS: Yeah. I appreciate that. But I think the issue is that my administrator doesn't like whatever this is.

THE VIDEOGRAPHER: Oh, I see.

THE WITNESS: It doesn't like it. I think if he just e-mails it to me, that might be easier and faster.

MR. SERGENIAN: I've e-mailed them to you. It may take a second to reach your inbox. But let me know when you're ready.

THE WITNESS: Okay. I haven't received it yet. I'll let you know. So I still haven't received it. I'm in the process of updating my internet by the way, so. Let me just try. I actually don't want to try a different thing because it might --

MR. SERGENIAN: Okay. We could just go off the record for now if this is going to take a little bit. Could we go off the record?

THE VIDEOGRAPHER: We're off the record at 10:13 a.m.

(OFF THE RECORD.)

THE VIDEOGRAPHER: We're back on the record at 10:14 a.m.

MR. SERGENIAN: Thank you.

///

BY MR. SERGENIAN:    10:14:57

Q.   Ms. Ardalan, can you open up Exhibit 1, please?    10:14:57

(EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)    10:15:00

A.   Yes.   I have Exhibit 1 open and it's -- let me just    10:15:00
put it on the screen.   But, yes, I have it open.    10:15:05

Q.   This is a letter dated June 27, 2024 from Virginie    10:15:09
Parant to Mr. Lapham.   And did you receive a copy of this    10:15:15
letter at or around the time it was sent?    10:15:21

A.   Without waiving any sort of attorney-client    10:15:26
communications or anything like that, I will say that I saw    10:15:34
this letter or e-mail or whatever this is at or around    10:15:37
June 27, 2024, yes.    10:15:43

Q.   Okay.   Let's go to Exhibit 2.   Can you please open    10:15:45
up Exhibit 2 and take a look at it?    10:15:49

(EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)    10:15:51

A.   Sure.   Yes, I have it.    10:15:53

Q.   Okay.   This is your July 3rd, 2024 letter to    10:15:58
Ms. Parant; correct?    10:16:07

A.   Correct.    10:16:09

Q.   And that's your signature on the second page;    10:16:10
correct?    10:16:12

A.   It is.    10:16:12

Q.   Okay.   Let's take a look at Exhibit 3.    10:16:17

(EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)    10:16:19

A.   Okay.    10:16:27

Q.   And is this a true and correct copy of an e-mail chain between you and -- well, on the first page there's a redacted e-mail that's redacted on the grounds of attorney-client privilege.  I'm going to ignore that.

A.   Yes.

Q.   So I'm only going to talk about the e-mails below that.  And my question to you is, is this a true and correct copy of an e-mail chain between you and Ms. Parant spanning from July 3rd, 2024 and August 12th, 2024?

A.   That's what it looks like, yes.

Q.   Do you have any reason to doubt that this is a true and correct copy of that e-mail chain?

A.   No.

Q.   Okay.  I'll also represent that it was produced by your side.  And that's your e-mail address; correct?

A.   May I ask a question?  If it was produced by your side, why aren't the Bates ranges on it.

Q.   That's a good question.  They didn't show up. Okay.  So the PDF files have a Bates number for the initial page.  But at least from the copy that I received, there are no Bates numbers on the individual pages.

A.   That's odd.  Okay.

Q.   So that's your e-mail address, correct, jardalan@onellp.com?

A.   Correct.

Q.   And as far as you know, vp@artechlaw.com is Ms. Parant's e-mail address?   10:18:03 10:18:11

A.   Yes.   10:18:12

Q.   Okay.  Let's go to -- let's go to Exhibit 2.   10:18:12

A.   Okay.   10:18:28

Q.   So in Exhibit 2, this as your letter to Ms. Parant dated July 3rd, 2024.  And you wrote: "We serve as litigation counsel for BackGrid USA," correct?   10:18:42 10:18:40 10:18:47

A.   Correct.   10:18:51

Q.   And the letter only identified BackGrid USA Inc. as your client; correct?   10:18:51 10:18:58

A.   Correct.   10:19:00

Q.   And you were sending Exhibit 2 on behalf of BackGrid Inc. USA Inc., correct?   10:19:00 10:19:02

A.   Correct.   10:19:07

Q.   I may have misstated that.  On behalf of BackGrid USA Inc., correct?   10:19:08 10:19:10

A.   That's what I understood your question to mean.  Yes.   10:19:10 10:19:15

Q.   Okay.  Thank you.  And your later e-mail correspondence in Exhibit 3, the e-mail chain, was that also sent on behalf of BackGrid USA Inc.?   10:19:15 10:19:20 10:19:26

A.   Yes, it was.   10:19:31

Q.   At any point did you communicate with Ms. Parant -- I'll withdraw the question.   10:19:32 10:19:37

At any point did you inform Ms. Parant that you were communicating with her on behalf of Shutterstock Inc.?

A. I actually don't remember whether I did or didn't over a phone call.

Q. Are you aware of any correspondence with Ms. Parant in which you identified yourself in writing as representing Shutterstock Inc.?

A. I don't think -- I don't recall any that have any. I don't think that there was any correspondences. I look at this Exhibit 3 and Exhibit 2 and I don't believe I did in writing.

Q. And let me ask you just a general question. I presented all of the written correspondence between you and Ms. Parant that's been produced by your side; and I'll represent of which I am aware. Are you aware of any other written correspondence between you and Ms. Parant?

A. With respect to this litigation, no.

Q. Okay. Have you communicated with her with respect to other litigations?

A. That would be outside the scope of this deposition and that is not discoverable. Thank you.

Q. Well, I'm just asking a background question. So my question stands. Have you communicated with Ms. Parant with respect to any other litigation?

A. So as we discussed and as I told you, I'm here to

answer questions with respect to the communications between Ms. Parant and me with respect to this litigation. I don't think it's appropriate to ask about other clients, other matters, other things. I don't think it's fair to other clients. And that's not what we're here to do today. So I will not be answering that question.

MR. QUINTO: And I'll object.

BY MR. SERGENIAN:

Q. I'm just asking if you had communicated with Ms. Parant about other matters. I'm not asking about specific clients. And I'll represent to you that I am not going to ask you about specific clients. Will you answer the question?

A. So you're asking whether I communicated with her on other matters unrelated of other clients? I don't think that's discoverable by you and this is not what we agreed to do here today.

Q. So are you refusing to answer the question?

A. Yes.

Q. Okay.

A. Unless you can give me a reason of why that relates to the communications here today. If you can give me some sort of offer of how that's relevant to the communications here today, I'm happy to consider it. But it just does seem like it's prying into other matters of other clients and

other things that is not appropriate.    10:22:41

Q.  No, I'm not asking you about other matters.  I'm    10:22:43
asking you if you had communicated with Ms. Parant at the    10:22:43
time of this communication about other matters?    10:22:48

A.  At this time of this communication?    10:22:52

Q.  Correct.    10:22:55

A.  If you're --    10:23:00

(CROSS TALK.)    10:23:00

Q.  -- all I'm asking.  That's all I'm asking.    10:23:06

A.  I wasn't clear on your initial question.    10:23:14

Q.  Okay.  So take a look at Exhibit 1.    10:23:14

A.  Okay.    10:23:19

Q.  So in Exhibit 1 -- first of all, who is Mr. Lapham?    10:23:19

A.  Mr. Lapham is an executive at Shutterstock.    10:23:22

Q.  It's John Lapham; correct?    10:23:29

A.  I believe that's correct.    10:23:34

Q.  And Mr. Lapham was and I believe is the General    10:23:36
Counsel for Shutterstock; correct?    10:23:40

A.  I'm not sure actually.    10:23:45

Q.  Okay.  Do you know if he ever was General Counsel    10:23:54
of Shutterstock?    10:23:50

A.  I believe that's correct.    10:23:52

Q.  Okay.  So taking a look at Exhibit 1, in the first    10:23:54
paragraph there's a contention by Ms. Parant that copyright    10:24:03
management information has been removed or altered from tens    10:24:19

of thousands of her clients' works in violation of 17 U.S.C. Section 1202. Do you see that?    10:24:23  10:24:28

A.  I do.    10:24:31

Q.  And Ms. Parant also demanded an audit of the BackGrid library; correct?    10:24:32  10:24:39

A.  Yes.    10:24:43

Q.  Okay.  And Ms. Parant's letter demanded that evidence be preserved; correct?    10:24:44  10:24:48

A.  Yes.    10:24:53

Q.  And as we saw on Exhibit 2 in response to this letter, you wrote back on behalf of BackGrid USA Inc., correct?    10:24:54  10:24:59  10:25:03

A.  Correct.    10:25:03

Q.  Okay.  Let's take a look at Exhibit 2 again.    10:25:06

A.  Okay.    10:25:11

Q.  This is your July 3rd, 2024 letter.  And in that letter you took the position that BackGrid would provide no further correspondence without, quote, "a complete list of photographers, all identifying information."  And then later you said, "and the location of the work in the BackGrid library," correct?    10:25:12  10:25:14  10:25:22  10:25:27  10:25:34  10:25:34

A.  Yeah, I see:  "You should not expect further correspondence from BackGrid without a complete list of photographers."  Because the initial letter did not identify any photographers, all identifying information corresponding    10:25:39  10:25:44  10:25:46  10:25:49

to the works they claim are at issue and the location of the    10:25:53

work in the BackGrid library.  Yes, that's what I said.    10:25:56

Q.  You were asking Ms. Parant to tell BackGrid the    10:25:59

location of the works within BackGrid's own library;    10:26:03

correct?    10:26:05

A.  Yes.    10:26:09

Q.  And you set out the standard for a 12(b)(3)    10:26:11

violation; correct?    10:26:18

A.  1202(b)(3) violation.    10:26:23

Q.  Sorry.  1202(b)(3) violation.  Thank you.  Is that    10:26:32

correct?    10:26:32

A.  Correct.    10:26:32

Q.  And you stated that that claim has a, quote,    10:26:32

"double scienter requirement," correct.    10:26:38

A.  Yes.    10:26:42

Q.  And you stated that the first requirement is actual    10:26:43

knowledge that CMI, quote, "has been removed or altered    10:26:47

without authority," end quote; correct?    10:26:51

A.  That sounds right but let me just look at it.  The    10:26:56

first requirement I said:    10:26:59

    "A defendant distributing copyrighted material    10:26:59

    have actual knowledge that CMI has been removed or    10:26:59

    altered without authority of the copyright owner or    10:26:59

    the law."    10:26:59

    Yes, that's the first requirement.    10:26:59

Q. And your letter states that the second requirement is knowledge or reason to know that distribution, quote, "will induce, enable, facilitate, or conceal an infringement," end quote; correct?

A. Well, you skipped over a part. The second requirement is:

"A defendant know or have reason to know that distribution of copyrighted material despite the removal of CMI will induce, enable, facilitate, or conceal an infringement."

Q. Okay. And you took the position in this letter that Ms. Parant had not identified any CMI that has been removed or altered; correct?

A. I think that -- and I hate to be ticky-tack but that's not exactly what I -- that's not exactly the position.

Q. Okay. Can you explain your position precisely?

A. Let me be precise. That was part of the position but not all of the position, right? So part of the position was that you haven't identified any CMI that's been removed or altered, yes. But there were certainly other issues with respect to her correspondence that made her correspondence unhelpful.

Q. So this letter did take the position that Ms. Parant did not identify any CMI that had been removed or

altered; correct?

A. Among other things, yes.

Q. So that was a statement about what Ms. Parant had or had not provided to you with respect to that information; correct?

A. Among other things, yes.

Q. So in this letter, you did not state to Ms. Parant that BackGrid had checked its library; correct?

MR. QUINTO: I'm going to object. The letter speaks for itself.

THE WITNESS: Yeah, I agree with that objection. And this letter I don't think it expressly said that we have checked the library. But, yeah, it doesn't expressly say that.

BY MR. SERGENIAN:

Q. Okay. And this letter does not expressly state that the CMI on any of these works was, in fact, in tact; is that correct?

A. We didn't know what the works were; right? So she hasn't identified photographers. She hasn't identified the works. So I'm not sure what we could do in response to that. So you're correct that the letter doesn't say that. But it doesn't say that because we didn't have any information from Ms. Parant.

Q. So a couple of questions back you stated that the

letter does not explicitly state that BackGrid had checked its library. I just want to make sure, are you contending that the letter implicitly states that BackGrid had not checked its library?

A. I'm just reading the letter quickly. But, yeah, my recollection is the letter does not say that we checked the library.

Q. And it doesn't imply that; correct? And take all the time you want to re-read it.

A. Yeah. I don't -- I don't want to testify as to what other people may or may not imply from this letter whether it's implied or whether we had checked the library or not. But I think that it's very difficult to check a library when somebody doesn't even identify the photographers that are at issue. So I mean, as I read the letter, I don't think it implies that we checked the library. But I also don't know how we could have checked the library.

Q. Okay. Fair enough. So just to answer my question directly that the letter does not imply that BackGrid USA Inc. had checked its library in response to Ms. Parent's communication?

A. So that was the same question you just asked me and I'll give you the same answer. It doesn't imply it. But again I'm not sure how we could have, so.

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.    JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026    CERTIFIED COPY    Page 24

Q.   Your letter also took the position that no infringement had been identified; is that correct?

A.   I believe that's correct.  Yep.

Q.   Is it also correct that the letter did not deny that infringement had, in fact, occurred?

MR. QUINTO:  Objection.  The letter speaks for itself.  Best evidence.

THE WITNESS:  So again, I mean, when you send a letter saying you represent a group of photographers and you don't tell us who the photographers are or what the works are, I'm not sure how much information we can give back to you.  So, I mean, like, when we write letters like this, we want to make sure that everything we say is correct.  And if you're not giving us information, how are we supposed to check it; right?  So the letter does speak for itself.  The letter says what it says.

I think the letter says that, you know, you're making a 1202 claim and your 1202 claim isn't going to go anywhere because you're, in your own letter, articulating that we have licenses.  So while the letter may not expressly say it, it certainly implies it because there's no 1202 claim that could possibly exist.  And as we all know, a 1202 claim has to have and underlying infringement.

BY MR. SERGENIAN:

Q.   So the letter does not -- to be clear, you admit

that the letter does not state that there was no

infringement of my clients' works; is that correct?

MR. QUINTO: Again, best evidence. The document speaks

for itself.

THE WITNESS: So the letter does not use the words.

But again you don't identify the photographers, you don't

identify the works. All we have responded to is this very

vague allegation that there's a 1203 [sic] violation. And

what we've explained is it's impossible for there to be a

1202 violation because you're admitting that there's

underlying licenses.

So it's just the whole claim in quotes in itself.

So, you know, we can't -- we didn't expressly use those

words, but I think in that sense it's implied in here.

BY MR. SERGENIAN:

Q. When you say -- you said that -- you said you are

taking a position that there are licenses. When you say

"you," who do you mean specifically?

