# Exhibit 22

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

THIBAULT MAUVILAIN, an

Individual; HENRI MAZARI, an

Individual; JEREMY DUPLAQUET, an

Individual; ROBERT CHRISTIAN

WOLF, an Individual; MICHEL

BOUTEFEU, an Individual;

STEPHANE KYNDT, an Individual;

and JOSEPH MEHDI, an Individual,

        Plaintiffs,

    v.                              Case No.

FLYNET PICTURES, LLC, a            2:25-cv-2757-FLA-MAA

California Limited Liability

Company; FAMEFLYNET INC., a

California Corporation; BACKGRID

INC., a California Corporation;

BACKGRID USA, INC., a California

Corporation; SHUTTERSTOCK, INC.,

a Delaware Corporation; and DOES

1-10, Inclusive,

        Defendants.

_____

Page 1

VIDEOTAPED DEPOSITION OF THIBAULT MAUVILAIN

DATE:           Monday, May 18, 2026

TIME:           10:11 a.m.

LOCATION:       Veritext

                707 Wilshire Boulevard, Suite 3500

                Los Angeles, CA 90017

OFFICIATED BY: John Canfield

JOB NO.:        8175694


PAGES 13-14, 148-153 ARE CONFIDENTIAL

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

million annually.  At least six of them were coming from international, which I was just in charge of coordinating with the agent, and I was doing the sole domestic sales.  So I had weekly reports with the owners about the weekly sales for the company.  I was in charge of licensing every single photograph as well as making up the subscription deals and so forth.

Q   Okay.  And so you oversaw the entire licensing --

A   Yes.  I did --

Q   Well, hold on.  Let me finish my question.

A   Yes.  Sorry.

Q   Okay.  So you oversaw the entire licensing efforts of FameFlynet while you were working there?

A   For -- for the -- for the time, I was, yeah, asked to do it.

Q   Okay.  So you would negotiate terms?

A   Uh-huh.

Q   Is that a "yes"?

A   Yes, it was.

Q   Okay.  And would you review the usages after the photo was licensed?

A   Yes.  The tools were not as developed as they are today, but we were starting to -- to work with some tracking monitoring services, or we would do the good

Page 26

actual percentage for the split that was expected on the -- revenues.

Q    Okay.  So let's talk about a situation where  -- let's talk about pooling a set.  Just at the most basic level, what is pooling a set?

A    Pooling a set would mean you're taking photograph of a specific subject.  So you have your photograph coming straight out of your camera, but you're in the context where another individual is here, and he's got his own set of photograph of this actual event that you'll capturing.

So now you have two options, either release your photo independently, or pool to sell photograph.  Meaning, possibly share revenues associated by just merging the combined photograph together in one set in order to make, again, possible stronger distribution deals and increase the potential of revenues.

Q    Okay.

A    So to my knowledge, the definition of pool means, again, associating pictures together from another contributor.  But it's strictly in the pursuit of making, again, better sales, better distribution, not compete against each other.  Nothing to do with sharing copyrights or -- which again, try to acquire or rights that did not belong to whoever contribute that

Page 75

photograph.

Q    Okay.  So let's go through an example where you may pool a set.  So let's say you see Lady Gaga at the mall and Jeremy Duplaquet is also there.  So you both take photos of her at different angles, and you decide to submit the photos as one set.  Is that --

A    Yeah.

Q    -- essentially how it works?  So there's one --

A    Well, each photographer would send them individually, but likely, it would come -- and at the time, again, today it's different; the tools are much better.  But at the time, we would send in an email or call the company at a time saying we want to pool this together.

Q    Okay.

A    So a way for the agency to know is just, let's say, if it's just me and Jeremy, we would still mark it as exclusive, so they would know that it's not coming from anywhere else.  But, yeah, at the time, we needed to communicate lot by phone.

Q    Okay.  When you pooled a set, was there an expectation that the contributor codes -- that both contributors codes would be in the byline?

