# Exhibit 23

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

THIBAULT MAUVILAIN, an

Individual; HENRI MAZARI, an

Individual; JEREMY DUPLAQUET,

an Individual; ROBERT CHRISTIAN

WOLF, an Individual; MICHEL

BOUTEFEU, an Individual;

STEPHANE KYNDT, an Individual;

and JOSEPH MEHDI, an Individual,

      Plaintiffs,

  v.                        Case No.

FLYNET PICTURES, LLC, a          2:25-cv-2757-

California Limited Liability    FLA-MAA

Company; FAMEFLYNET INC., a

California Corporation; BACKGRID

INC., a California Corporation;

BACKGRID USA, INC., a California

Corporation; SHUTTERSTOCK, INC.,

a Delaware Corporation; and DOES

1-10, Inclusive,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF HENRI MAZARI

Wednesday, May 20, 2026

JOB No. 8175707

Page 1

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

VIDEOTAPED DEPOSITION OF HENRI MAZARI

DATE:            Wednesday, May 20, 2026

TIME:            10:23 a.m.

LOCATION:        Veritext Legal Solutions

                 707 Wilshire Boulevard, Suite 3500

                 Los Angeles, CA 90017


OFFICIATED BY:

Ruby Moreno

JOB NO.:         8175707


PAGES 147-150 ARE CONFIDENTIAL

Page 2

agreement with FlyNet other than what you just described?

A    Not that I recall.

Q    Okay.  And did you have a piece of paper describing the terms you just described with FlyNet?

A    No.  The piece of paper for me was my sales report.  I submit my W-9.  I get my 1099 every year.

Q    Okay.  So the sales report confirmed your understanding of your split?

A    Correct.

Q    Okay.  Did the sales report confirm your understanding of anything else about the obligations that FlyNet had to you?

A    Obligation?  Not that I recall anything specific about obligation.

Q    Okay.  Did FlyNet have any obligations to you other than paying you the 70 percent?

A    Well, it's deontology between -- you know, we have a specific, how do you call it?  We work together.  We agree on something.  It's a respect that we have that you respect your power, and I respect my power.  If not, I leave.

Q    Understood.

MS. ARDALAN:  Can you re-ask my last question, please?

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

THE OFFICER:  Hold on one moment.

MS. ARDALAN:  Thank you.

(The officer repeated the record as requested.)

MS. ARDALAN:  That was my last question?

THE OFFICER:  Mm-hmm.

MS. ARDALAN:  I thought it was something else.  Okay, fair enough.  All right.

BY MS. ARDALAN:

Q    So other than the 70/30 split, was there anything else that -- excuse me, I said the wrong entity.

Other than the 70/30 split, was there anything else that FlyNet had to do for you under your understanding of the agreement that you had with FlyNet?

A    No.  Not that I know.

Q    Okay.  Did you ever have a website for your photography?

A    Did I have a website for my photography?  No.

Q    Okay.  Are you on social media at all?

A    No.

Q    So you don't have an Instagram?

A    No.

Q    You don't have a LinkedIn?

A    Okay, let me rephrase that.  An Instagram, I

Page 24

various outlets?

A    Because it's something I'm not super familiar with -- with that -- with that part, I will say each photos have a code from BAC or from anybody.  You cannot send a blank photo and say, "Okay, take this."  So you have to have a code, a reference, or something.  If you go deeper, the metadata or IPTC will give you all the information you need to know.  That's all I can say.  If there is more than that, I don't know.

Q    Okay.  Are you aware of whether you had a code, a photographer code, while working at BAC Photos?

A    I don't recall it.  Probably for sure.  I'm -- I'm not 100 percent sure about the -- the way it was coded or -- but I'm sure I did.

Q    Okay.  So I don't want you to guess.

A    So I'm not --

Q    So if you don't know, that's fine.

A    Okay.

Q    If you do know, then we're entitled to that information.  So the question is whether you know whether you had a code associated with you while you were submitting photos to BAC Pictures?

A    I will answer I don't know because like you said, if you're not sure 100 percent.

Q    Okay.  All right.  Do you know what happened

Page 44

A     Not really.

Q     Okay.  And there's some magazines that, you mentioned, don't use the photographer byline, just the agency, just the syndication byline.

A     Correct.

Q     Is that a problem for you?

A     I like to have my byline on the magazine.  But you know, if it's the policy of the magazine, I cannot fight against that.  Or I decide not to sell them the pictures.