A. Virginie Parant on behalf of her clients.

Q. Well, let's go back to Exhibit 1. Where does she

say that there are licenses?

A. Well, Exhibit 1 she is complaining about -- she's

complaining about the photographs not being on the BackGrid

system. So that sounds like BackGrid has a license to have

it on the system. If you're complaining about them not

being on the system, that sounds like there is a license.

Q. Well, I don't see Ms. Parant stating that there's a license. Is there some particular phrase or sentence in her letter to Mr. Lapham in which she states that there's a license?

MR. QUINTO: Asked and answered.

THE WITNESS: Yeah. Asked and answered. But again if you look at even her request for an audit, she's requesting an audit so the works that are in question can be identified and reattributed. She's not saying that they shouldn't be up there. She wants them up there and just reattributed. That sounds --

BY MR. SERGENIAN:

Q. So it sounds like the answer to my question as to whether Ms. Parant affirmatively stated that BackGrid USA Inc. or Shutterstock Inc. had a license to her clients' work is no there's nothing in the letter that states that. Do you disagree?

MR. QUINTO: Objection. Mischaracterizes the witness's prior testimony.

THE WITNESS: Yeah, I disagree with that. That's not what I said.

BY MR. SERGENIAN:

Q. But then what is the language in her letter that affirmatively states that there's a license?

A.   So --

MR. QUINTO:   Objection.   Again mischaracterizes the witness's prior testimony.

THE WITNESS:   So she's requesting an audit because she wants reattribution to the rightful owners.   So what she's asking for is -- she's not saying the works shouldn't be up there.   She's saying she wants the works up there and she wants them reattributed to the rightful owners.   That's how I read the letter.

BY MR. SERGENIAN:

Q.   Where does she say she wants the works up there?

A.   She requested an audit of the BackGrid libraries so the works in question can be identified and reattributed to the rightful owners.

Q.   So your assertion is that if there's incorrect copyright management information and there's a request for an audit, that that's a concession that there's a license?

MR. QUINTO:   Objection.   Mischaracterizes the witness's testimony.

THE WITNESS:   And you're also taking off the last part in your question which is she's asking for reattribution to the rightful owners.

BY MR. SERGENIAN:

Q.   A reattribution.   In other words, a correction of the CMI; correct?

A.   Correct.

Q.   Okay.  So that to you is equivalent to her stating that there is a license?

A.   She is asking for the works that exist on BackGrid to be reattributed to the photographers.

MR. SERGENIAN:  Could I have my question read back, please?

(WHEREUPON THE RECORD WAS READ.)

THE WITNESS:  Yeah.  Can you just give me a full question, Mr. Sergenian?

BY MR. SERGENIAN:

Q.   So it sounds like to me what you're saying is that because Ms. Parant's letter stated that she wanted an audit and a reattribution of incorrect CMI information, that that was equivalent to her asserting that there was a license, true?

A.   That was equivalent to her acknowledging that a license exists I think is a more accurate way to say it.

Q.   So let's go to Exhibit 2; this is your letter.  And you took the position that Ms. Parant's clients' claims were dead on arrival; is that correct?

A.   That sounds right, yes.  That's correct.

Q.   All right.  And you can take your time to review the letter as much as you want.  This is not a quiz.  I'm just trying to get some background.  You also wrote that the

photographers' concerns, quote, "come from misunderstanding of BackGrid's relationship with Shutterstock."  That's in the second to last paragraph.  Do you see that?

A.  Yeah.  I say:

"I suspect their concerns come from a misunderstanding of BackGrid's relationship with Shutterstock."

That's what I said.

Q.  In this letter, you did not state what that relationship was; correct?

A.  I did not.

Q.  Did you ever explain to Ms. Parant what the actual relationship between BackGrid and Shutterstock was?

A.  I believe I did tell her on a phone conversation; not in extreme detail, but I think we did address it.

Q.  What is your best recollection of what you told Ms. Parant about the relationship between BackGrid and Shutterstock on your phone call?

A.  I told her that Shutterstock purchased BackGrid and that BackGrid is continuing its operations as it always had.

Q.  Did Ms. Parant ask any follow up questions in response to that statement?

A.  I don't believe she did.

Q.  Did you --

A.  Let me just qualify and say I don't remember her

asking any follow up questions.  I don't believe she did.          10:42:00

Q.  Did you and Ms. Parant discuss anymore details          10:42:05
about the relationship between BackGrid and Shutterstock?          10:42:10

A.  No, I don't think we did.          10:42:13

Q.  Did you and Ms. Parant discuss whether Shutterstock          10:42:18
was liable for conduct of BackGrid?          10:42:22

A.  No, I don't believe we went into it.          10:42:26

Q.  Okay.  So your best recollection as you sit here          10:42:29
today is that you didn't discuss that issue on a phone call          10:42:33
with Ms. Parant at all that particular issue of whether          10:42:36
Shutterstock had any liability for the conduct of BackGrid?          10:42:40

A.  No, and she didn't raise it.  I mean, if she'd          10:42:46
asked.  If she would have asked questions and if she wanted          10:42:49
to discuss it, I would have discussed it with her.  But my          10:42:52
recollection is we didn't get into it.          10:42:56

Q.  And in this letter, you invited Ms. Parant to,          10:42:59
quote, "review the publicly filed reports made by          10:43:06
Shutterstock," correct?          10:43:10

A.  Correct.          10:43:12

Q.  Did you discuss those reports with Ms. Parant at          10:43:14
anytime?          10:43:16

A.  No.          10:43:18

Q.  Did you hear my question?          10:43:28

A.  Yeah.  I answered it.  I said "no."          10:43:29

Q.  Oh.  I didn't hear your answer.  Thank you.  This          10:43:32

letter does not identify, other than referring to public reports, it didn't identify any specific documents supporting BackGrid's position; correct?

A. Correct.

Q. And the letter did not identify or discuss any particular payments BackGrid had made to any of these photographers; correct?

A. We didn't know who the photographers were at this point. So I'm not sure how we could have done that.

Q. So the answer is "no," correct?

A. Correct.

Q. Let's go to Exhibit 3 now and this is the e-mail chain between you and Ms. Parant spanning July 3rd, 2024 to August 12, 2024.

A. Okay. I have it in front of me.

Q. So if you go to the last e-mail in this chain which is in reverse order, so that's the first e-mail chronologically. Do you see that?

A. This is the one that's from July 3rd at 4:35 p.m.?

Q. Correct.

A. Okay.

Q. So you sent Ms. Parant the July 3rd letter that we just looked at; correct?

A. Correct.

Q. Was that --

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.          JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026          CERTIFIED COPY                    Page 32

MR. SERGENIAN:  I don't know if the court reporter got that.  You said "correct"?

THE WITNESS:  I said "correct."

MR. SERGENIAN:  Okay.  It's breaking up a little bit. But I'll let you know if I can't hear it.

THE WITNESS:  Okay.

BY MR. SERGENIAN:

Q.  So in response that same day -- well, I'll just say the response is actually July 3rd, 2024 at 10:15 a.m.  But it seems to be that there is some sort of discrepancy in the timecode.  Is that fair?

A.  I guess so.

Q.  It's just a guess by me.

A.  Yeah, it's possible.  I don't know.

Q.  Okay.  And Ms. Parant wrote back:

"Hi, Jo.  Thank you for your reply.  Let's set up a call to discuss this further.  I have no issue disclosing the names of the photographers. Identifying the works, however, is more problematic precisely due to the CMI alterations.  Our understanding is that the BackGrid library has been incorporated into the Shutterstock library.  Hence, our request to Shutterstock."

Do you see that?

A.  Yes.

Q.   At any point in time -- well, let me just -- if you go up to the next e-mail in the chain, your e-mail back to Ms. Parant's states:  "Please respond with the names of the photographers."  Do you see that?

A.   Yes.

Q.   All right.  So you did not respond in writing to Ms. Parant's understanding that the BackGrid library had been incorporated into the Shutterstock library; is that fair?

A.   I needed to know the names of the photographers before I could proceed with anything.  So, yes, I did not respond with respect to her, quote, "understanding" from July 3rd at 10:15 a.m. because I needed to know the photographers before we could proceed with anything.

Q.   Are you aware of any writing by you in which you responded to Ms. Parant's understanding of the BackGrid library had been incorporated into the Shutterstock library?

A.   In writing?

Q.   In writing.

A.   No, I don't -- I don't think I did.

Q.   Did you ever discuss that issue on the telephone with Ms. Parant?

A.   So with respect to what I had testified to earlier which is, you know, I believe what I explained to her was Shutterstock simply purchased BackGrid, and BackGrid's

continuing its operations as normal.  You know, we discussed that.

And again if she had specific questions about it, she was free to ask me on the call.  But I don't believe she asked about this specific issue about whether it was incorporated in the Shutterstock library or not; beyond what I told her which is BackGrid is continuing its operations as normal.

Q.  So regardless of what she asked, do you have any recollection discussing with Ms. Parant over the telephone -- actually, let me step back.

With respect to the claims in Ms. Parant's correspondence, am I correct I think you said this already that there were only telephonic and e-mail correspondence between you and Ms. Parant; correct?

A.  That's correct with the one little caveat just because I want to make sure we're accurate here is that to the extent it looks like there is, you know, a letter, it's because it's an attachment to an e-mail.  It might look like a letter, but it's an attachment.

Q.  Understood.  I'm including that; in the e-mail the way you define it.  But you never spoke in-person to Ms. Parant about these claims; correct?

A.  --

(AUDIO LATENCY.)

THE COURT REPORTER:  Can you repeat the answer?  It didn't come through.

THE WITNESS:  I'm sorry.  Can you repeat the question for me?  I forgot what the question was.

MR. SERGENIAN:  Let me just repeat it.

THE WITNESS:  Okay.

BY MR. SERGENIAN:

Q.  Am I correct that you and Ms. Parant never spoke face-to-face about these claims?

A.  Correct.  That's correct.

Q.  So let's go back to the question which is regardless of what Ms. Parant asked you, did you ever discuss with her whether the BackGrid library had been incorporated into the Shutterstock library?

A.  Beyond what I testified to earlier which is we discussed that BackGrid's continuing its operations as usual and that Shutterstock simply purchased it.  Beyond that, no. That's per my recollection.

Q.  Okay.  Let's go to the next page.  The next e-mail is July 8, 2024 at 4:43 p.m. from Ms. Parant to you.  Do you see that?

A.  Yes.

Q.  And in this e-mail, Ms. Parant identified claimants as Stephane Kyndt (Nodinot), Jerome Nicod, Thibault Mauvilain, Michel Boutefeu, Victor Ordonez and Jeremy

Duplaquet.  Do you see that?    10:50:32

A.  I do.    10:50:38

Q.  Okay.  I've never taken a French class, so that's    10:50:50
probably terrible pronunciation, but.  So you received the    10:50:53
names that you requested; correct?    10:50:57

A.  On July 8th, yes.    10:51:00

Q.  Okay.  Let's go up to the July 17, 2024 e-mail from    10:51:04
Ms. Parant to you which is on page two of the PDF.  Do you    10:51:20
see that?    10:51:25

A.  Okay.    10:51:26

Q.  And in her e-mail, Ms. Parant provided a    10:51:28
per-claimant breakdown of missing photographs which are    10:51:33
estimates; right?  Correct?    10:51:41

A.  --    10:51:44

(AUDIO LATENCY.)    10:51:44

Q.  You're not coming through.  Can you repeat what you    10:51:44
said?    10:51:52

A.  Yeah.  Can you just repeat the question for me,    10:51:52
please?    10:51:54

Q.  Sure.  On July 7, Ms. Parant provided a    10:51:57
per-claimant breakdown of the estimated number of    10:52:01
photographs for her clients; correct?    10:52:05

A.  It was actually July 17th.  You said July 7th.    10:52:09
But, yes, on July 17th she provided a breakdown of at    10:52:11
least --    10:52:14

Q.   Okay.

A.   A breakdown, yes.

Q.   Okay.   Thank you for the correction.   And she states that for Jerome it's 25,000, for Viktor it's 15,000, for Stephane it's 8,500, for Jeremy it's 20,000, for Thibault it's 10,000, and Michel it's 1,000.   These are all her estimates; correct?

A.   These are her estimates, correct.

Q.   And you received that breakdown and then she also provided, if you scroll to the next page, an example which is an image of a photograph with the credit "PHOTO: VO/JN/FLYNET."   Do you see that?

A.   So on the next page, you mean earlier in time?   No, I'm sorry.   It's the same e-mail message.   Yes.

Q.   It's the same e-mail?   Okay.

A.   Yeah.

THE WITNESS:   I'm so sorry.   My dogs are going a little bit nuts right now.

MR. SERGENIAN:   All right.   Do you want to go off the record?   Or what do you want to do?

THE WITNESS:   I think they're okay right now.   But I just want to make sure I can hear your question.   I think they're okay.   Okay, I think we're ready to go.

BY MR. SERGENIAN:

Q.   All right.   So now if we can go up to the first

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.        JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026        CERTIFIED COPY                              Page 38

page, you wrote back in response on August 12th, 2024.  Do you see that?

    A.  Yes.

    Q.  And you pointed out that the image was from 2008; right?

    A.  Yes.  Uh-huh.

    Q.  And you took the position of the statute of limitations had expired on any claims of that image; correct?

    A.  Yes.  That's one of the positions.

    Q.  Correct.  And during the -- let me just ask you right now did you have one phone call with Ms. Parant or multiple calls with her about these claims?

    A.  I believe it was just one phone call.

    Q.  Okay.  So during your call with Ms. Parant, did you discuss the statute of limitations issue?

    A.  So to be clear, the phone call took place before she sent this example I believe.  So I don't believe we discussed statute of limitations in part because we didn't even know what she was claiming at that point.  So, no, I don't believe we did discuss it at that time.

    Q.  Okay.

    A.  On the phone call.

    Q.  Did --

    A.  Let me just clarify.  I don't recall discussing the

statute of limitations on the phone call.

Q. Okay. Do you recall discussing any affirmative defenses to any of Ms. Parant's clients' claims on your phone call?

A. No. I believe the phone call was really about trying to gather information to figure this out more than anything. So, no, it really wasn't about affirmative defenses and whatnot.

Q. Did you discuss on that phone call any counterclaims that your client or clients might file against Ms. Parant's clients?

A. So we did not discuss any counterclaims in particular. I did mention to her that one of the plaintiffs -- or not plaintiffs, excuse me -- one of the claimants one of the people that she was representing had, in my understanding -- and I think actually what I said to her exactly was words to the effect of: She should investigate who she's representing because there were allegations that one of the people that she represented stole a lot of money from Fameflynet.

And so I mentioned that to her, but I didn't get into detail about counterclaims or anything like that. I just said, "You should probably know that."