A    From the Flynet/FameFlynet era, I mean, the

Page 76

when you graciously give us access to Backgrid portal in January --

Q    Okay.  So I want to go back to my original question, which was, if a photograph that you took is pooled with another photographer, do you have an expectation of both bylines being in the published work, even though it's your photograph?  Or do you have the expectation that it just be your byline?

A    I'm going to be very frank with you, again, by reiterating.  To me, the byline is just a title.  It's a fancy title in the magazine.  What matters to me is the copyright ownership.  As long as I'm the author, as I'm listing it in the photograph when I submitted, I'm good.  You can put your name on my photograph.  It has actually happened in the past.

Especially when you work at an agency level, sometimes there are events where we get what are called "end outs."  Okay.  What is an end out?  I'll give you an example.  The funerals of Michael Jackson's were going to be covered by only one photographer to photograph the family.  What they did after that, they hand over the photo to each agency.  So I had a set of photograph marked "BAC."  Bauer-Griffin had one.  Flynet picture had one.  Everybody had their own.

The byline doesn't matter.  The byline is

referring to the source where the magazine's getting the photo.  What matters is, we were all instructed to keep the name of the photographer as the author.  That way understand the difference between byline and copyright holder.

Q    Okay.

A    That's the industry standard.

Q    So what is your concern about what Backgrid USA did wrong here?

A    Well, so first of all, I do not know any difference between Backgrid USA and Backgrid Inc.  My concern started as a simple observation that, in my portal -- the contributor total of myBackgrid, I was missing images that I had contributed to Flynet prior to 2012.  From there, we were denied the ability to understand the reason of that missing part of my archive.  Thanks to you refusing to give us an access, to just simply discuss with the company this issue.  That was obvious to me.

And therefore, this led to an escalation where we had to file a lawsuit to be able to finally get the evidence after we got access to the Backgrid client portal.  In which we discovered all -- lots of very interesting things that are way beyond the fact that images were just simply missing for mismanagement.  And

Page 81

eventually led to the claims of copyright management information removal, active copyright infringement -- fiduciary breach of contract, California Penal Code 496, and all the good things.

Q    Okay.  So your complaint about missing images from the portal, from the contributor portal, when you discovered this, did you have specific images in mind that were missing?

A    All of them.  I mean, I didn't have -- I -- I know what I entrusted Flynet pictures with at the time. I know because I produced these images, so, obviously, my entire production was missing.  And I knew we were talking roughly -- I already estimated, just for that era, over 10,000 images.  I could give you the -- the actual count.

We didn't do it because we focused right now for the time being on the one that we could found on the Backgrid, which for me is, I believe, 3,958 photos.  But I could give you the exact number and the exact reference of every single set by the way they are in the server of the -- the legal office.  I'm very keen to find out where are these images today.

Q    Okay.  So when you went -- I just want to clarify one thing.  There are photographs that you've submitted through the Backgrid contributor portal?

Page 82

expense on FameFlynet.  I know there are monthly payment made by agencies across the world that are coming in. If you don't have my name, my code, how can this be accounted for and paid to me?  It can't be.  So the agencies are receiving constant streams of income without paying what's due.

Q    If the -- let's say that there's a set that you took that is on the portal, and let's say for whatever reason, the byline is wrong, but you get paid for it.  Do you have a problem with it?

A    The byline doesn't matter.  It's the contributor code that matters.

Q    Okay.  So let's say the contributor code is wrong, but it's linked to your account so you end up getting paid for it.  Are you okay with that?

A    No.

Q    Why not?

A    Because it's not my contributor code, and it's very confusing.  It actually gives the impression that I'm getting paid for something, but I no longer own the copyright to it.  I'm not okay with that.

As a matter of fact, you will be receiving a refund from me because I only realized on our last phone call last Friday that I got paid magically last month for images that are correctly attributed to me.  But at

Page 130

the end, two photo that shows source FAFL.  Which, I'm sorry, FAFL is not me.  So it's got to be an issue.  It's either my picture or it's not.