Q     Have you ever --

A     I can do that.

Q     Have you ever decided to not sell photos because they refused to include a byline?

A     Never.

Q     Okay.  So it's more important to you to get the license out and the money than it is to have the byline included?

A     Yeah.  It's not an ego situation.  When you have your pictures sold, you know, you're happy to have an agency representing you and said, okay, we did a good job.  And that's what you expect.

Q     Okay.  How did you meet Jeremy Duplaquet?  That is D-U-P-L-A-Q-U-E-T.

A     Keep it like that.  It's great.  How do I meet

Page 57

A    Okay.

Q    So do you have any recollection of whether the FlyNet website used your byline code KO or HM or any other code in connection with the photographs that you submitted to FlyNet?

A    So I will say that I have no recollection because I cannot picture the -- the website right now. I try, but --

Q    Okay.

A    So I have no recollection.

Q    Okay.

A    It should, but --

Q    Okay, but you don't know?

A    No.

Q    Okay.  So the editing process -- going back to the editing process.  You were editing the ITPC [sic] data; correct?  And you were also editing the photograph itself; is that correct?

A    No.  I was editing mostly the -- I didn't have to touch any information on the -- the camera part.  I was doing the IPTC only, the information.

Q    Okay.  But did you actually edit the photograph?  Like, did you crop it?  Did you color correct it?

A    Yes, I did.

Page 117

Ventura Boulevard?

A    Yes.  I didn't know at the time they -- they set up the office.  I have no clue.  I learned that later, way later.

Q    I see.  Okay.  All right.  So I am going to mark this as Exhibit Number 3.  And I'll represent to you that this was filed with your second amended complaint.  It was filed as Exhibit B to your second amended complaint, but this is it.

(Exhibit 3 was marked for identification.)

A    Yes.

MS. ARDALAN:  So we'll mark this as Exhibit Number 3.

BY MS. ARDALAN:

Q    What is this document?

A    This is my -- my letter to a -- to a FlyNet, addressed to Scott Cosman and Nicolas who preside by this letter -- letting you know that FlyNet.  Know that it was a real pleasure to work with you, with your company all those years.  And thanks for your -- for our past collaboration.  My photo and archive and video will not be longer under FlyNet Pictures representation, either by its affiliate agencies.

Q    Okay, so you said this is a letter; is that

Page 183

right?

A    Yes.

Q    Okay.  So was this sent to FlyNet?

A    Yes.  Yes.

Q    Okay.  And who sent the letter to FlyNet?

A    I did.

Q    Did you go to the post office?

A    I went to the post office.

Q    And how did you deliver this?  Did you use any special services to deliver this letter?  For example, certified mail, anything like that?

A    It was a certified mail.

Q    Do you have the receipt?

A    I wish.

Q    So you do not have the receipt?

A    No.  Even the post office, I tried to -- to figure out if the other office.  Apparently, they don't keep record past a number of years; so --

Q    Did you ever receive the receipt?

A    They give me a -- a receipt in -- in the post office.

Q    Okay.  So with certified mail, they give you a --

A    Yeah, you --

Q    -- receipt that you provided it to the post

Page 184

office.  But is there any return receipt that has actually been delivered?

A    I don't recall that.

Q    Okay.  Did you ever check to see whether the letter had been properly delivered?

A    No, I don't recall that I checked.  But like I said, if you look at the date, I sent this letter on September 18, 2011.  And I stopped to give any pictures in 2009.  So this letter was just to confirm that you don't want -- I don't want you to use my picture, take my pictures for anything.  I want you to take everything out.  And that was a cease and desist to me.

Q    So I am looking at this Exhibit Number 3 that has some text to the very top that says "Moving archive is final."  Do you agree with that?

A    What is it?

Q    "Moving archives final."  Do you agree with that?

A    Where -- where do you see that?

Q    In the top left corner.

A    Moving archives -- yeah, I see this.

Q    So is this a computer file?

A    I think it is.  You mean this?  This is -- originally was a PDF, I guess.  When I tape it.  When you -- you cannot, you know, PDF have its own.  So

Page 185

sent the letter.  I decide to -- to get rid of everything related to FlyNet.

Q    Are you sure this is the copy of what you sent --

A    Yes.

Q    -- to FlyNet?

A    Yes.

Q    How are you sure?