Q. Did you identify that individual against whom there were allegations that he had stolen money from Fameflynet?

A.   I believe I did provide the name at the time, yeah.     10:56:54

///    10:56:57

///    10:56:57

///    10:57:07

///    10:57:07

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

///    10:57:55

          (PAGE 40, LINES 2 THROUGH 19 WERE DESIGNATED HIGHLY     10:57:55

          CONFIDENTIAL AND ARE BOUND SEPARATELY.)     10:57:55

BY MR. SERGENIAN:     10:57:55

     Q.   So with respect to the person you identified as     10:57:55

allegedly stealing money, that individual was not Stephane     10:58:05

Kyndt, Thibault Mauvilain, Michel Boutefeu, or Jeremy     10:58:13

Duplaquet; correct?

A.   Correct.

Q.   Okay.   So let's go back to the August 12th e-mail that you wrote?

A.   Just one second.

Q.   Take your time.

A.   Yep, I got it.

Q.   So in the third paragraph of your e-mail, second sentence, you stated, quote:

"BackGrid was formed long after the statute of limitations expired here and has nothing to do with this license," closed quote.

Do you see that?

A.   Correct.

Q.   And were you referring to a license for the particular photo that's re-printed in the next page of this exhibit?

A.   So just so that we are very clear on the record, what I was referring to was the People Magazine cropped screenshot that Ms. Parant had e-mailed on July 17th, 2024 that was from long before BackGrid had been formed, correct.

Q.   Okay.   So your response was that that sentence was specific to the particular photograph which is actually, I misspoke, two pages down of Brittany Spears; correct?

A.   Yes, that is correct.

Q.   Okay.  And you also stated in that e-mail in the same paragraph, quote:

"To be clear, if BackGrid issued a license and the photographer has not been paid on it, it is probably because BackGrid hasn't been paid and if alerted, it will try to collect the fee."

Do you see that?

A.   I do.

Q.   That sentence, you will agree with me, assumes that BackGrid issues licenses on these photographers' works; correct?

A.   Correct.

Q.   And it acknowledges there are situations in which a photographer has not been paid on a license BackGrid issued; is that correct?

A.   Can you repeat your question, please?

Q.   That sentence acknowledges that there are situations in which a photographer has not been paid on a license BackGrid issued; correct?

A.   So I would disagree with that.  I think what it's saying is if this situation happened, it's because it hasn't been -- BackGrid hasn't been paid.  And if it's alerted, it will try to collect the fee.  I don't think it's acknowledging that those situations necessarily have happened.  I think what it's saying is if this were to

happen, this is what -- this is how it would play out.          11:01:44

Q.   Your e-mail is not denying that BackGrid was          11:01:49
offering for license, photographs submitted to Flynet;          11:01:52
correct?          11:01:57

A.   It was not -- it was not -- say that question again          11:02:02
for me one more time.          11:02:07

MR. SERGENIAN:   Ms. Godoy, could you repeat the          11:02:08
question, please?          11:02:10

(WHEREUPON THE RECORD WAS READ.)          11:02:11

THE WITNESS:   So there was no allegation of that nature          11:02:47
in earlier correspondence to deny.   So in other words, the          11:02:48
message from Ms. Parant never said BackGrid is licensing          11:02:51
images from Flynet so that we would have to respond to that;          11:02:58
not that we would have to respond to it anyway.   But your          11:03:02
question assumes that such a representation has been made          11:03:05
and is available to be responded to.          11:03:09

BY MR. SERGENIAN:          11:03:12

Q.   Well, you don't disagree, do you, that Ms. Parant          11:03:13
was alleging that there were -- that her clients' works were          11:03:16
being offered for license on the BackGrid -- through the          11:03:22
BackGrid library?   I mean, she clearly said that.   Do you          11:03:28
agree or disagree with that?          11:03:33

A.   So, disagree.   She was complaining of the          11:03:36
photographs were missing from the library.   That's what she          11:03:38
was complaining about.   She was saying these photographs are          11:03:42

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.          JOANNA ARDALAN Non-Confidential
2:25-cv-2757-FLA-MAA, 05/25/2026      CERTIFIED COPY                    Page 44

missing, not that these photographs appear.

Q.  Well, let's go back to Exhibit 1.

A.  Okay.

Q.  Let me know when you're there.

A.  I'm here.

Q.  What she wrote is:

"I represent a group of photographers whose works are part of the BackGrid library acquired by Shutterstock. It has come to my clients' attention that copyright management information, CMI, has been removed or altered from tens of thousands of their works in violation of 17 U.S.C. Section 1202."

Do you see that?

A.  I do.

Q.  So she was referring to works in the BackGrid library; correct?

A.  Yes, but that's not what your previous question was.  Is she referring to works that are part of the BackGrid library for a group at the time of unknown, undisclosed photographers?  Yes.  That's what this June 27th, 2024 letter says.

Q.  Well, she later disclosed the photographers.

A.  Correct.

Q.  So, taken together, she was alleging that her

clients who are identified had works in the BackGrid library where CMI was removed or altered; correct?

A. That's not exactly what she was complaining about. She was always complaining about the works being missing from the library. That -- she was complaining of the photographers were going onto the portal and were unable to see their works. That's what she was complaining about.

Q. Well, she actually states in the very first paragraph that she writes that CMI has been removed or altered. Do you dispute that?

A. That's what she says in the letter.

Q. Okay. So that was the initial issue in this dispute; correct?

A. What specifically are you referring to?

Q. That her clients' photographs in the BackGrid library had CMI that was removed or altered. Do you dispute that that's what she -- the first thing that she wrote to Mr. Lapham?

A. So the first thing she wrote is that she represents a group of photographers. She doesn't name who they are; whose works are part of the BackGrid library and that she believes that the copyright management information has been removed from those photographs.

But her complaint was that those photographs did not appear in their own portals. That's what she was

complaining about.  She was complaining that they weren't there.  She wasn't complaining that they were there.

Q.  Well, where does it state that in the letter?

A.  It doesn't state it expressly in the letter.  But that's what she was -- that's what our discussion was about, the phone call.

Q.  Where does it state --

A.  Excuse me.  Let me finish my answer.

Q.  I thought you were finished.  Go ahead.

A.  So that is what she discussed on the phone call. And you can tell from the e-mail correspondence too what she's complaining about is that the photographs were missing.  And that's why she gave an estimate of the photographs that she believed were missing.

Q.  Is it your contention -- well, let me ask you this way.  Did Ms. Parant at any point inform you that she was dropping her claim that for thousands of works -- tens of thousands of works in the BackGrid library acquired by Shutterstock, her clients CMI was altered or removed?  Did she ever tell you she was withdrawing that claim?

A.  No.

Q.  Okay.  So you're saying during the phone call she discussed the fact that photographs were missing from the BackGrid contributor portal?  Is that fair?  Is that what you discussed?

A.    I don't think she understood what the -- you know, I don't want to attribute BackGrid contributor portal language to her because I don't think she understood it or understood, you know, what the different portals were and whatnot.  So I don't want to attribute that language to her.

But I'll say that her concern was that photographs were missing from the contributor portal -- I'm going to call it contributor portal but that wasn't her language -- and that her concern was that they weren't there.

Q.    Did Ms. Parant ever tell you that if the photographs were restored to the contributor portal but continued to be offered for license to BackGrid clients with altered CMI, that her clients had no issue with that?

A.    So by "altered CMI," I think what you mean is with updated CMI to reflect their contributor codes.  Is that what you mean?

Q.    No.  I mean altered or removed CMI as in incorrect CMI.  My question is, just to get a clear record, did Ms. Parant state at any point in her phone call with you that her clients would be satisfied if their photographs were restored to the BackGrid portal even if BackGrid continued to offer for license their photographs with removed or altered CMI?

A.    She didn't address that one way or the other.

Q.    Okay.  She didn't say anything like that in those

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.    JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026    CERTIFIED COPY    Page 48

words or in sum or substance; is that fair?

A. Not to my recollection.

Q. Okay. So let's go back to your August 12 e-mail.

A. Okay. Exhibit 3, August 12th. Yes.

Q. It's going to be on the first page. So in the third paragraph of your e-mail, you state -- just for context, let me back up a little bit. You state, quote:

"To be clear, if BackGrid issued a license and the photographer has not been paid on it, it is probably because BackGrid hasn't been paid. And if alerted, it will take try to collect the fee. Knowing specific examples of what is missing is helpful. That said, if this were to happen, it would be a rare exception, not the norm."

Do you see that?

A. Yes.

Q. You weren't referring to a -- well, let me rephrase it this way.

You did not identify a single license, payment, or photographer to support that statement; correct?

MR. QUINTO: The document speaks for itself.

THE WITNESS: Yeah. You're asking if I stated a specific photographer or payment to support that statement? No, I did not.

///

BY MR. SERGENIAN:

Q. Okay. And did you, on your phone call with Ms. Parant, did you identify a single license, payment or photographer to support that statement?

A. I don't believe I did. But I don't think that she asked about it.

Q. Did you disclose at any point in your communications with Ms. Parant that BackGrid operates on an accrual basis?

A. I don't think we even discussed that. Again if she had any questions about how it worked, she was free to ask me that. And that's what the phone call was about; giving her the opportunity to discuss it. But I don't think that she asked about it. And I think this e-mail message from August 12th makes clear that people are paid on a cash basis. And that's what this is saying is when we get the fee, the photographer gets paid; cash basis.

Q. So let's try to -- actually, let's go to her response which is right above that on the same day.

A. Okay.

Q. And she states in her e-mail -- this is in the -- she starts off by stating that she resents the implication. And the implication is that she was obscuring the fact that the photograph of Brittany Spears indicated that it was made in 2008 and that you were accusing her of making sure that

that date wasn't viewable from the cropped image; correct?

A. So what I expressly said, what I actually said was that I believe she attempted to conceal the date in which the photo was published because what she had e-mailed me was a screenshot of the usage and she did not send a link to the usage. And in taking the screenshot, she made sure that the 2008 date wasn't viewable from the cropped image.

Q. Right. You stated in your e-mail below, quote:

"You took a screenshot. You didn't send the link. And you made sure 2008 wasn't viewable from your cropped image," closed quote.

A. That's correct.

Q. Okay. And she disputes that she was -- she said that's not how she operated. And then she states, quote:

"As discussed at length on our call, this case is about deleted CMI. And this was an example of a photograph that used to be properly credited but no longer appears in the photographer's account," closed quote.

Do you see that?

A. I do.

Q. So she was clearly stating/reiterating what this case was about which is deleted CMI and the fact that the photograph that used to be properly credited was no longer in the photographer's account; correct?

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.          JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026        CERTIFIED COPY                         Page 51

A. Well, I'm not going to change the characterization of the document. What she's complaining about is deleted CMI and that it was -- it used to be properly credited but no longer appears in the photographer's account. So her concern on the phone call was that the photographs didn't appear in the photographer's account. That's what she was concerned about.

Q. And so on the call, she goes on to write -- withdraw that. Let me make this a little clearer. In her e-mail she states, quote:

"As for the data provided, I clearly told you over the phone that we were not able to provide more details precisely because the photographs in question have vanished from my clients' accounts," closed quote.

Do you see that?

A. I do.

Q. On your call did you discuss with Ms. Parant the fact that there is a contributor portal at BackGrid and also a client portal?

A. I don't believe we discussed the different portals.

Q. Did Ms. Parant ask you if there were -- if there was a different portal for clients?

A. No, she did not. Not to my recollection.

Q. And you did not disclose that there's a different

portal for clients on the call, did you?

A.   I don't think it came up.

Q.   Okay.  She has discussed -- but you clearly discussed the contributor portal, didn't you?

A.   Maybe not in those specific terms.  But what we were discussing was her clients logging into their contributor portal, yes.

Q.   Okay.  So you may or may not have used the term "client portal"?  I'm just trying to get your best recollection here.  Do you remember using the term "client portal" at any time during the call?

A.   --

        (AUDIO LATENCY.)

Q.   I didn't hear your answer.

A.   The answer is "No."

Q.   Okay.  And did you discuss -- putting aside the term "client portal," did you discuss the fact that BackGrid had a portal that clients -- contributors could log into?

A.   Well, yeah, because that's what she was complaining.  I mean, that's what she was complaining about.  That's what we're talking about was that the photos didn't appear on her clients' portal.  So that's what we were discussing.

Q.   Did you provide an explanation to Ms. Parant in that call as to why photographs had disappeared from the

client portal?

A. So I believe I explained to her on the phone that when photos don't get licensed for a while, they may not -- actually, I don't think I did discuss that with her. No, nevermind. No, I don't think we talked about that. No.

Q. Well, what did you discuss about, if anything, about the photographs vanishing from the client portal -- or let me withdraw that.

What did you discuss, if anything, about the photographs vanishing from the contributor portal?

A. So my recollection was the call was very big-picture. It was her complaining about the photos not being there. It was about her -- that they weren't able to see some of the photos. It was -- you know, I explained to her about the concerns we had about -- not concerns, but we explained to her, you know, some of the problems some of her clients had in terms of their past and, you know, how they stole money as we discussed earlier.

But, you know, I don't think we went into a lot of detail about things. My recollection was that, you know, I was there to answer questions and to, you know, provide information as best as I could and try to figure out what's going on. But I don't recall her being very specific with her questions or anything else.

So I'm just trying to -- can you just ask your

question again because I want to just -- I want to make sure I'm giving you the most accurate recollection that I have. So can you just ask that question one more time?

Q. You said a moment ago -- you referred a moment ago to clients stealing money?

A. Yes.

Q. I'll just -- we already went through this. None of the -- you already stated that neither Stephane, Jeremy, Thibault, or Michel -- Stephane Kyndt, Jeremy Duplaquet, Thibault Mauvilain, or Michel Boutefeu were accused of stealing money; correct?

A. Correct.

Q. Okay. I just want -- you said "clients," but we had actually discussed a particular client of Ms. Parant's?

A. Sure. It was her client at the time. I don't --

Q. Correct. I just want to make the record clear. And that client is not a plaintiff in this lawsuit; correct?

A. Correct.

Q. Okay. During that phone call, did Ms. Parant say anything to you that indicated she was aware that there was a client portal at BackGrid?

A. It seemed to me like she was aware because she was complaining about photographs not appearing on a portal. Excuse me. Sorry. I just dropped something.

Q. That's fine. I just didn't get the last part of

your sentence.  She was complaining about what?

A.  About photographs not appearing on a portal.

Q.  Okay.

A.  So, yes.

Q.  Well, she was, in her correspondence, she was talking about -- we can agree she was talking about her clients' portal?

A.  Correct.

Q.  Correct.  And so that -- so that statement doesn't indicate that she was aware of the client portal, does it?

A.  I thought what you just said it would because she was talking about her own clients' portal.

Q.  I think there's some confusion because she has her clients.  "Client portal" means something else.  So let's define terms.  When I say "client portal," I'm referring to BackGrid or Shutterstock's clients.  Is that fair?