But I don't want to see a picture listed FAFL as the rightful copyright owner/contributor code being paid to me.  That's not what it's about.  It's like, yeah, asking me if you want to go pursue infringement but need to have me sign a transfer agreement.  I will never do that.  As a matter of fact, you know, I never signed any of those documents.  I don't transfer my copyright ownership.

Q    So does a contributor code -- I'm just trying to understand your concerns, really, because I understand what you're saying is that it's concerning to you if the contributor code is wrong.

A    Yep.

Q    If the contributor code -- where else does the contributor code go other than the portal?  In other words, are you aware of it being distributed in other --

A    It goes into your accounting.

Q    It goes into the accounting.

A    That's where it's processed.  Of course.

Q    Okay.

A    Every royalty is associated to a contributor code.  So whoever has the contributor code is the one

Page 131

getting paid.  So you don't have your contributor code on your picture, you're getting screwed.

Q    Okay.  Other than for purposes of payment, how else is the contributor code used as far as you know?

A    Again, copyright ownership.  So technically, right now, if you claim a FAFL Picture as been infringed upon by a client, you can go sue them because you're going to claim you own a copyright because it says FAFL on your system.

Q    Okay.  So is that your concern?

A    Among others, yeah, of course it's a concern. Anything pertaining to the copyright ownership is my concern because then that could lead to infringement. That could lead to other things where there is no recognition that I am the rightful owner of my own photograph.

So let's just say even tomorrow, if I use my photograph and I make a film, the glory of the year 2010 of Paris Hilton.  What if I receive a cease-and-desist letter from Shutterstock who has no idea who -- who was Thibault Mauvilain BAC back in the days?  And sue me for copyright infringement on a hundred photo I used in the documentary.  And now they're suing me for $15 million. And I'm like, that's my photos.  How I'm going to prove it.  How I'm going to prove it?

Page 132

subject.  So I do have interviews parts that have been filmed that I want to use for it.  Yes.

Q    Okay.  Who is Emily Carter?

A    Oh, Emily Carter is a fictional character.

Q    Okay.  Did you email Backgrid asking for access while pretending to be Emily Carter?

A    Yes.

Q    Okay.

A    Yes.

Q    And why did you come up with Emily Carter to reach out to Backgrid?  Why not just --

A    I just thought --

Q    -- use your name?

A    -- it sound good.

Q    Excuse me?

A    I just thought it sounds good, the name.

Q    Okay.  Is there a reason why you didn't give your real identity to Backgrid?

A    But because last time I checked, I did that two weeks prior, and you send us a letter saying we can't get access.  So I was not going to be stupid enough to try again.  You had been very clear that if we attempted to continue to try to get access, continue to claim that these missing picture were an issue, you were going to pursue potentially legal action.  So of course

Page 172

I was not going to continue to reach out.  You'd made it clear.

Q    And are you basing your belief of what I said based off of writings or oral communications?

A    Oh, I saw your letter.

Q    Okay.  So this is based off of writings; correct?

A    I saw the threat being written black-and-white.

Q    Very good.  So with respect to creating the Emily Carter account for the Hollywood Uncovered project, did you create that for your project?  Did you request access to the client portal because of your project or because you wanted to view the client portal for purposes of collecting information for this lawsuit?

A    I wanted to view the portal.

Q    For collecting information regarding this lawsuit.  Correct?

A    I had a very good reason to.  I had just notified the -- that I had 15,000 dollar -- 15,000 images missing.  And after 20 years of contribution, you told us that we were not allowed to look into the matter.  I hate to tell you, I've explained to you, you do not put ten years of your time, of your blood, sweat, tears into something that you own when someone is

Page 173

privilege work product.

THE WITNESS:  I don't know.

MS. ARDALAN:  I'm not sure how that's --

THE WITNESS:  The answer is, I don't know.

MS. ARDALAN:  Okay -- privileged, not one way or the other.  But okay.

MR. CARREON:  Okay.  Well, he doesn't know either way, so.