A    Because that's the only one I sent.  I remember exactly what I sent, and that's the exact copy.  All the information, FlyNet USA, the Suite, Royal Canyon Boulevard, Studio City, whatever.  That's all the information I had at the time.  The name -- and at the time I sent it, you can see that it addressed to Nicolas and Scott because I cannot even get a -- reach -- I cannot have a reach with Gerome; so --

Q    How did you determine that you should send it to 3940 Laurel Canyon Boulevard?

A    Well, I -- in 2009, it was not the first time somebody sent a letter of cease and desist at this address.  And I was connected with a guy called Rik Feddeck from Canada that I worked with.  And I went to take the pictures of Megan Fox.  And he's one of the guy, we were, like, fighting to get our pictures corrected and paid and all this weird deal from the

Page 191

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

company with -- with different blog.

And he -- I think he sued them at one point to get rid of this mess.  And he sent a letter of desist, and he sent to this address.  And I did the same two years later.  That was the only address I have at the time.

Q    Did you look online to see if there was another address listed with FlyNet?

A    No.

Q    Did you check what address was associated with its registered agent?

A    No.  That's the only information I have.  I have this address, I don't remember from where.  But I have this address, and I think that's the correct address for sure.

Q    Do you have any understanding as to whether this address has suites?

A    It was long time ago.  What you ask, it's like I -- I can't recall the way -- exactly the way I got the address.  But I think the address was pretty known at the time.

Q    Did you Google search to find out whether 3940 Laurel Canyon Boulevard has suites?

A    No.  I didn't -- I didn't recall that.

Q    So you used the address listed on a legal

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

letter sent two years earlier to decide where to send the letter?

A    No.  I didn't say that.  I said I -- I sent the letter of cease and desist for -- for the specific address.  I probably get the address at the time I was sending it.  I don't remember -- I don't recall how I get the address.

But I had the address from -- from a solid source at the time.  I will not send the letter without the right address.  Except if you tell me, "Oh, this address doesn't exist," I would be very surprised.  But --

Q    Well, I'll tell you that the offices were somewhere else at the time.

A    You talk about the office?

Q    The FlyNet offices were not located at 3940 Laurel Canyon Boulevard.

A    Yeah.  I wonder why this address is related to -- to this issue now because I didn't invent this address.

Q    Well, I'll represent to you that the FlyNet address at the time was 13750 Ventura Boulevard in Sherman Oaks.

A    Yeah, I have no idea of this address.  I didn't know this address.

Page 193

Q    Did you ever send the letter to 13750 Ventura Boulevard?

A    No.  But you know, I have to recall something also maybe the letter from 2009 to know where I send this letter from 2009.

Q    Did you ever email a copy of this letter to anyone at FlyNet?

A    No.

Q    Why not?

A    Like I said, email was not the thing.  I was -- I was more like -- I feel more confident with the post office sending something than an email.

Q    But you did email Mr. Cosman before 2011; correct?

A    Before 2011, we have exchange on email about a case that he needs some -- he needs some statement from me for something.  And I -- that's the time I was emailing Scott, I guess.  That's the last email I have.

Q    So that's a yes, you did email him prior to this date?

A    Yeah.  I have a very few email with Scott. And that was just like a formal thing that he -- he need me for a statement that I remember for a lawyer.

Q    Did you ever call anyone from FlyNet to confirm whether they received this letter?

Page 194

A     Never.

Q     Did you do anything to follow up on this letter after you sent it?

A     No.

Q     Did you ever search for usages of your works after you sent this letter on or around September 18, 2011?

A     No.  No, I didn't.

Q     This letter appears to be a cropped image. Would you agree with that?

A     I'm not too sure about it.

Q     How did you save this file?  Again, I only have the PDF.  So how did you save this file?

A     I -- like I said, I find this file.  That was, like, years ago.  I don't know why.  Maybe -- maybe I cropped it this way to get, like, a perfect image at the time.  But I don't recall any -- any action on it.  What I know, it's like I wrote it, I -- I print it, sign it, and send it.

Q     Okay.  So in the letter that you sent, it was signed; is that right?

A     Yes.

Q     Okay.  Here the signature block doesn't give you much room to sign.

A     Yeah, so like I said, it was different format

Page 195

Q    Sure.  During the time that you had access to BackGrid's confidential client portal, the three weeks of access, did you personally save each of the files that you have produced in discovery that you contend contain your photograph?

A    Yes.

Q    Okay.  How many files did you save from BackGrid's confidential client portal during that three-week period?