A.  Oh.  Yes.  BackGrid or Shutterstock's clients, correct.

Q.  Okay.  And when I say "contributor portal," I mean the photographers who contribute photographs.  Are we on the same page?

A.  Okay.  Sure.  Yeah.

Q.  Okay.  So when Ms. Parant stated that it was her understanding that there were photographs that had vanished from the contributor portal, that doesn't indicate that she

was aware of the BackGrid client portal, does it?

A. Oh. No, not necessarily. You're correct.

Q. Okay.

A. At least from that statement, correct.

Q. Were there any other statements that she made in her phone call that indicated to you that she was aware that BackGrid had a client portal?

A. Not to my recollection. I don't recall.

Q. Am I correct that you don't remember discussing the BackGrid client portal at all with Ms. Parant?

A. The client portal? No, we didn't talk about that.

Q. Okay. Okay. Now let's go back to that --

MR. SERGENIAN: By the way, I'm not taking a break because you seem to be fine not taking them. But if you want to, let me know.

THE WITNESS: Okay. I'm fine. Thank you.

MR. SERGENIAN: Okay. Just based on prior depositions, you seem to enjoy lengthy sessions. So that's why I'm not offering a break. But I figured, knowing you, I figured you're not exactly a shrinking violet and you would speak up for yourself. So --

THE WITNESS: David shouldn't be laughing at that. All right. Sorry. Go ahead.

MR. SERGENIAN: Let the record reflect David is uproariously laughing.

BY MR. SERGENIAN:

Q.   Okay. Let's go back to Ms. Parant's August 12th e-mail.

A.   Okay.

Q.   And she wrote -- not only did you write that the case is about deleted CMI, she also wrote in the last paragraph -- or the second to last paragraph I should say:

"Thousands of photographs in their/Shutterstock's database are not credited to the proper photographers and these CMI violations will inevitably turn into copyright infringement if they have not already."

Do you see that?

A.   I do.

Q.   So Ms. Parant was clearly stating/reiterating what she had said at the beginning of the correspondence that the issue was that thousands of photographs in the database were not credited to the proper photographers and there were CMI violations; correct?

A.   If you're asking me what this sentence says, the sentence says:

"Thousands of photographs in their/Shutterstock's database are not credited to the proper photographers."

That's what it's saying.

Q. Okay. Have you communicated with Ms. Parant after August 12th about this case?

A. I don't believe I did.

Q. And when I say "this case," let me ask another question just to be precise. Did you communicate after August 12th with Ms. Parant about the issue that you were discussing in this correspondence?

A. No.

Q. Okay. And so at no point in time did Ms. Parant communicate to you that she was backing off the position that there had been CMI violations; correct?

A. Correct.

Q. So let's see. And this is the last e-mail in the chain at least in which Ms. Parant is a recipient? That was the final word, I take it, or the final communication between you and Ms. Parant was this writing?

A. I believe that's right.

Q. Okay. So let's try to -- let's try to figure out when the phone call was. If we go to -- on the same exhibit, if you go to page 3, there's an e-mail from you dated July 9, 2024. And you state that you should be available for a phone call at 4:00 p.m. Do you see that?

A. Yes, the next day.

Q. The next day. Correct. Is that when the phone call took place to the best of your recollection?

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.        JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026        CERTIFIED COPY        Page 59

A.   Best of my recollection, that sounds right.   11:27:43

Q.   Okay.  How long was the call?   11:27:48

A.   Best of my recollection, it was -- I don't think it was more than 30 minutes, probably less.   11:27:58 11:28:02

Q.   And do you remember who placed the call?   11:28:10

A.   I don't remember.   11:28:15

Q.   Was it just you and Ms. Parant on the line?  Or was anyone else on the call?   11:28:17 11:28:22

A.   It was just me and Ms. Parant.   11:28:24

Q.   Okay.  Can you tell me everything you can recall about what was discussed on that call?   11:28:41 11:28:39

A.   Yes.  I will try my best.  Ms. Parant complained about photos not being up; concerns that she might be missing -- her clients might be missing out on license fees. I asked her for the best example she could provide so that we could investigate what's going on.  So I said please give me the best example you can give me.  And she said she would get back to me with the best example she could give me.   11:28:42 11:28:49 11:28:57 11:29:02 11:29:08 11:29:11 11:29:17

We also talked about how, you know, this is BackGrid's system.  BackGrid's continuing operations as normal.  Yeah, Shutterstock purchased it, but BackGrid's continuing.  And I think that's about it.  I mean, she was -- it was a pretty friendly call.  It wasn't very adversarial.   11:29:18 11:29:22 11:29:26 11:29:27 11:29:41 11:29:44

It was -- I explained to her why a 1202 violation   11:29:44

would never work; we talked about that.  I told her that, you know, as long as there's a license there's no way that there's a 1202 violation as a threshold matter.  And, you know, I just asked her to give us as much information as she could.

Q.   Anything else you can remember about what was discussed on that call?

A.   No, not at this time.

Q.   And you say that Ms. Parant stated that her clients might be missing out on licensing fees?

A.   Correct.

Q.   During that call did Ms. Parant ever state to you in sum or substance that if licensing fees were paid on licensed photographs that had incorrect CMI information, that that would settle the matter?

A.   She never talked about that one way or the other in my recollection -- in my recollection.

Q.   Okay.  Fair.  Did you ever talk about whether if licensing fees were paid on photographs that were licensed with improper CMI, whether that would settle the claims of the -- of her clients?

A.   Can you say that question one more time?  I'm sorry.  I was thinking about something else.

Q.   That's fine.

///

MR. SERGENIAN:  Ms. Godoy, could you read it back?    11:31:22

(WHEREUPON THE RECORD WAS READ.)    11:31:25

THE WITNESS:  That's an interesting question.  It didn't come up one way or the other.    11:32:08 11:32:09

BY MR. SERGENIAN:    11:32:12

Q.  You said that you explained to her why a 1202 claim would fail; is that right?    11:32:13 11:32:20

A.  Correct.    11:32:19

Q.  Did she respond to that?    11:32:21

A.  I don't think she really responded substantively. I mean, my impression was that she wasn't -- this wasn't really her area of law.  It wasn't really, like, her expertise in terms of -- you know, I don't think she was really prepared to discuss claims, like, in a legal sense. I mean, I think she was trying to.    11:32:23 11:32:34 11:32:36 11:32:41 11:32:48 11:32:53

But, you know, I did walk her through it because I really wanted her to understand why that claim isn't a viable claim.  So, you know, in that sense we talked about it.  Did she really push back on it?  I don't think so. That's not my recollection.  My recollection is that she was really just complaining about the works not being on the portal.  That was really the focus of her concerns.  Did that answer your question?    11:32:55 11:33:00 11:33:06 11:33:12 11:33:15 11:33:17 11:33:19 11:33:26

Q.  Yes, it does.  Thank you.  Is it fair to say that during that call she never conceded that any 1202 claim    11:33:27 11:33:31

would fail?

A. No, I don't think she conceded it. But I don't think she exactly pushed for it either.

Q. So you said a little while ago that you were discussing the 1202 claim and you stated that one of the -- well, you stated that you told Ms. Parant that one of the reasons that a 1202 claim would fail was because there was a license for using the photographs; is that fair?

A. Yes.

Q. Okay. Did you discuss with Ms. Parant who the licensee or licensees were?

A. We didn't even get into that sort of detail, no. And she didn't contest the licenses either. I mean --

Q. She didn't contest the licenses, but she didn't -- did she concede the licenses existed?

A. Essentially, I understood her as conceding the licenses existed because she was complaining about the works not being on the portal. So that's sounds like she wants the photos up on the portal.

Q. Did you understand her to be conceding the licenses existed for any other reason other than that the photographs were on the portal?

A. I'm sorry. That -- please, can you rephrase that question, please?

Q. You just said that you understood that she was

conceding there was a license because she knew that the photographs were on the portal?

A.  That's not what I said.  What I said was --

Q.  Okay.  Then what did you mean by that?

A.  I said -- oh, you're misstating what I said.  What I said was --

Q.  In your words.

A.  Yes.  She was contesting that works were not on the portal.  So in other words, she wanted the works on the portal.  So that sounds like a license.  That sounds like BackGrid has a license because her complaint is that they are not on the portal.

Q.  Did you -- well, is the reason that it sounded like a license, as you said, solely because Ms. Parant was asking or requesting that her clients' photographs be put onto the portal?

A.  In the context of this conversation?  Is that what you're saying?  Or in the context of what was just said?

Q.  In the context of the conversation.

A.  Yeah.  In the context of the conversation, she is complaining about the photographs not being on the portal.  She didn't really get into detail about who licensed who to what or anything like that.  But what she was complaining about was:  I have these clients and these clients believe that works that should be getting licensed are not getting

licensed and I think it's because they're not on the portal.

Q. So it sounds like you were inferring that she was conceding there was a license? Is that a fair characterization?

A. Was I inferring it? Or was she saying it? I mean, she's complaining about works not being on a portal. So to me that is saying that there is a license of permission to have works on the portal.

Q. Well, it sounds like she never at one point said words to the effect of "I agree that there was a license"?

A. I'm not going to say that she didn't say that because I don't remember her expressly saying that expressly. But by the context of the conversation, she very well could have said it and I don't remember it. But she very well could have said it. With respect to these photographs, for example, these photographs have been licensed and your clients should have them on their portal. Because again her complaint was the photographs should be on the portal.

Q. So as you sit here today, you don't have a recollection one way or the other as to whether Ms. Parant explicitly conceded that your clients had a license to the photographs; is that fair?

A. I don't have a recollection if she expressly said that there was a license. But she very well could have said

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.    JOANNA ARDALAN Non-Confidential
2:25-cv-2757-FLA-MAA, 05/25/2026    CERTIFIED COPY    Page 65

it. And again in the context of her complaining that works are not on the portal, then she is acknowledging the existence of a license.

Q. So that's an inference, isn't it, that because she is acknowledging -- or what is it? Walk me through that again. It sounds like an inference that because she said "X," that means there's a license. What's "X" in your mind based on what she said?

A. She's complaining that the works of her clients are not on the portal.

Q. And so that means -- in your mind, that means she's conceding there's a license?

A. Yes.

Q. Okay. So that's an inference by you; isn't it?

A. I mean, we can wordsmith this. But I think that is an acknowledgment that there is a license.

Q. Well, she never explicitly acknowledged there's a license; correct?

A. She didn't use --

MR. QUINTO: Asked and answered.

THE WITNESS: So she didn't use the words as I recall one way or the other. But she very well could have. But again if she's complaining that works are not on a portal, then she is conceding that a license exists. Because why would one complain about something not being there if they

didn't have the right to be there?

BY MR. SERGENIAN:

Q. Well, that's your inference. But do you agree with me that neither you nor Ms. Parant on that call discussed who the parties to the license were?

A. So --

Q. Let me withdraw that.

A. Okay.

Q. Do you agree that on that call with Ms. Parant, neither you nor Ms. Parant discussed who the parties to a supposed license between her clients and BackGrid were, who the parties were? That wasn't discussed, was it, on the call?

A. So your question is a bit vague. So I'm going to give you the best response I can which is we didn't get into detail between, you know, which party licensed to whom or who submitted to what. We didn't get into that. But again she was complaining that BackGrid did not have photographs on its portal. That's -- in that context, we discussed it.

Q. Okay. And neither you nor Ms. Parant discussed when a license was entered into between her clients and your client; correct?

MR. QUINTO: Asked and answered.

BY MR. SERGENIAN:

Q. You can answer.

A.   Yeah.  So you're asking my clients collectively;    11:40:52
so, I mean, it's a little bit vague.  But I will just say    11:40:54
what I've said before which is responsive to your question    11:41:00
which is we didn't discuss the details about who licensed    11:41:03
who to what.  But again she was complaining about the    11:41:07
photographs not being on the BackGrid portal.    11:41:12

Q.   Well, let's be precise here because you're    11:41:16
referring to your clients and I understand that you have    11:41:18
three clients in this litigation.  But at the time, you had    11:41:20
only identified to Ms. Parant one client; isn't that    11:41:23
correct?    11:41:27

A.   Correct.  In writing we did discuss BackGrid USA    11:41:29
Inc.  And I believe we might have talked about Shutterstock,    11:41:33
but I don't remember the details of that.    11:41:36

Q.   Do you have any recollection of informing    11:41:38
Ms. Parant that, on the phone call, that Shutterstock was    11:41:40
your client as well?    11:41:43

A.   We already talked about this.  I believe I did, but    11:41:46
I don't remember.    11:41:48

Q.   Okay.  And so back to my question.  My question is    11:41:49
simply it sounds like from what you're telling me that, on    11:41:55
that phone call, neither you nor Ms. Parant discussed when a    11:41:59
license was entered into between any of her clients on the    11:42:06
one hand and either of your two clients on the other hand?    11:42:11
Is that a fair characterization?    11:42:14

(VIDEO LATENCY.)

MR. SERGENIAN:  All right.  The witness has a frozen video.

THE COURT REPORTER:  Yeah, I'm not getting any of that.

THE WITNESS:  Hi.  I'm having massive internet problems and I couldn't hear what you said for the last 30 minutes or so.

MR. QUINTO:  30 minutes?

THE WITNESS:  Sorry.  30 seconds.  Excuse me; 30 seconds or so.  Let me change Wi-Fi.

(BRIEF PAUSE.)

THE WITNESS:  Okay.  Can you hear me now?

MR. SERGENIAN:  Yes.

THE WITNESS:  Are you able to hear us?

MR. SERGENIAN:  Yes.

THE WITNESS:  Okay --

(CROSS TALK.)

THE VIDEOGRAPHER:  -- you say something, please?

(CROSS TALK.)

MR. SERGENIAN:  -- very well.

THE VIDEOGRAPHER:  Mr. Quinto, this is the videographer.  Can you say something, please?

MR. QUINTO:  Yes.  Can you hear me?

THE VIDEOGRAPHER:  Yes.  Thank you.

THE WITNESS:  Okay.  So we cut out there, I apologize,

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.        JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026        CERTIFIED COPY        Page 69

with our Wi-Fi.  So I didn't hear your last question.    11:43:49

MR. SERGENIAN:  That's okay.    11:43:53

Ms. Godoy, would you please re-read the question?    11:43:53

(WHEREUPON THE RECORD WAS READ.)    11:44:58

THE WITNESS:  So I do not recall whether we discussed when the clients entered into a license one way or the other.    11:45:02 11:45:05 11:45:09

BY MR. SERGENIAN:    11:45:10

Q.  And did you -- do you remember if you and Ms. Parant on that call discussed the scope of any license?    11:45:12 11:45:15

A.  I don't have a recollection of discussing that, no.    11:45:22

Q.  Do you recall whether you discussed with Ms. Parant on that call whether any license between her clients on the one hand and either of your clients on the other hand were written, oral, or implied?    11:45:28 11:45:32 11:45:42 11:45:42

A.  No, we never discussed that as far as I remember.    11:45:46

Q.  Now, let's go back to Exhibit 3 for a moment.    11:45:51

A.  Okay.    11:46:19

Q.  Now, looking at the first paragraph in her final e-mail to you on August 12, 2024.    11:46:19 11:46:35

A.  Okay.    11:46:42

Q.  In the second sentence until the end of the paragraph, she is discussing what she contends was discussed on the call.  Is any of that inaccurate?    11:46:42 11:46:47 11:46:54

A.  Are you asking if it's inaccurate whether we    11:47:03

discussed on the call that she has concerns about deleted CMI and proper credit?  I mean, my hesitation -- I'm not trying to be tricky, but my hesitation is that's not all that was discussed.  But I mean, you know, did we discuss it on the call --

Q.   Let me make my question clear then.

A.   Okay.

Q.   Let me make my question clear.  I'm not asking you if this was the exclusive topic of conversation or if this paragraph represents everything you discussed on the call.