MS. ARDALAN:  All right.

THE WITNESS:  Well, what I still really want to say on the record here, what really strike me the most is, you really played the system well because you gave us a limited access, without the ability to download, which you didn't grant.  We wouldn't have been able to prove the metadata had been altered if it wasn't for your glitch.  And I'm calling it a glitch because it's an anomaly.  It's an anomaly.

No one should be able to go on a website, drag a photo, and read the metadata.  It was just poorly designed, thank God.  And thanks to that, we didn't need your download access.  I think what -- what a surprise.  What a -- I was the first one shocked.  Because you want to know the truth?  I was on the website for two weeks before I even tried and realized.  It didn't even occur

Page 179

to me that it could show me what's inside.

So I -- I could only see the photos on there without proving the metadata change. And one day, for some reason, I was just on the computer and I thought, what if I drag it on the desktop? Can I read anything on that photo? And when I realized I could, I was just like, no way. That was nice surprise.

The bad surprise is, wait a minute, my name's not on there. I'm like, I -- if I remember correctly, Joanna Ardalan said no, there's nothing wrong with the way Backgrid and all their contributors archive. I'm like, well, I guess she was wrong.

BY MS. ARDALAN:

Q   All right. So I'm going to look at what I will mark as Exhibit number 2, and I'm going to scroll down because it's on the screen. So you can tell me if you want me to speed up or go more slowly.

A   Yeah. That's fine.

(Exhibit 2 was marked for identification.)

MR. CARREON: Jo, just to clarify. Are you going to provide hard copies of this that are going to then --

MS. ARDALAN: I'm going to send you an email with it.

Page 180

"Backgrid 2018," "Backgrid 2019," "2020," "'21" -- so of course I know it's Backgrid.  How can -- who else could do it?

Q    Okay.  If the information on the client portal was both your contributor code and copyright Backgrid, would that be a problem?

A    As long as that, you know -- here -- here's the thing.  They have to do a nuance of what they mean by "copyright."  I do not give transfer.  I do not transfer my copyright to anyone.  If it's just for the purpose of being identified as the syndication agent, I have no problem with that.

As a matter of fact, when I upload the photo right now, I'm listed as the rightful owner and it shows my contributor code.  It also show Backgrid and the year.  I have no problem with that because they're the syndication agency of record for me.  It allows the client to identify who to call to buy the photo.  Now, when you go to that agency, you purchase it.  As long as my contributor code is right, I get paid the royalties.  Everything works.  There's no problem.

Q    Yeah.

A    But everything should be tied to the fact that the contributor code is correct.  If the contributor code, according to the system, is wrong, then I am no

Page 195

A    But going back to what you were asking earlier, why -- you can notify a person on a specific set as you -- him; right?  Now, seven, or how many?  No. Nine years after the fact.  Nine years into Backgrid, realizing that all your archive from ten years prior up to 20 years ago is missing and a hundred thousand photographs are at stake.  It's a different issue.  You just don't send a text message, in my opinion.

This just showed that, yeah, we had an ongoing relationship.  I'm not going to lie.  If I need to call Alex tomorrow, but maybe because of this case, it would be inappropriate, but it's -- there's nothing personal in this business.

Q    When was the last time you submitted a set to Backgrid?

A    Two weeks ago, I would say.

Q    Okay.  Why do you continue to submit sets to Backgrid?

A    Because it's still a leading agency.  As a matter of fact, throughout all this merger, they really managed to wipe out all competition.  There's really no other places to send your photograph if you want to still be in this business.  Which, I'm seasonal in the business, but there's really no other agencies to send it to.  So I don't really have a choice.

Page 315

CERTIFICATE OF DEPOSITION OFFICER

I, JOHN CANFIELD , the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Date: June 3, 2026

<%32538,Signature%>

JOHN CANFIELD

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CERTIFICATE OF TRANSCRIBER

I, LYNDSY JENKINS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Date: June 3, 2026

<%32991,Signature%>

LYNDSY JENKINS

Page 365