A    I like the confidential.  1,803.

Q    Okay.  And so you saved about 1,800 files from BackGrid's confidential client portal in about January 2026; is that correct?

A    About the period that -- that I have, yes.

Q    Okay.  Do you look at the court docket to look at the files that have been filed in this case?  Have you -- do you look at the -- let me start that over.

Do you look at the court docket to figure out what documents have been filed in this litigation?

A    I looked at the court docket.  You -- you try to -- you ask me -- I don't understand really the -- the --

Q    Sure.  Are you familiar with the filings that are happening in this litigation?

A    With mine, yes.

Page 266

taking a screenshot of and saving the image; correct?

MR. CARREON:  Objection calls for a legal conclusion.  It's speculation.

You can answer.

THE WITNESS:  Yeah, like I said, I just drag and drop the image.  I didn't download any image.  I take a screenshot of drag and drop.  I have no reason to save anything.  I have the -- the screenshot.

BY MS. ARDALAN:

Q    Mr. Mazari, you testified earlier there was a fantastic glitch in the system; correct?

A    Yeah.  It will permit you to drop and drag -- drag and drop the pictures, not downloading the pictures.  It's completely different, downloading an image.

Q    Dragging and dropping the file onto your desktop; correct?

A    Correct.

Q    Okay.  So you took the file, you dragged and you dropped it onto your desktop.  And so that file existed on your desktop; correct?

A    Correct.

Q    Okay.  So the files that we've been talking about that you took from the confidential client portal, you drag and dropped, and you stored it on your desktop;

Page 272

correct?

A    Correct.

Q    Okay.  And those JPEGs that you drag and dropped and put onto your desktop were not produced to us by January 12, 2026, were they?

A    Which one?  I'm sorry.

Q    The files that you dragged and dropped from BackGrid's confidential client portal and saved onto your desktop were not produced to Defendants by January 12, 2026; correct?

A    Nothing was saved.  That was drag and drop and shot, screenshot.  You drag and drop an image, you take a screenshot, and you get the information that you're looking for.  There is no downloading, saving, keeping those image.  I have no reason to keep those image.  And plus, that's my shot, and I don't know why they are here.

But they have nothing to do in this -- in this website anyway.  And most of all, they have nothing to do to portal client where I cannot even access, I'm not even a contributor.  Make no sense.

Q    Are the files.

A    So I didn't download an image.  I didn't have the access to download an image.  I drag and drop, and I take a screenshot.

Page 273

directly?

A    From the client portal?  What kind of screenshot I'm going to have from the client portal?  From the client portal, I have pictures and very tiny description of whatever it is.  I have no information on the image.  And that's why it was not fair because we should have full access.

First, it's my image.  I have full access to this image and be able to read the IPTC correctly.  The one where there is something CMI change.  I couldn't have that if I didn't drag and drop the image.

Q    I see.  So you made a decision that you needed to drag and drop the image so that you can see additional data that the court order did not permit you to see?

A    Where it say that I couldn't --

Q    Is that correct?

A    -- have access to those information?  I drag and drop the image because there was a glitch who permitted to do it and because you basically didn't want us to upload the image or download the image, download the image, and read all the information that we need to prove that those pictures have CMI removal.

And when I drag and drop those image, I got all the information I need to -- to show that there was

Page 275

a removal of CMI on my image.  And also that my image were there when they're not supposed to be there.

Q   Mr. Mazari, the files that are contained in Exhibit 10, 11, and 12 are not cropped photographs; correct?

A   The file --

Q   The files contained in Exhibit 10, 11, 12, and 13 that you just went through with Counsel are JPEGs that were not cropped screenshots, were they?

A   No.

Q   Okay.  So the files that are contained in Exhibit 10, 11, 12, and 13 that you just went through with Counsel are files that you drag, dropped, and saved onto your computer.

A   Are we talking about the file that you saw in -- in the -- on the screen?

Q   The files that you just went through with your counsel --

A   On the screen?

Q   -- when he went through each of the files one by one and asked you if you are claiming that photograph in this litigation.  Those files are not screenshots, are they?

A   No.  They're are pictures.

Q   Okay.  Again, those files that you just went

Page 276

CERTIFICATE OF DEPOSITION OFFICER

I, RUBY MORENO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

RUBY MORENO

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Page 285

CERTIFICATE OF TRANSCRIBER


I, SARAH MARTINES, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SARAH MARTINES

Page 286