A.   Okay.

Q.   But I'm asking you if anything that she stated was discussed on the call, was not actually discussed on the call?

A.   With respect to this sentence, no.  She did discuss on the call deleted CMI and that the photo doesn't appear on the photographer's account.  She did say it.

Q.   Okay.  And what about the next question "you had" -- it started with "you had requested," is that accurate?

A.   That I had requested that she give an example, yes. So I asked her to give us an example showing -- give us your best example.  Give us your best example of your concerns about a lost licensing fee because CMI wasn't updated and that it's not in the portal and whatnot.  Give us your best

example of what you think is at issue.  Correct.

Q.  And then what about the last sentence?  Is that accurate?

A.  So I think this is a bit of an overstatement from my recollection.  I think that, you know, I did ask her to provide as much information as you can.  And I think she said she would.  She said she would give me as much information as she could.  Like, I felt it was more cooperative on the phone call.  And in this statement, it seems to be a little bit more of an overstatement from that which is:

"I clearly told you over the phone that we're not able to provide more details precisely because the photos in question have vanished from my photographers' account."

I was expecting a little bit more than what she gave us.

Q.  Well, my question is specific to the phone call. Did she -- did she actually tell you over the phone that she and her clients were not able to provide more details because the photographs in question had vanished from her clients' accounts?

A.  So my recollection, you know, she did discuss the difficulty in it.  But I mean, the point of having the call and further correspondence was so that she could give me the

information that she could for us to investigate.

Q.   During the call do you remember Ms. Parant telling you in sum or substance that the photographers were revoking any permission your two clients had to use, distribute, or license their works?

A.   No.

Q.   Is it your -- so the question I asked you is if you recall that.  You said, "No."  Is it possible that she stated that to you?

A.   I highly doubt that that would be the case.

MR. QUINTO:  Objection.  Calls for speculation.

BY MR. SERGENIAN:

Q.   Well, you say you "highly doubt."  I don't want to put words in your mouth, but it sounds like you're not saying you're 100 percent sure she didn't state that?  Is that fair?

A.   She didn't state it.

Q.   She did not state it?

A.   She did not state it.

Q.   Okay.  And you're clear that I'm asking you if she said words to that effect, right, not just the exact words?

A.   Correct.

Q.   And on the call, did Ms. -- and let me just be clear for the record.  I think I asked you if she stated that the photographers were revoking any permission your two

clients had.  Let me just be complete here.

On the call did, Ms. Parant inform you in sum or substance that she was -- that the photographers were revoking any permission BackGrid had, Shutterstock had, or both of them had to use, distribute, or license their works?

A.   There was no communications on that phone call about revocation of licenses one way or the other.

Q.   Okay.  Did Ms. Parant tell you on the call that the photographers were no longer authorizing BackGrid or Shutterstock to license their works?

A.   No.

Q.   Did Ms. Parant tell you the photographers demanded that either BackGrid or Shutterstock stop offering their works for license?

A.   No.

Q.   Did Ms. Parant inform you that any of the photographers were terminating any license or permission that had been granted to either BackGrid or Shutterstock?

A.   No.

Q.   Did she inform you that any continued use of works by BackGrid or Shutterstock was unauthorized?

A.   No.

Q.   And if Ms. Parant testifies that she did give you this notice, is it your testimony that she is giving false testimony?

A.   Yes.

Q.   Okay.  Did you -- did you ever tell Ms. Parant that her clients' works would be removed from the BackGrid library?

A.   No.

Q.   Did you ever tell Ms. Parant --

A.   I did not.

Q.   Okay.  Did you ever tell Ms. Parant that her clients' works would no longer be offered for license on the BackGrid library?

A.   No.

Q.   Did you take notes of this call?

A.   Yes.

Q.   Okay.  Did you consult your notes before this deposition?

A.   I did not because I did not want to testify as to work product.

Q.   Did you memorialize the content of the call and any communication other than communications solely to your client or to your client and co-counsel?  In other words, I'm asking about non-privileged communications.

A.   I have no non-privileged or work-product communications about this call other than what's been produced.

MR. QUINTO:   No non-privileged or work-product

communications?

THE WITNESS:  Is there an issue?

MR. QUINTO:  Yeah.  I think you mean no non-work product communications.

THE WITNESS:  Yeah.  I'm sorry.  Yes.  Thank you. David pointed out that what I meant is that I have no non-work product/non-attorney-client privileged communications with respect to that conversation. Everything I have, in other words, is work product or attorney-client privilege.  I misspoke earlier.

MR. SERGENIAN:  All right.  Let's take a brief break; about ten minutes.  And then I might not have much, if anything, but I just want to take a look at my notes here.

THE WITNESS:  Sure.  Okay.

THE VIDEOGRAPHER:  We're off the record at 11:55 a.m.

(WHEREUPON A RECESS WAS TAKEN.)

THE VIDEOGRAPHER:  On the record at 12:04 p.m.

THE WITNESS:  Thank you.  So --

MR. SERGENIAN:  Wait, wait, wait.  There's no question pending.  Are you talking about something procedural or substantive?

THE WITNESS:  --

(VIDEO LATENCY.)

THE COURT REPORTER:  Sorry.  Is she frozen for you too? I don't hear anything.

MR. SERGENIAN: Yeah, she's frozen. Yeah.    12:04:14

THE WITNESS: -- series of questions --    12:04:14

(VIDEO LATENCY.)    12:04:14

MR. QUINTO: Wait, wait, wait. I'm not -- I'm not    12:04:14
asking -- if you want your own counsel to ask you questions,    12:04:14
you can. But otherwise this is not a freeform discussion of    12:04:35
the merits of the case.    12:04:38

THE WITNESS: --    12:04:39

(VIDEO LATENCY.)    12:04:39

MR. SERGENIAN: I'm not agreeing --    12:04:39

THE COURT REPORTER: Hold on. Hold on. She's still    12:04:39
frozen. I'm not getting any of this, whatever she's saying.    12:04:44

THE VIDEOGRAPHER: Yeah, neither is the videographer.    12:04:46
Do you want to go off the record until their internet issue    12:04:54
is over? Off the record, sir?    12:04:54

MR. SERGENIAN: Yeah, we can go off the record.    12:05:08

THE VIDEOGRAPHER: We don't have to, hun. It's    12:05:12
completely up to you. But the reporter's having trouble.    12:05:13
And every time, you know, the witness is skipping in and    12:05:15
out, she can't take it down.    12:05:17

MR. SERGENIAN: Yeah, no, that's fine. We can go off    12:05:22
the record. I have no issue with that.    12:05:24

THE VIDEOGRAPHER: Okay. We're off the record at    12:05:28
12:05 p.m.    12:05:27

(OFF THE RECORD.)    12:06:18

THE VIDEOGRAPHER: We're back on the record at 12:07 p.m.

BY MR. SERGENIAN:

Q. Ms. Ardalan, did you ever see a written termination or revocation of any licenses that Ms. Parant's clients had with any of your clients?

A. So --

MR. QUINTO: You mean prior to this litigation?

MR. SERGENIAN: Prior to -- yes, prior to this litigation.

THE WITNESS: So prior to this litigation, I did not see it.

And I just want to clarify with respect to your previous questions that are asking about, you know, did she revoke this and that; all those questions relate to a phone call that we had that she did not -- she did not revoke any licenses. And my responses stay the same with respect to the phone call.

The only reason why I raised it during the break is that you have produced a document during this litigation that includes language of revocation. So, you know, I just wanted to be clear that, like, you know, I've seen that document in the course of this litigation.

BY MR. SERGENIAN:

Q. To your knowledge was that letter received by any

of your clients?

A. So that question, I can't speak on behalf of my clients, right? So, you know, I can only speak about what I've seen personally. I can't speak about what they have received because that would get into -- that is outside the scope of this deposition as we have discussed.

Q. Okay.

A. And again it's attorney-client privileged communication by the way. So, yeah.

Q. Yeah, I understand that. Is there anything else discussed on your call with Ms. Parant that you haven't discussed -- or that you haven't testified to today that you recall?

A. No.

MR. SERGENIAN: All right. I have no further questions at this time.

THE WITNESS: Okay. Dave, do you have any follow-up?

MR. QUINTO: No.

THE WITNESS: Okay. Thank you everybody.

MR. SERGENIAN: Have a good -- oh, yeah. Do you want to ask about the transcripts?

THE VIDEOGRAPHER: Yes. Who would like a copy of the transcript and who would like a copy of the video?

THE WITNESS: I'll get a copy of the transcript. I'm not interested in the video. Thank you.

THE VIDEOGRAPHER: No worries. 12:09:44

MR. SERGENIAN: You look fine, Jo, by the way. I don't 12:09:45 know if we're on the record or not, but hopefully we're off 12:09:48 the record. 12:09:50

THE WITNESS: I hope we're on the record. I'll take 12:09:50 it. 12:09:50

MR. SERGENIAN: I wouldn't have known that you did not 12:09:50 prepare your hair or whatever if you had asked me, so. 12:09:59

I'll take a transcript, please. 12:10:02

THE VIDEOGRAPHER: Did you want the video also, 12:10:05 Mr. Sergenian? 12:10:06

MR. SERGENIAN: Not yet. Not at this time. 12:10:09

THE VIDEOGRAPHER: No worries. All right. This 12:10:10 concludes today's video-recorded deposition of Joanna 12:10:10 Ardalan in the matter of Mauvilain et al. versus Flynet 12:10:13 Pictures LLC et al. Off the record at 12:10 p.m. 12:10:14

(WHEREUPON THE PROCEEDINGS CONCLUDED AT 12:10 PM) 12:10:23

DECLARATION

I herby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof; and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of _____ _____,
                (Day)                (Month)       (Year)

at _____, _____.
                (City)                (State)

_____
Joanna Ardalan

WITNESS' CHANGES OR CORRECTIONS

NOTE:     If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify with "Add" or "Delete" and sign this form.

Deposition of: JOANNA ARDALAN
Case Title: MAUVILAIN, MAZARI, DUPLAQUET, WOLF, BOUTEFEU, KYNDT, MEHDI vs. FLYNET PICTURES, FAMEFLYNET, BACKGRID INC., BACKGRID USA INC., SHUTTERSTOCK INC.

Deposition Date: May 25, 2026

I, _____have

the following corrections to make to my deposition:

Page     Line     Change/Add/Delete

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

_____          _____
Joanna Ardalan                    DATE

REPORTER'S CERTIFICATE

I, Ireene Godoy, Certified Shorthand Reporter, in and for the State of California, Certificate No. 14817, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken before me at the time and place therein set forth and were taken down by me in oral stenography and thereafter transcribed into typewriting under my direction; said transcript being a true and correct transcription of testimony given.

I further certify that I am neither counsel for, nor related to, any party to said action, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: JUNE 08, 2026

IREENE GODOY
CSR No. 14817

Date: JUNE 08, 2026

Joanna Ardalan
3007 Franklin Canyon Drive
Beverly Hills, CA  90210

Re: MAUVILAIN, MAZARI, DUPLAQUET, WOLF, BOUTEFEU, KYNDT, MEHDI vs. FLYNET PICTURES, FAMEFLYNET, BACKGRID INC., BACKGRID USA INC., SHUTTERSTOCK INC.

Dear Joanna Ardalan:

The original deposition transcript in the above mentioned case is now complete.  It will be held at our office for 30 days from the date of this letter for you to review. Enclosed you will find a witness signature page and an errata sheet for any corrections you make to the transcript. After the 30 day period, the original will be forwarded to the attorney who ordered you to be present at the deposition.

If it is more convenient for you, you may review your attorney's copy of the deposition.  Your attorney will then advise us, and opposing counsel, of any changes you make to your testimony.  Please contact your attorney with instructions on how you should proceed.

If you are not represented by counsel, contact the attorney who arranged for you to be present at your deposition.  You may also call us at (714) 835-0366 to make an appointment to review the original transcript.

Sincerely,

_____
IREENE GODOY
(714) 835-0366

Cc:  All counsel present
     Original transcript

_____

California Code of Civil Procedure Section:  2025.520(f)  If the Deponent fails or refuses to approve the transcript within the allotted period, the deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the Deponent.

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.          JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026          CERTIFIED COPY                Index: --o0o--..agreeing

**Exhibits**

**Exhibit 1** 3:9 13:2,3,4 18:11,13, 23 25:20,22 44:2

**Exhibit 2** 3:10 13:13,14,15 15:4, 6,13 16:10 19:10,14 28:19

**Exhibit 3** 3:12 13:23,24 15:21 16:10 31:12 48:4 69:17

**-**

**--o0o--** 5:7

**1**

**1** 11:3 13:2,3,4 18:11,13,23 25:20, 22 44:2

**1,000** 37:6

**10,000** 37:6

**100** 72:15

**10:01** 4:2,9

**10:13** 12:20

**10:14** 12:23

**10:15** 32:9 33:13

**11:55** 75:15

**12** 31:14 48:3 69:20

**12(b)(3)** 20:7

**1202** 19:2 24:18,22,23 25:10 44:13 59:25 60:3 61:6,25 62:5,7

**1202(b)(3)** 20:9,10

**1203** 25:8

**12:04** 75:17

**12:05** 76:24

**12:07** 77:2

**12:10** 79:16,17

**12th** 14:9 38:1 41:3 48:4 49:15 57:2 58:2,6

**14817** 4:4 5:4

**15,000** 37:4

**17** 19:1 36:7 44:12

**17th** 36:23,24 41:20

**19** 40:20

**2**

**2** 13:13,14,15 15:4,6,13 16:10 19:10,14 28:19 40:20

**20,000** 37:5

**2008** 38:4 49:25 50:7,10

**2024** 9:20 10:11 13:6,12,17 14:9 15:7 19:16 31:13,14 32:9 35:20 36:7 38:1 41:20 44:22 58:21 69:20

**2026** 4:2,11

**25,000** 37:4

**25th** 4:1,11

**27** 13:6,12

**27th** 44:22

**2:25-cv-02757-fla-maa** 4:13

**3**

**3** 11:3 13:23,24 15:21 16:10 31:12 48:4 58:20 69:17

**30** 59:4 68:6,8,9

**3rd** 13:17 14:9 15:7 19:16 31:13, 19,22 32:9 33:13

**4**

**40** 40:20

**4:00** 58:22

**4:35** 31:19

**4:43** 35:20

**7**

**7** 36:20

**7th** 36:23

**8**

**8** 35:20

**8,500** 37:5

**8th** 36:6

**9**

**9** 58:21

**A**

**a.m.** 4:2,9 12:20,23 32:9 33:13 75:15

**account** 50:18,25 51:4,6 70:17 71:15

**accounts** 51:14 71:22

**accrual** 49:9

**accurate** 28:18 34:17 54:2 70:20 71:3

**accused** 54:10

**accusing** 49:25

**acknowledged** 65:17

**acknowledges** 42:13,17

**acknowledging** 28:17 42:24 65:2,5

**acknowledgment** 65:16

**acquired** 44:8 46:18

**action** 5:2

**actual** 20:16,22 29:12

**address** 14:15,23 15:2 29:15 47:24

**administrator** 12:4

**admit** 24:25

**admitted** 7:1

**admitting** 25:10

**adversarial** 59:24

**affirmative** 39:2,7

**affirmatively** 26:15,25

**agree** 22:11 42:9 43:22 55:6 64:10 66:3,9

**agreed** 5:20 6:21 7:19 17:16

**agreeing** 76:10

agreement 7:21,24

ahead 6:22 46:9 56:23

alerted 42:6,22 48:11

allegation 25:8 43:10

allegations 39:19,25

allegedly 40:24

alleging 43:19 44:25

alluded 10:9

alterations 32:20

altered 18:25 20:17,23 21:13,21 22:1 44:11 45:2,10,16 46:19 47:13,14,17,23

ambiguous 8:19 9:3

Angeles 4:15

answering 17:6

anymore 30:2

anytime 30:21

apologize 68:25

appeared 4:5

appearing 54:23 55:2

appears 50:18 51:4

Ardalan 4:5,10,16,19,24 5:8 6:18 7:4 8:1 13:2 77:4 79:15

Ardalan's 4:25

area 61:12

arrival 28:21

ARTECH 10:10

articulated 8:22,23,25

articulating 24:19

asserting 28:15

assertion 27:15

assumes 42:9 43:15

attachment 10:21 34:19,20

attempted 50:3

attending 4:9

attention 44:9

attorney-client 6:11,13 13:9 14:4 75:10 78:8

attribute 47:2,5

AUDIO 34:25 36:15 52:13

audit 19:4 26:8,9 27:4,12,17 28:13

August 14:9 31:14 38:1 41:3 48:3,4 49:15 57:2 58:2,6 69:20

authenticate 11:7

authenticating 11:1

authority 20:18,23

authorizing 73:9

aware 16:5,15 33:15 54:20,22 55:10 56:1,6

---

**B**

back 12:22 19:11 22:25 24:11 25:20 28:6 32:15 33:2 34:11 35:11 38:1 41:3 44:2 48:3,7 56:12 57:2 59:18 61:1,19 67:20 69:17 77:1

Backgrid 4:20 8:5,6,18,21 9:8, 22,24,25 10:1,4 15:8,10,14,16,22 19:5,11,17,20,23 20:2,3 22:8 23:1,3,20 25:23,24 26:15 27:12 28:4 29:13,17,19,20 30:3,6,11 31:6 32:21 33:7,16,25 34:7 35:13 41:10,21 42:3,5,10,14,19,22 43:2, 12,20,21 44:8,16,20 45:1,15,21 46:18,24 47:2,12,21 48:8,10 49:8 51:19 52:17 54:21 55:16,17 56:1, 7,10 63:11 66:11,18 67:6,12 73:4, 9,13,18,21 74:3,10

Backgrid's 20:4 29:2,6 31:3 33:25 35:16 59:20,21

background 7:22 16:22 28:25

backing 58:10

Bar 7:1

based 56:17 65:8

basis 49:9,16,17

Bates 14:17,19,21

began 5:23

begin 5:6 8:10,17 9:8

beginning 4:16 11:7 57:16

behalf 5:9 15:13,16,22 16:2 19:11 25:19 78:2

---

believed 46:14

believes 45:22

Benedict 4:14

big-picture 53:12

bit 8:19 12:18 32:4 37:18 48:7 66:14 67:2 71:4,10,16

BOUND 40:21

Boutefeu 35:25 40:25 54:10

box 11:11

break 56:13,19 75:11 77:19

breakdown 36:12,21,24 37:2,9

breaking 32:4

Brittany 41:24 49:24

---

**C**

California 4:4 7:1

call 10:20 16:4 29:18 30:9 32:17 34:4 38:12,14,15,17,23 39:1,4,5,9 46:6,10,22 47:8,19 49:2,12 50:15 51:5,8,18 52:1,11,25 53:11 54:19 56:6 58:19,22,25 59:2,5,8,11,23 60:7,12 61:25 66:4,9,13 67:16,22 69:10,13,24 70:1,5,10,13,14,16 71:9,18,24 72:2,23 73:2,6,8 74:12,18,23 77:16,18 78:11

called 5:9

calls 38:13 72:11

case 4:12 8:7 9:16 10:6 50:15,23 57:6 58:2,4 72:10 76:7

cash 49:15,17

caveat 34:16

Certified 4:3

chain 14:2,8,12 15:21 31:13,16 33:2 58:14

chance 11:11

change 51:1 68:10

characterization 51:1 64:4 67:25

chat 10:25 11:11

check 23:13 24:14

checked 22:8,13 23:1,4,6,12,16,

17,21

**chronologically** 31:18

**claim** 20:1,13 24:18,22,23 25:12 46:17,20 61:6,17,18,25 62:5,7

**claimants** 35:23 39:15

**claiming** 38:20

**claims** 8:7,11,13,14,18,22,25 9:1, 19 10:5,11 28:20 34:12,23 35:9 38:8,13 39:3 60:20 61:14

**clarify** 9:3 38:25 77:13

**class** 36:3

**clear** 5:17 18:10 24:25 38:17 41:18 42:3 47:18 48:8 49:15 54:16 70:6,8 72:20,24 77:22

**clearer** 51:9

**client** 15:11 39:10 51:20 52:9,10, 17 53:1,7 54:14,15,17,21 55:10, 14,15 56:1,7,10,11 66:22 67:10, 17 74:20

**clients** 7:9 8:14,15 9:22 10:11, 12,13 17:3,5,11,12,15,25 25:19 36:22 39:10,11 45:1 46:19 47:12, 13,20 51:23 52:1,6,18 53:17 54:5, 13 55:14,16,17 59:14 60:9,21 63:24 64:17,22 65:9 66:11,21 67:1,8,9,23,24 69:6,13,14 71:20 72:4 73:1 77:5,6 78:1,3

**clients'** 19:1 25:2 26:16 28:20 39:3 43:19 44:9 45:15 51:14 52:22 55:7,12 63:15 71:22 74:3,9

**closed** 41:12 50:11,19 51:15

**CMI** 20:17,22 21:9,12,20,25 22:17 27:25 28:14 32:20 44:10 45:2,9, 16 46:19 47:13,14,15,17,18,23 50:16,23 51:3 57:6,10,18 58:11 60:14,20 70:2,16,24

**co-counsel** 74:20

**Coalition** 4:14

**codes** 47:15

**collect** 42:6,23 48:11

**collectively** 67:1

**communicate** 15:24 58:5,10

**communicated** 16:18,23 17:9, 14 18:3 58:1

**communicating** 16:2

**communication** 5:21,25 18:4,5 23:22 58:15 74:19 78:9

**communications** 6:2,4,7,21,23, 25 7:6 8:24 9:5,9,11 10:10,14 13:10 17:1,22,23 49:8 73:6 74:19, 21,23 75:1,4,8

**complain** 65:25

**complained** 59:12

**complaining** 25:22,23,25 43:23, 25 45:3,4,5,7 46:1,2,12 51:2 52:20 53:12 54:23 55:1 61:21 62:17 63:21,23 64:6 65:1,9,23 66:18 67:5

**complaint** 45:24 63:11 64:18

**complete** 19:18,23 73:1

**completely** 76:18

**computer** 11:17 12:2

**conceal** 21:3,10 50:3

**concede** 62:15

**conceded** 61:25 62:2 64:22

**conceding** 62:16,20 63:1 64:3 65:12,24

**concern** 47:6,9 51:5

**concerned** 51:7

**concerns** 29:1,5 53:15 59:13 61:22 70:1,23

**concession** 27:17

**CONCLUDED** 79:17

**concludes** 79:14

**conduct** 30:6,11

**CONFIDENTIAL** 40:21

**confusion** 55:13

**connection** 8:6,11,18

**consult** 74:14

**contend** 5:21

**contending** 23:2

**contends** 69:23

**content** 74:18

**contention** 18:24 46:15

**contest** 62:13,14

**contesting** 63:8

**context** 48:7 63:17,18,19,20 64:13 65:1 66:19

**continued** 47:12,22 73:20

**continuing** 29:20 34:1,7 35:16 59:20,22

**contribute** 55:20

**contributor** 46:24 47:2,7,8,11,15 51:19 52:4,7 53:10 55:19,25

**contributors** 52:18

**conversation** 29:14 63:17,19,20 64:13 70:9 75:8

**cooperative** 71:9

**copy** 13:7 14:1,8,12,20 78:22,23, 24

**copyright** 18:24 20:23 27:16 44:10 45:22 57:11

**copyrighted** 20:21 21:8

**correct** 6:19,20 8:8 9:12,14 10:2, 3,11,12,15 13:18,19,21 14:1,7,12, 15,23,25 15:8,9,11,12,14,15,17 18:6,15,16,18,22 19:5,8,12,13,21 20:5,8,11,12,14,18 21:4,13 22:1, 5,8,18,22 23:8 24:2,3,4,13 25:2 27:25 28:1,21,22 29:10 30:18,19 31:3,4,7,10,11,20,23,24 32:2,3 34:13,15,16,23 35:8,10 36:5,13, 22 37:7,8 38:9,11 41:1,2,14,21, 24,25 42:11,12,15,19 43:4 44:17, 24 45:2,13 48:20 50:1,12,25 54:11,12,16,17,18 55:8,9,18 56:2, 4,9 57:19 58:11,12,24 60:11 61:8 65:18 66:22 67:11,12 71:1 72:22

**correction** 27:24 37:3

**correspondence** 15:21 16:5,13, 16 19:18,23 21:22 34:13,14 43:11 46:11 55:5 57:16 58:7 71:25

**correspondences** 16:9

**counsel** 5:22 7:11,16 8:5 11:18 15:8 18:18,20 76:5

**counterclaims** 39:10,12,22

**couple** 22:25

**court** 4:14 5:3,10 32:1 35:1 68:4 75:24 76:11

credit 37:11 70:2

credited 50:17,24 51:3 57:9,18, 23

cropped 41:19 50:1,7,11

CROSS 18:8 68:17,19

CSR 4:4 5:3

cut 68:25

**D**

data 51:11

database 57:9,17,23

date 50:1,3,7

dated 13:6 15:7 58:21

Dave 78:17

David 4:23 5:1 56:22,24 75:6

day 4:1,2 32:8 49:19 58:23,24

dead 28:21

defendant 20:21 21:7

Defendants 4:20

defending 4:25

defenses 39:3,8

define 34:22 55:15

deleted 50:16,23 51:2 57:6 70:1, 16

demanded 19:4,7 73:12

deny 24:4 43:11

denying 43:2

deposed 5:18

deposition 4:10,25 6:6 7:20 10:25 16:20 74:15 78:6 79:14

depositions 56:17

DESIGNATED 40:20

detail 29:15 39:22 53:20 62:12 63:22 66:16

details 30:2 51:13 67:4,14 71:13, 20

difficult 23:13

difficulty 71:24

directly 23:20

disagree 7:22 26:18,21 42:20 43:18,22,23

disappeared 52:25

disclose 49:7 51:25

disclosed 9:19 44:23

disclosing 32:18

discoverable 16:21 17:16

discovery 5:24 6:2,24 7:8

discrepancy 32:10

discuss 6:23 30:2,5,9,14,20 31:5 32:17 33:21 35:13 38:16,21 39:9, 12 49:13 51:18 52:16,17 53:4,6,9 61:14 62:10 67:4,12 70:4,15 71:23

discussed 5:16 16:25 30:14 34:1 35:16 38:19 46:10,23,25 49:10 50:15 51:21 52:3,4 53:18 54:14 59:11 60:7 66:4,10,12,19, 20 67:22 69:5,10,12,16,23 70:1,4, 10,13 78:6,11,12

discussing 34:10 38:25 39:2 52:6,23 56:9 58:7 62:5 69:11,23

discussion 46:5 76:6

dispute 45:10,13,16

disputes 50:13

distribute 72:4 73:5

distributing 20:21

distribution 21:2,8

document 25:3 48:21 51:2 77:20,23

documents 31:2

dogs 37:17

double 20:14

doubt 14:11 72:10,13

download 11:3,4,17,18,19,25 12:1

downloaded 12:1

downloads 11:19 12:2

dropped 54:24

dropping 46:17

due 32:20

duly 5:10

Duplaquet 36:1 41:1 54:9

**E**

e-mail 5:16 6:3 10:14,19,21 11:12,14 13:11 14:1,3,8,12,15,23 15:2,20,21 31:12,16,17 33:2 34:14,19,21 35:19,23 36:7,11 37:14,15 41:3,8 42:1 43:2 46:11 48:3,6 49:14,21 50:8 51:10 57:3 58:13,20 69:20

e-mailed 12:9 41:20 50:4

e-mails 12:8 14:6

earlier 33:23 35:15 37:13 43:11 53:18 75:10

easier 11:6,13,15 12:8

effect 39:17 64:10 72:21

enable 21:3,9

end 20:18 21:4 69:22

enjoy 56:18

entered 66:21 67:23 69:6

entitled 5:24

entity 8:10 10:5

equivalent 28:2,15,17

Essentially 62:16

estimate 46:13

estimated 36:21

estimates 36:13 37:7,8

et al 4:11,12 79:15,16

evidence 19:8 24:7 25:3

exact 72:21

EXAMINATION 6:15

examined 4:5

examples 48:12

exception 48:14

exclusive 70:9

excuse 11:16 39:14 46:8 54:24 68:9

**executive** 18:14

**exhibit** 13:2,3,4,13,14,15,23,24 15:4,6,13,21 16:10 18:11,13,23 19:10,14 25:20,22 28:19 31:12 41:17 44:2 48:4 58:20 69:17

**exhibits** 10:25 11:3

**exist** 24:22 28:4

**existed** 62:15,17,21

**existence** 65:3

**exists** 28:18 65:24

**expect** 19:22

**expecting** 71:16

**expertise** 61:13

**expired** 38:8 41:11

**explain** 8:20 21:17 29:12

**explained** 25:9 33:24 53:2,14,16 59:25 61:6

**explanation** 52:24

**explicitly** 23:1 64:22 65:17

**expressly** 22:12,13,16 24:21 25:13 46:4 50:2 64:12,13,24

**extent** 6:5 7:7 34:18

**extreme** 29:15

---

**F**

**face-to-face** 35:9

**facilitate** 21:3,9

**fact** 22:17 24:5 46:23 49:23 50:23 51:19 52:17

**fail** 61:7 62:1,7

**fair** 10:23 17:4 23:19 32:11 33:9 46:24 48:1 55:16 60:18 61:24 62:8 64:3,23 67:25 72:16

**false** 73:24

**Fameflynet** 39:20,25

**faster** 12:8

**fee** 42:6,23 48:11 49:17 70:24

**fees** 59:14 60:10,13,19

**felt** 71:8

**figure** 39:6 53:22 58:18

**figured** 56:19

**file** 11:18,19 12:2 39:10

**filed** 8:21,22 9:6 10:7 30:17

**files** 14:19

**final** 58:15 69:19

**fine** 6:4 54:25 56:14,16 60:24 76:21 79:2

**finish** 46:8

**finished** 46:9

**Flynet** 4:12 43:3,13 79:15

**focus** 61:22

**follow** 7:15 8:1 29:21 30:1

**follow-up** 78:17

**forgot** 35:4

**formed** 41:10,21

**free** 34:4 49:11

**freeform** 76:6

**French** 36:3

**friendly** 59:23

**front** 31:15

**frozen** 68:2 75:24 76:1,12

**full** 6:17 28:9

---

**G**

**gather** 6:6 39:6

**gave** 46:13 71:17

**general** 16:12 18:17,20

**give** 7:6 17:21,22 23:24 24:11 28:9 59:16,17,18 60:4 66:15 70:21,22,23,25 71:7,25 73:23

**giving** 6:1 11:9 24:14 49:12 54:2 73:24

**Godoy** 4:3 5:3 43:7 61:1 69:3

**good** 4:8,17,23 5:1,3 9:23 14:18 78:20

**granted** 73:18

**grounds** 7:18 14:3

**group** 24:9 44:7,20 45:20

**guess** 32:12,13

---

**H**

**hair** 79:8

**hand** 67:24 69:14

**happen** 43:1 48:13

**happened** 42:21,25

**happy** 8:20 9:3 17:24

**hate** 21:14

**hear** 4:17 30:23,25 32:5 37:22 52:14 68:6,12,14,23 69:1 75:25

**helpful** 48:13

**hesitation** 70:2,3

**highly** 40:20 72:10,13

**hold** 11:9 76:11

**hope** 79:5

**hour** 4:2

**hun** 76:17

---

**I**

**IDENTIFICATION** 13:3,15,24

**identified** 15:10 16:6 21:12,20 22:20 24:2 26:9 27:13 35:23 40:23 45:1 67:10

**identify** 4:16 19:24 21:25 23:14 25:6,7 31:1,2,5 39:24 48:19 49:3

**identifying** 19:19,25 32:19

**ignore** 14:4

**image** 37:11 38:4,8 50:1,7,11

**images** 43:13

**implication** 49:22,23

**implicitly** 23:3

**implied** 23:12 25:14 69:15

**implies** 23:16 24:21

**imply** 23:8,11,20,24

**important** 5:24

**impossible** 25:9

**impression** 61:11

**improper** 60:20

**in-person** 5:16 6:8 34:22

**inaccurate** 69:24,25

**inbox** 12:10

**includes** 77:21

**including** 34:21

**incorporated** 32:22 33:8,17 34:6 35:14

**incorrect** 10:16,17 27:15 28:14 47:17 60:14

**individual** 14:21 39:24 40:24

**induce** 21:3,9

**inevitably** 57:11

**inference** 65:4,6,14 66:3

**inferring** 64:2,5

**inform** 16:1 46:16 73:2,16,20

**information** 6:6 18:25 19:19,25 22:4,24 24:11,14 27:16 28:14 39:6 44:10 45:22 53:22 60:4,14 71:6,8 72:1

**informing** 67:15

**infringement** 21:4,10 24:2,5,23 25:2 57:11

**initial** 14:19 18:10 19:24 45:12

**instructed** 7:5

**instruction** 7:15,16 8:2

**interested** 78:25

**interesting** 61:3

**internet** 12:14 68:5 76:14

**investigate** 39:18 59:16 72:1

**invited** 30:16

**Ireene** 4:3 5:3

**issue** 8:7,20 11:9,11 12:4 20:1 23:15 30:9,10 32:17 33:21 34:5 38:16 45:12 47:13 57:17 58:6 71:1 75:2 76:14,22

**issued** 42:3,14,19 48:8

**issues** 21:21 42:10

---

**J**

---

**jardalan@onellp.com** 14:24

**Jeremy** 35:25 37:5 40:25 54:8,9

**Jerome** 35:24 37:4

**Jo** 32:16 79:2

**Joanna** 4:5,10,19,24 5:8 6:18 79:14

**John** 18:15

**July** 13:17 14:9 15:7 19:16 31:13, 19,22 32:9 33:13 35:20 36:6,7,20, 23,24 41:20 58:21

**June** 9:20 13:6,12 44:22

---

**K**

---

**Kim** 4:14

**knew** 63:1

**knowing** 48:12 56:19

**knowledge** 20:17,22 21:2 77:25

**Kyndt** 35:24 40:25 54:9

---

**L**

---

**language** 26:24 47:3,5,8 77:21

**Lapham** 13:7 18:13,14,15,17 26:4 45:18

**late** 9:18,20

**LATENCY** 34:25 36:15 52:13 68:1 75:23 76:3,9

**laughing** 56:22,25

**law** 10:10 20:24 61:12

**lawsuit** 8:15,21 9:6 10:6 54:17

**lawyer** 5:18,19 7:8

**legal** 61:14

**length** 50:15

**lengthy** 56:18

**letter** 10:14,19,20,21,22 13:6,8, 11,17 15:6,10 19:7,11,16,17,24 21:1,11,24 22:7,9,12,16,22 23:1, 3,5,6,11,16,20 24:1,4,6,8,15,17, 19,20,25 25:1,5 26:4,17,24 27:9

---

28:13,19,24 29:9 30:16 31:1,5,22 34:18,20 44:22 45:11 46:3,4 77:25

**letters** 24:12

**liability** 30:11

**liable** 30:6

**libraries** 27:12

**library** 19:5,21 20:2,4 22:8,13 23:2,4,7,12,14,17,18,21 32:21,22 33:7,8,17 34:6 35:13,14 43:21,24 44:8,17,20 45:1,5,16,21 46:18 74:4,10

**license** 25:24 26:1,3,5,16,25 27:17 28:3,15,18 41:12,15 42:3, 14,19 43:3,20 47:12,22 48:8,19 49:3 59:14 60:2 62:8 63:1,10,11, 14 64:3,7,10,22,25 65:3,7,12,16, 18,24 66:5,11,21 67:23 69:6,10, 13 72:5 73:5,10,14,17 74:9

**licensed** 53:3 60:14,19 63:22,25 64:1,17 66:16 67:4

**licensee** 62:11

**licensees** 62:11

**licenses** 24:20 25:11,17,21 42:10 62:13,14,15,17,20 73:7 77:5,17

**licensing** 43:12 60:10,13,19 70:24

**limitations** 38:8,16,19 39:1 41:11

**limits** 7:10

**LINES** 40:20

**link** 50:5,10

**list** 19:18,23

**litigation** 5:19,23 8:5,24 9:1 10:2 15:8 16:17,24 17:2 67:9 77:8,10, 11,20,23

**litigations** 16:19

**LLC** 4:12 79:16

**LLP** 4:23 6:19

**location** 11:24 19:20 20:1,4

**log** 52:18

**logging** 52:6

**long** 41:10,21 59:2 60:2

**longer** 50:18,24 51:4 73:9 74:9

**looked** 31:23

**Los** 4:15

**lost** 70:24

**lot** 39:20 53:19

**M**

**made** 21:22 30:17 31:6 43:15 49:24 50:6,10 56:5

**Magazine** 41:19

**mail** 10:22

**make** 5:17 6:9 23:2 24:13 34:17 37:22 51:9 54:1,16 70:6,8

**makes** 49:15

**making** 24:18 49:25

**management** 18:25 27:16 44:10 45:22

**MARKED** 13:3,15,24

**massive** 68:5

**material** 20:21 21:8

**matter** 4:11 7:11 60:3,15 79:15

**matters** 17:4,10,15,25 18:2,4

**Mauvilain** 4:11 35:25 40:25 54:10 79:15

**means** 55:14 65:7,11

**meant** 75:6

**memorialize** 74:18

**mention** 39:13

**mentioned** 39:21

**merits** 76:7

**message** 5:16 37:14 43:12 49:14

**Michel** 35:25 37:6 40:25 54:9,10

**mind** 65:7,11

**minutes** 59:4 68:6,8 75:12

**mischaracterizes** 26:19 27:2,18

**missing** 36:12 43:24 44:1 45:4 46:13,14,23 47:7 48:12 59:14 60:10

**misspoke** 41:24 75:10

**misstated** 15:16

**misstating** 63:5

**misunderstanding** 29:1,6

**moment** 54:4 69:17

**Monday** 4:1,11

**money** 39:20,25 40:24 53:18 54:5,11

**morning** 4:8,17,23 5:1,3

**mouth** 72:14

**multiple** 38:13

**N**

**names** 32:18 33:3,10 36:5

**nature** 43:10

**necessarily** 42:24 56:2

**needed** 33:10,13

**nevermind** 53:5

**Nicod** 35:24

**Nodinot** 35:24

**non-privileged** 74:21,22,25

**non-work** 75:3,7

**norm** 48:14

**normal** 34:1,8 59:21

**notes** 74:12,14 75:13

**notice** 73:24

**number** 4:12 14:19 36:21

**numbers** 14:21

**nuts** 37:18

**O**

**object** 6:7,24 17:7 22:9

**objection** 7:2,23 22:11 24:6 26:19 27:2,18 72:11

**obscuring** 49:23

**occurred** 24:5

**odd** 14:22

**offer** 17:23 47:22

**offered** 43:20 47:12 74:9

**offering** 43:3 56:19 73:13

**open** 11:18 13:2,4,5,13

**operated** 50:14

**operates** 49:8

**operations** 29:20 34:1,7 35:16 59:20

**opportunity** 6:1 49:13

**oral** 69:15

**order** 31:17

**Ordonez** 35:25

**overstatement** 71:4,10

**owner** 20:23

**owners** 27:5,8,14,22

**P**

**p.m.** 31:19 35:20 58:22 75:17 76:24 77:2 79:16

**pages** 14:21 41:24

**paid** 42:4,5,14,18,22 48:9,10 49:15,17 60:13,19

**paragraph** 18:24 29:3 41:8 42:2 45:9 48:6 57:7 69:19,23 70:10

**Parant** 5:23 6:3,23 7:7 9:11 10:10 13:7,18 14:8 15:6,24 16:1,5,14, 16,23 17:2,10 18:3,24 19:4 20:3 21:12,25 22:3,7,24 25:19 26:2,15 29:12,17,21 30:2,5,10,16,20 31:13,22 32:15 33:22 34:10,15,23 35:8,12,20,23 36:8,11,20 38:12, 15 41:20 43:12,18 46:16 47:10,19 49:3,8 51:18,22 52:24 54:19 55:23 56:10 57:15 58:1,6,9,14,16 59:7,9,12 60:9,12 62:6,10 63:14 64:21 66:4,9,10,20 67:10,16,22 69:10,12 72:2 73:2,8,12,16,23 74:2,6,8 78:11

**Parant's** 15:2 19:7 28:13,20 33:3,7,16 34:12 39:3,11 54:14 57:2 77:5

**Parent's** 23:21

**part** 21:5,18,19 27:20 38:19 44:8, 19 45:21 54:25

**parties** 4:24 5:19 66:5,10,12

**partner** 6:19

**party** 66:16

**past** 53:17

**PAUSE** 68:11

**payment** 48:19,23 49:3

**payments** 31:6

**PDF** 14:19 36:8

**pending** 75:20

**people** 23:11 39:15,19 41:19 49:15

**per-claimant** 36:12,21

**percent** 72:15

**permission** 11:10,21,23 64:7 72:4,25 73:4,17

**person** 7:8 40:23

**personally** 4:5 78:4

**phone** 6:3 16:4 29:14,18 30:9 38:12,14,17,23 39:1,4,5,9 46:6, 10,22 47:19 49:2,12 51:5,12 53:2 54:19 56:6 58:19,22,24 67:16,22 71:9,12,18,19 73:6 77:15,18

**photo** 37:11 41:16 50:4 70:16

**photograph** 37:11 41:23 49:24 50:17,24

**photographer** 42:4,14,18 48:9, 20,23 49:4,17

**photographer's** 50:18,25 51:4,6 70:17

**photographers** 9:14,16,19 19:19,24,25 22:20 23:15 24:9,10 25:6 28:5 31:7,8 32:18 33:4,10,14 44:7,21,23 45:6,20 55:20 57:10, 18,24 72:3,25 73:3,9,12,17

**photographers'** 8:7 29:1 42:10 71:15

**photographs** 25:23 36:12,22 43:3,24,25 44:1 45:15,23,24 46:12,14,23 47:6,11,20,22 51:5, 13 52:25 53:7,10 54:23 55:2,20, 24 57:8,17,22 60:14,19 62:8,21 63:2,15,21 64:16,18,23 66:18 67:6 71:21

**photos** 52:21 53:3,12,14 59:13 62:19 71:14

**phrase** 26:3

**Pictures** 4:12 79:16

**place** 38:17 58:25

**plaintiff** 54:17

**plaintiffs** 5:2,9,21 8:25 9:16 10:6 39:14

**play** 43:1

**PM** 79:17

**point** 15:24 16:1 31:9 33:1 38:20 46:16 47:19 49:7 58:9 64:9 71:24

**pointed** 38:4 75:6

**portal** 45:6 46:24 47:2,7,8,11,21 51:19,20,23 52:1,4,7,9,11,17,18, 22 53:1,7,10 54:21,23 55:2,7,10, 12,14,15,19,25 56:1,7,10,11 61:22 62:18,19,22 63:2,9,10,12, 16,21 64:1,6,8,17,19 65:2,10,23 66:19 67:6 70:25

**portals** 45:25 47:4 51:21

**position** 19:17 21:11,16,17,18, 19,24 24:1 25:17 28:20 31:3 38:7 58:10

**positions** 38:10

**possibly** 24:22

**precise** 21:18 58:5 67:7

**precisely** 21:17 32:20 51:13 71:13

**prepare** 79:8

**prepared** 61:14

**present** 4:9,15

**presented** 8:25 16:13

**preserved** 19:8

**pretty** 59:23

**previous** 44:18 77:14

**prior** 8:22,24 9:1 10:6 26:20 27:3 56:17 77:8,9,11

**privilege** 6:13 14:4 75:10

**privileged** 75:7 78:8

**problematic** 32:19

**problems** 53:16 68:5

**procedural** 75:20

**proceed** 33:11,14

**PROCEEDINGS** 79:17

**process** 12:14

**produced** 14:14,16 16:14 74:24 77:20

**product** 6:11,12 74:17 75:4,9

**product/non-attorney-client** 75:7

**pronunciation** 36:4

**proper** 57:10,18,24 70:2

**properly** 50:17,24 51:3

**provide** 19:17 40:1 51:12 52:24 53:21 59:15 71:6,13,20

**provided** 22:4 36:11,20,24 37:10 51:11

**prying** 17:25

**public** 7:11 31:1

**publicly** 30:17

**published** 50:4

**purchased** 29:19 33:25 35:17 59:21

**purported** 7:24

**push** 61:19

**pushed** 62:3

**put** 5:15 10:24 13:5 63:15 72:14

**putting** 52:16

---

**Q**

---

**qualify** 29:25

**question** 7:14 8:13,19 9:2,3,23 14:7,16,18 15:18,25 16:12,22,23 17:6,13,18 18:10 23:19,23 26:9, 14 27:13,21 28:6,10 30:23 35:3,4, 11 36:18 37:22 42:16 43:5,8,15 44:18 47:18 51:14 54:1,3 58:5 60:22 61:3,23 62:24 66:14 67:3, 20 69:1,3 70:6,8,18 71:14,18,21 72:7 75:19 78:2

**questions** 7:22 11:2 17:1 22:25 29:21 30:1,13 34:3 49:11 53:21,

MAUVILAIN, ET AL. vs FLYNET PICTURES, LLC, ET ALK.        JOANNA ARDALAN Non-Confidential
2:25–cv–2757–FLA–MAA, 05/25/2026        CERTIFIED COPY        Index: quickly..scroll

24 76:2,5 77:14,15 78:15

quickly 23:5

Quinto 4:23 7:2,11,15,17,19,25 17:7 22:9 24:6 25:3 26:6,19 27:2, 18 48:21 65:20 66:23 68:8,21,23 72:11 74:25 75:3 76:4 77:8 78:18

quiz 28:24

quote 19:18 20:13,17,18 21:2,4 29:1 30:17 33:12 41:9,12 42:2 48:7 50:8,11,14,19 51:10,15

quotes 25:12

**R**

raise 30:12

raised 77:19

ranges 14:17

rare 48:14

re-printed 41:16

re-read 23:9 69:3

reach 12:10

read 23:15 27:9 28:6,8 43:9 61:1, 2 69:4

reading 23:5

ready 12:11 37:23

reason 14:11 17:21 21:2,7 62:21 63:13 77:19

reasons 62:7

reattributed 26:10,11 27:8,13 28:5

reattribution 27:5,21,24 28:14

recall 16:8 38:25 39:2 53:23 56:8 59:10 65:21 69:5,12 72:8 78:13

receive 13:7

received 12:12,13 14:20 36:4 37:9 77:25 78:5

RECESS 75:16

recipient 58:14

recollection 23:6 29:16 30:8,15 34:10 35:18 48:2 51:24 52:10 53:11,20 54:2 56:8 58:25 59:1,3 60:17 61:20 64:21,24 67:15 69:11 71:5,23

record 4:8 5:15,17 6:9,17 7:12 12:17,19,20,21,22 28:8 37:20 41:18 43:9 47:18 54:16 56:24 61:2 69:4 72:24 75:15,17 76:14, 15,16,22,23,25 77:1 79:3,4,5,16

redacted 14:3

referred 54:4

referring 9:21 31:1 41:15,19 44:16,19 45:14 48:17 55:15 67:8

reflect 47:15 56:24

refusing 7:14 17:18

regard 9:9,15

relate 77:15

relates 17:21

relationship 7:9 29:2,6,10,13,17 30:3

Relevance 7:2

relevant 17:23

remember 16:3 29:25 52:10 56:9 59:5,6 60:6 64:12,14 67:14,19 69:9,16 72:2

REMEMBERED 4:1

remotely 4:9

removal 21:9

removed 18:25 20:17,22 21:13, 20,25 44:11 45:2,9,16,23 46:19 47:17,23 74:3

repeat 35:1,3,5 36:16,18 42:16 43:7

rephrase 48:17 62:23

reply 32:16

reporter 4:4 5:3,5,10 32:1 35:1 68:4 75:24 76:11

reporter's 76:18

Reporters 4:15

reports 30:17,20 31:2

represent 4:19,24 8:20 10:1,5 14:14 16:15 17:11 24:9 44:7

representation 9:18 43:15

representations 9:21

represented 39:19

representing 5:2,19 8:10,17 9:8 16:6 39:15,18

represents 45:19 70:10

request 26:8 27:16 32:23

requested 27:12 36:5 70:19,21

requesting 26:8 27:4 63:15

requirement 20:14,16,20,25 21:1,6

resents 49:22

respect 8:13 9:13,18 10:4,5 16:17,18,24 17:1,2 21:22 22:4 33:12,23 34:12 40:23 64:15 70:15 75:8 77:13,17

respond 6:22 33:3,6,12 43:13,14 61:9

responded 25:7 33:16 43:16 61:10

response 19:10 22:21 23:21 29:22 32:8,9 38:1 41:22 49:19 66:15

responses 77:17

responsive 67:3

restored 47:11,21

reverse 31:17

review 28:23 30:17

revocation 73:7 77:5,21

revoke 77:15,16

revoking 72:3,25 73:4

rightful 27:5,8,14,22

**S**

satisfied 47:20

save 11:10,23

saving 11:10

scienter 20:14

scope 6:21,25 7:2,6,19,24 16:20 69:10 78:6

screen 13:5

screenshot 41:20 50:5,6,9

scroll 37:10

**seconds** 68:9,10

**Section** 19:2 44:12

**seek** 7:8

**send** 24:8 50:5,9

**sending** 15:13

**sense** 9:2,17 10:22 25:14 61:14, 18

**sentence** 26:3 41:9,22 42:9,17 55:1 57:20,21 69:22 70:15 71:2

**SEPARATELY** 40:21

**Sergenian** 5:1 6:16 7:3,13,16,18, 21 8:1,4 10:24 11:6,12 12:9,17,24 13:1 17:8 22:15 24:24 25:15 26:13,23 27:10,23 28:6,10,11 32:1,4,7 35:5,7 37:19,24 40:22 43:7,17 49:1 56:13,17,24 57:1 61:1,5 66:2,24 68:2,13,15,20 69:2,8 72:12 75:11,19 76:1,10,16, 21 77:3,9,24 78:15,20 79:2,7,11, 12

**series** 76:2

**serve** 15:7

**sessions** 56:18

**set** 20:7 32:16

**settle** 60:15,20

**she'd** 30:12

**Shorthand** 4:4

**show** 14:18

**showing** 70:22

**shrinking** 56:20

**Shutterstock** 4:20 8:6 9:24 10:2 16:2,7 18:14,18,21 26:16 29:2,7, 13,18,19 30:3,5,11,18 32:22,23 33:8,17,25 34:6 35:14,17 44:9 46:19 59:21 67:13,16 73:4,10,13, 18,21

**Shutterstock's** 55:16,17

**sic** 25:8

**side** 14:15,17 16:14

**signature** 13:20

**simply** 33:25 35:17 67:21

**single** 48:19 49:3

**sir** 76:15

**sit** 30:8 64:20

**situation** 42:21

**situations** 42:13,18,24

**skipped** 21:5

**skipping** 76:19

**solely** 7:23 9:21 63:14 74:19

**sort** 6:10 13:9 17:23 32:10 62:12

**sounded** 63:13

**sounds** 20:19 25:24 26:1,12,14 28:12,22 59:1 62:18 63:10 64:2,9 65:6 67:21 72:14

**spanning** 14:8 31:13

**speak** 24:15 56:20 78:2,3,4

**speaking** 9:13,15

**speaks** 22:9 24:6 25:3 48:21

**Spears** 41:24 49:24

**specific** 11:2 17:11,12 31:2 34:3, 5 41:23 48:12,23 52:5 53:23 71:18

**specifically** 25:18 45:14

**speculation** 72:11

**spoke** 34:22 35:8

**standard** 20:7

**stands** 16:23

**start** 9:5 11:1

**started** 5:14 9:18 70:19

**starting** 6:20

**starts** 49:22

**state** 4:4 5:10 6:17 22:7,16 23:1 25:1 29:9 46:3,4,7 47:19 48:6,7 58:21 60:12 72:15,17,18,19

**stated** 20:13,16 22:25 26:15 28:13 41:9 42:1 48:22 50:8 54:8 55:23 60:9 62:5,6 70:12 72:9,24

**statement** 22:3 29:22 48:20,23 49:4 55:9 56:4 71:9

**statements** 56:5

**states** 21:1 23:3 26:4,17,25 33:3 37:4 45:8 49:21 50:14 51:10

**stating** 26:2 28:2 49:22

**stating/reiterating** 50:22 57:15

**statute** 38:7,16,19 39:1 41:10

**stay** 77:17

**stealing** 40:24 54:5,11

**step** 34:11

**Stephane** 35:24 37:5 40:24 54:8, 9

**stole** 39:20 53:18

**stolen** 39:25

**stop** 73:13

**submitted** 43:3 66:17

**substance** 48:1 60:13 72:3 73:3

**substantive** 75:21

**substantively** 61:10

**sum** 48:1 60:13 72:3 73:2

**support** 48:20,23 49:4

**supporting** 31:3

**supposed** 24:14 66:11

**suspect** 29:5

**swear** 5:6

**sworn** 5:10

**system** 25:24,25 26:1 59:20

---

**T**

**tact** 22:17

**taking** 18:23 25:17 27:20 50:6 56:13,14

**talk** 14:6 18:8 56:11 60:18 68:17, 19

**talked** 53:5 59:19 60:1,16 61:18 67:13,18

**talking** 9:10 52:21 55:6,12 75:20

**telephone** 10:15,20 33:21 34:11

**telephonic** 34:14

**telling** 67:21 72:2

**ten** 75:12

**tens** 18:25 44:11 46:17

**term** 52:8,10,17

**terminating** 73:17

**termination** 77:4

**terms** 52:5 53:17 55:15 61:13

**terrible** 36:4

**testified** 5:11 33:23 35:15 78:12

**testifies** 73:23

**testify** 6:21 23:10 74:16

**testifying** 6:12

**testimony** 7:6 26:20 27:3,19 73:24,25

**their/shutterstock's** 57:9,23

**Thibault** 35:24 37:6 40:25 54:9, 10

**thing** 12:15 45:17,19

**things** 6:12 17:4 18:1 22:2,6 53:20

**thinking** 60:23

**thought** 46:9 55:11

**thousands** 19:1 44:11 46:17,18 57:8,17,22

**threshold** 60:3

**ticky-tack** 21:14

**time** 13:8 18:4,5 23:9 28:23 33:1 37:13 38:21 40:1 41:6 43:6 44:20 52:11 54:3,15 58:9 60:8,22 67:9 76:19 78:16 79:12

**timecode** 32:11

**today** 4:21,24 5:20 6:10 17:5,17, 22,24 30:9 64:20 78:12

**today's** 79:14

**Todays'** 4:10

**told** 6:8 16:25 29:16,19 34:7 51:11 60:1 62:6 71:12

**topic** 70:9

**transcript** 78:23,24 79:9

**transcripts** 78:21

**tricky** 70:3

**trouble** 76:18

**true** 14:1,7,11 28:16

**truth** 5:11

**turn** 57:11

**U**

**U.S.C.** 19:1 44:12

**Uh-huh** 38:6

**unable** 45:6

**unauthorized** 73:21

**underlying** 24:23 25:11

**understand** 8:12,14 9:6 61:17 62:20 67:8 78:10

**understanding** 32:21 33:7,12, 16 39:16 55:24

**understood** 15:18 34:21 47:1,3, 4 62:16,25

**undisclosed** 44:21

**unhelpful** 21:23

**unknown** 44:20

**unrelated** 17:15

**unusual** 5:18 6:5

**updated** 47:15 70:24

**updating** 12:14

**uproariously** 56:25

**USA** 4:21 8:5,18,21 9:8,22,24,25 10:1 15:8,10,14,17,22 19:11 23:20 26:15 67:12

**usage** 50:5,6

**usual** 35:16

**V**

**vague** 8:19 9:2 25:8 66:14 67:2

**vanished** 51:14 55:24 71:14,21

**vanishing** 53:7,10

**versus** 4:12 79:15

**viable** 61:18

**Victor** 35:25

**video** 68:1,3 75:23 76:3,9 78:23, 25 79:10

**video-recorded** 4:10 79:14

**Videoconferencing** 4:3

**viewable** 50:1,7,10

**Viktor** 37:4

**violation** 19:1 20:8,9,10 25:8,10 44:12 59:25 60:3

**violations** 57:10,19 58:11

**violet** 56:20

**Virginie** 5:23 6:2 9:11 10:10 13:6 25:19

**VO/JN/FLYNET** 37:12

**vp@artechlaw.com** 15:1

**W**

**wait** 75:19 76:4

**waiving** 6:10 13:9

**walk** 61:16 65:5

**wanted** 28:13 30:13 61:17 63:9 77:22

**whatnot** 39:8 47:5 70:25

**Wi-fi** 68:10 69:1

**withdraw** 15:25 51:9 53:8 66:7

**withdrawing** 46:20

**witness's** 26:19 27:3,18

**word** 58:15

**words** 25:5,14 27:24 39:17 43:11 48:1 63:7,9 64:10 65:21 72:14,21 74:20 75:9

**wordsmith** 65:15

**work** 6:10,12 19:20 20:2 26:16 60:1 74:17 75:9

**work-product** 74:22,25

**worked** 49:11

**works** 19:1 20:1,4 22:17,19,21 24:10 25:2,7 26:9 27:6,7,11,13 28:4 32:19 42:10 43:19 44:8,12, 16,19 45:1,4,7,21 46:17,18 61:21 62:17 63:8,9,25 64:6,8 65:1,9,23 72:5 73:5,10,14,20 74:3,9

**worries** 79:1,13

**write**  24:12 51:8 57:5

**writes**  45:9

**writing**  6:8 16:6,11 33:6,15,18,19 58:16 67:12

**written**  16:13,16 69:15 77:4

**wrote**  15:7 19:11 28:25 32:15 38:1 41:4 44:6 45:17,19 57:5,6

**Z**

**Zoom**  4:2,9