# Exhibit 24

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

THIBAULT MAUVILAIN, an

Individual; MICHEL BOUTEFEU, an

Individual; JEREMY DUPLAQUET, an

Individual; STEPHANE KYNDT, an

Individual; HENRI MAZARI, an

Individual; JOSEPH MEHDI, an

Individual; and ROBERT CHRISTIAN

WOLF, an Individual,

      Plaintiffs,

  v.                  Case No.

FLYNET PICTURES, LLC, a         2:25-cv-2757-FLA-MAA

California Limited Liability

Company; BACKGRID USA, INC., a

California Corporation; BACKGRID

INC., a California Corporation;

FAMEFLYNET INC., a California

Corporation; SHUTTERSTOCK, INC.,

a Delaware Corporation; and DOES

1-10, Inclusive,

      Defendants.

_____

Page 1

Veritext Legal Solutions

866-299-5127      calendar-ca@veritext.com      www.veritext.com

VIDEOTAPED DEPOSITION OF

ROBERT CHRISTIAN WOLF

DATE:            Friday, May 22, 2026

TIME:            10:01 a.m.

LOCATION:        Veritext

                 707 Wilshire Boulevard, Suite 3500

                 Los Angeles, CA 90017

OFFICIATED BY: Jessica Jurgensmeier

JOB NO.:         8175706


PAGES 33-36, 117, 128-131, 183 ARE CONFIDENTIAL

Page 2

And I -- that really wasn't a big surprise to me.  But he said, "We have a lawsuit we're working on and we think it's going to go forward."  And I -- and he said, "Do you want to, you know, find your pictures and submit them and participate in this lawsuit?"  And I -- and I -- I don't know if I -- I said, "I probably do, and let me get back to you."

And I think I called him within a day or so and said, "Yes, I do."  And I have these pictures here.  And -- because Scott offered me -- when I first met Scott, he offered me -- he said, "You can either be a freelance photographer or you can be a staff photographer."

And he said -- he explained the difference and he -- he gave me the option of a -- he said, "If you're freelance, you can be 60/40," which I did think was a little low.  And from what I've learned now, it was low.  But I accepted that and I -- I never even really considered being a staff photographer for them.

Q   Okay.  What year did Scott make that offer to you for a 60/40 deal?

A   That was in -- that was in -- I believe it was very late in the year of 2004.

Q   Did you discuss any other requirements that you had before submitting photographs to FlyNet?

Page 89

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

MR. SERGINIAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah.  I just wanted to be sure that he was going to, you know, manage my copyright information properly and meticulously and thoroughly and ethically.  And -- and I told him any number of times, "I want to get paid every penny that I have earned."

BY MS. ARDALAN:

Q    Okay.  I want to go back to the first thing you said.  You said you wanted to make sure he managed your copyright information ethically.  Is that -- do I have that correct?

A    Yeah.

Q    Okay.  How did you communicate that to him?

A    You know, it was so long ago.  I just -- I just wanted to be -- I told him: "I wanted to be able to know that I could trust you to take care of my pictures once I give them to you to archive them, keep accounts, keep track of who's buying them and who's" -- "who's licensing them and" -- "and who's paid and who hasn't paid.

And" -- "and that I am paid every penny that I've earned."

Q    Okay.  Did you say anything else about what you require for him to license your photographs, other

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

And I always -- always was aware that my name was attached to it.

BY MS. ARDALAN:

Q    What name did you expect to see?

A    Chris Wolf.  Oh -- in some cases I did make a -- some sort of a, I don't know, pseudonym or nom de guerre or something like that.  And I think we've submitted those.  Or my -- or my code, which FlyNet used.  Which, BackGrid -- in BackGrid my code was RIWE, but in FlyNet my code was -- could have been any number of things.

Could have been -- could have -- I -- from what I recall, it could have been CW.  Could have been CCR.  Could have been -- I don't know if it's CCW or if it was also -- I made up a -- a name from a fictional novel that I used on one set of pictures one time, which was stupid.

I don't know why I did that.  I think I had some dumb reason, but I -- I wish I hadn't.  I don't think it matters.  But it was Hans Castrop, which -- Hans Castorp, which they spelled it wrong, which is a fictional character in a novel.

Q    Okay.  And how do you spell that?

A    H-A-N-S, Hans, C-A-S-T-O-R-P.  Hans Castorp.

Q    How often did you use Hans Castorp?

Page 107

A     I used it one time on one set of pictures, and I think they published those pictures, like, three out of four weeks in a row in Us Weekly.  And so they used it.  I -- I don't know if they -- sometimes they'll drop the credit, the personal photographer credit after the -- the initial publication.

So I don't know if they used it every time, but I know they used it the first time.  But they did spell the name wrong.

Q     And who is "they"?

A     The editors at Us Weekly.  They -- they transposed the O and the R in the last name.  They called it Hans Castrop and instead of Hans Castorp, which is -- I wish I had never done -- bothered.  I don't know what I was thinking.

Q     So -- you've only used that -- byline once?

A     I think that one time -- I think so.  I --

MR. SERGINIAN:  Just make sure you let Ms. Ardalan finish the question, just for --

THE WITNESS:  I'm sorry.

MR. SERGINIAN:  -- court reporter.

THE WITNESS:  Thank you.  Yeah.

BY MS. ARDALAN:

Q     So you only used that byline once?

A     I think so.  I think it was one time.

Page 108

Q    Okay.  Is it typical for a magazine to publish without a byline, in your experience?

A    I think they do that a lot.

Q    Okay.  And do they sometimes just include the syndication agent in the byline?

A    I think they do that a -- a lot, yeah.

Q    How long have they been doing that for, in your experience?

A    They do that depending on, I think, a lot of things that are, sort of, like, less specific and spelled out.  But they do it for -- they -- they'll put -- they tend to put a specific photographer name, byline credit attached to a photo, if it's a particularly good photo that they use as a feature photo.

As opposed to just some, like, you know, sort stock photo that's not a -- an exclusive breaking news sort of recent, you know, timely photo -- just some old photo.  They don't put that on -- they don't put the photographer's name on.  And they have other -- I'm sure they have other reasons for doing what they do or don't do.

Q    Do you know why they don't put the photographer name when it's an old photo?

A    I don't know exactly why.  It's -- I don't

Page 109

I -- probably about -- I hadn't seen him before for about five years. And now I have seen -- at least five years.

Q    When was the last time you texted him?

A    Must have been sometime in 2025, I guess. I -- if I even did text him. I may have been -- I may have only communicated with him by phone, for all I know.

Q    Did you produce text messages in this litigation with respect to your communications with Mr. Mauvilain?

A    For what?

Q    With respect to Mr. Mauvilain?

A    I tried to produce all my text messages. I did my best to find them all. And I -- I produced, you know, not too many because I -- I really haven't had much text communications with -- with any of -- that's pertaining to this litigation or relevant to this litigation, that I'm aware of.

And I tried to produce as many -- I produced the text messages I -- I exchanged with Alex and I -- what was the other ones? I don't already have them, I think.

Q    Have you communicated with Mr. Mauvilain since Monday?

Page 122

A    Yeah.  I talked to him -- actually, I talked to him in person when I saw him in -- in Studio City on Wednesday.

Q    Okay.  Did you -- was this a planned meeting or was it you just happened to run into each other?

A    We -- he -- we got in touch by the phone that morning and said why -- "Let's get together for coffee."

Q    Okay.  And where did you meet for coffee?

A    Starbucks.  At Vantage -- Laurel -- sorry.  Ventura and Vantage.  One block west of Laurel Canyon.

Q    And how long did you meet for?

A    I don't know, half hour, 45 minutes.

Q    What did you talk about?

A    Oh, well, we talked about -- we talked about this case, I guess, and -- yeah, his deposition.

Q    What did he say?

A    He said -- sorry.  He said you're a tough attorney.

Q    What else did he say?

A    Gosh, I don't know.  I just -- he just wanted me to be prepared to, you know, explain everything about how -- how I expected to get paid for my work product and my rights and my copyright -- pictures.

And -- and how I feel that it's very, very evident and plainly provable that I haven't been paid

Page 123

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

all -- that I haven't been represented in -- in -- by industry standards, basically, with my copyright being protected.

And that's what we've discovered in, you know, all the research that Thibault did prior to me being involved in this and all the research that we've all done, including myself, in the time since I've been being involved in this.

Q   So did Thibault give you any, like, hints on, like, helpful sound bites to talk about today?

A   Trying to think.  What'd he say?  He told me to -- that I should demand to be -- to have my -- to be treated fairly and -- and to not be taken advantage of and not be -- not having them -- not be willing to let them change my copyright so that they get paid for my pictures instead of me.

Q   So that's what he told you to say?

MR. SERGINIAN:  Objection.  Misstates testimony.

BY MS. ARDALAN:

Q   That was a question.  Is that what he told you to say?

A   He told me I needed to go in there prepared to stand up for my purposes for being in this lawsuit.

Q   Okay.  What else did he tell you?

Page 124

A    No.

Q    Have you spoken with Thibault Mauvilain, not in the presence of Counsel, about attorney's fees?

A    Let's see.  Thibault brought something to my attention and I can't remember exactly what it was, but it looked somewhat serious.  And I can't remember exactly what it was, but it was pretty -- let's see. What was that?

Something to suggest that -- that BackGrid's attorney's fees could be in dispute at some point.  I don't know any more specifics than that.  I -- I did know a little bit more specifically what it was at the time, but not fully specifically.

Q    Did Thibault talk to you about BackGrid's obligation to enforce your copyright at your meeting on Wednesday?

A    I'm sorry, could you say that again?

Q    Sure.  Did Thibault Mauvilain speak to you about BackGrid's obligation to enforce copyright at your meeting on Wednesday?

A    Well, yeah.  I think in the general terms of that they were obligated to represent me ethically.  And they didn't.

Q    And why do you say that?

A    Well, because we found my pictures on their

Page 137

website with -- with their generic, sort of -- I don't know what kind of -- they -- they changed my copyright information to theirs to -- made it look like their picture instead of my picture.

Q    And did Mr. Mauvilain tell you to say that?

A    No, because -- well, he told me that this is what's been going on, you know, way back when, way back at the -- the first time I talked to him, in January of 2025.

Q    Did Mr. Mauvilain tell you what the industry custom and practices with respect to publishing paparazzi photographs?

A    Well, he said they have a -- they have an industry standard practice obligation to protect my copyright, to manage my copyright, to collect my -- to -- to archive and -- and keep track of sales and licenses.

And -- and to keep count -- keep a account of my percentage due and to pay me my percentage due and all those things.

Q    Did he tell you all of that on Wednesday?

A    No.  No.  He -- I've -- he -- we have talked about this and he has told me that, although I knew all that.  But he has -- we've talked about that, you know, any number of times over -- over the past -- well, since

Page 138

archives to the other agencies available for license,
including FameFlynet, FlyNet, AKM-GSI?

A    I assumed that.

Q    Okay.  Did you ever -- I already asked.  Did I
ask -- did you submit to AKM-GSI?

A    No, I didn't.  I never did.

Q    Okay.  Is there any particular reason why you
didn't?

A    Well, I didn't really need a new agency.  I
didn't feel like I needed a new agent.  And I -- I
thought at the -- yeah.  I -- I didn't think I needed a
new agent

Q    Prior to submitting works to BackGrid, did you
have a conversation with Alex about what BackGrid was
obligated to do for you in issuing licenses?

A    Not that I can remember, particularly.  I
think -- I think I had been in this business for so long
at that point -- I had been in this business for, I
don't know, 12, 14 years maybe -- I -- at that point.
And I -- I don't remember the phone call -- the
conversation we had.

I think we just pretty much -- I think he
would -- I think he's -- I think he just -- yeah.  I --
I confirmed with him that my -- my FlyNet archive would
be included and -- and I would be -- just go on with,

Page 141

like, building a, you know, further archive from then on by submitting to BackGrid all in the same agency.

Q    And what did he say?

A    I think he -- we agreed on that.

Q    What words did he say?

A    Probably -- yeah.  Alex is not really a big talker.  He doesn't say much.  I -- I think he said, "Yes."

Q    Okay.  And what did he say yes to, exactly?

A    What I just described, that my FlyNet archive would be included and would be -- and then now I could start submitting to BackGrid and just build on my FlyNet archive.

Q    Okay.  And when -- what -- when was this?

A    This was in, I believe -- I'm -- I'm pretty sure this is, like I've told you, probably in February of 2018.

Q    Okay.  And did you have access to the myBackgrid portal at that time?

A    Well, to the BackGrid uploader?

Q    To the myBackgrid portal, which shows your accounting?

A    My back -- I got -- I got a -- a link for an access to myBackgrid, you know, I don't know, week, a couple weeks, few weeks later.  Alex set me up with the

Page 142

A    In the camera body, you can make those kind of settings.

Q    How do you do it?

A    You go into the back of the camera.  You look -- you look on the back of the camera and you have a menu and, you know, a zillion different sort of, like, you know, five -- eight or ten different, you know, choose this.  And then each one has a long drop-down of all kinds of, like, sub-chooses -- choices to get into.

Q    And did you update your camera with your name?

A    Yeah.

Q    And when did you first do that?

A    I did that every time I got a new camera.

Q    What name would you put in there?

A    Chris Wolf.

Q    Did you ever put Hans Castrop [sic]?

A    No.  No.

Q    Never?

A    No, not in my camera.

Q    Was the name that you put in your camera reflected in the file that you submitted to FlyNet?

A    Well, it was in the metadata.

Q    How do you know?

A    Well, because that's what metadata is.  It includes all those things that -- that are -- that

Page 154

BY MS. ARDALAN:

Q    With respect to the photo files that are at issue in this case, that are supposed to reflect the works at issue, has anyone handled those files other than you and your lawyers?

A    Well, I think Thibault.

Q    In what sense?  What did he -- what happened?

A    Well, I think Thibault -- you know, he -- he had some of those pictures before I ever was able to like, find them and -- and start to deal with them.  He had them prior to me, some of them.  And -- and then I think Thibault -- I think Thibault put -- put all those files into a format that included all my proper data.

Q    What do you mean by that?

A    I don't know what else to say but -- than just that.  I think he, I guess -- I -- I think he included all the data that he thought was necessary to present these pictures as mine, without any doubt.  Even though they were the same JPEGs that I've been able to produce from my external hard drive and with my camera metadata.

Q    So do you mean that he updated some of the ITPC [sic] data -- on the files that you submitted to us?

A    I -- I don't know that "updated" is the right word.  I think he made it clear that that was the

Page 164

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

metadata that was -- that was the ITPC -- IPTC data that was related or relevant to that picture.

Q    How did he make clear?

A    I don't know.  He -- he just -- I don't know.

Q    So in other words, the files, like, the JPEG files that you submitted in this litigation first went to Thibault Mauvilain?

MR. SERGINIAN:  Objection.  Vague and ambiguous.  Misstates testimony.

You can answer.

THE WITNESS:  Well, all I know is that I had -- those were my JPEG pictures and I have the original JPEGs from my camera, with my camera metadata on every one of them.  And every one of them is my picture that I shot and that I sent a FlyNet.

BY MS. ARDALAN:

Q    Understood.  And when you say -- when you said earlier that Mr. Mauvilain had the files or did something to the files, what did he do to make clear that it was your work?

MR. SERGINIAN:  Objection.  Lacks foundation.

THE WITNESS:  I don't think he needed to make clear that it was my work because I had the original JPEGs and I've included that in everything

Page 165

(Nonconfidential portion of transcript begins.)

BY MS. ARDALAN:

Q   Do you have any written agreements for your agents, with any agency?

A   I did have a contract with WENN.

Q   Okay.  Understood, when you were a staff photographer.  But I mean as a freelance photographer?

A   You know, other than the kinds of communications that we've talked about, whether it's taxes or sales reports and whatnot.  Other than that, no, no written contracts.

Q   Okay.  Did you ever update your metadata to include Hans Castrop [sic]?

A   No.  No.

Q   Have you ever told any other photographer that this lawsuit's not going anywhere?

A   No, I haven't had any -- I've never made any kind of predictive comment about this lawsuit to anyone.

Q   Have you spoken to Bam Bam about this lawsuit?

A   I've -- I don't know.  Had -- did I?  I -- I don't think I have.

Q   Did you tell Bam Bam that this lawsuit's not going anywhere?

A   Absolutely not.  Absolutely not.  No.  I -- I

Page 184

MS. ARDALAN:  This is Exhibit 3, excuse me.  Exhibit number 3.

THE WITNESS:  Is that the what?  The code?

BY MS. ARDALAN:

Q    Yes?

A    Yeah.  DSC, that was the -- that was the -- yeah.

Q    Okay.  So is this one of the photographs from the set that we just looked at?

A    Yeah, I -- I'm sure it is.  I don't know if that's my photo or not.

Q    Okay.  Let's take a look at the file that you provided to us.  And we're looking at the details.  You see the copyright says Chris Wolf/Hans Castrop?

A    Castorp, yeah.  So what is this that we're looking at?

Q    We are looking at the properties of a file that has been produced to us.

A    Okay.  I don't think I would've used that Hans Castorp name on those Tom and Katie -- like I said, I -- I used that one time that I'm aware of, and it was Jessica Simpson.

Q    Do you know how Hans Castorp got into the metadata information for DSC_3064?

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A    I don't know.  Maybe -- I don't know if I might have -- I don't know.  The answer to your question is, I don't know.

Q    Okay.  You know what?  I will go ahead and mark the -- let me go ahead and make a screenshot of the properties for this file.  So I will right click it.

A    I think --

Q    -- properties.  And what I'm going to do is I'll put it side by side here.  I'm going to take a screenshot.  I'm going to go to paint.  I'm going to open a new file.  I'm going to copy-paste it in.  And I'm going to mark this document as Exhibit number 3.

A    These dates are --

THE OFFICER:  It's number four.  It's the next one.

MS. ARDALAN:  Oh, thank you.  Exhibit number 4.

(Exhibit 4 was marked for identification.)

THE WITNESS:  These dates are from 2025.  These pictures were taken, you know, 15 years before that.  I -- what is -- created -- created by who on Saturday October 4, 2025?  I mean, you know, again, I just want to reiterate, this is a set that I pulled out of this litigation a long time ago.

Page 197

And somehow it seeped through and you're using it to say that we're trying to -- you know, we're not accurate in our claims and that's not true because I didn't ever want this set to -- I knew this set wasn't part of our dispute.

BY MS. ARDALAN:

Q    So how did the modification date come up in 2025?

A    -- no.

MR. SERGINIAN:  -- vague and ambiguous.

And I'm going to instruct you not to disclose any confidential attorney-client communications.  But if you can answer otherwise, go ahead.

BY MS. ARDALAN:

Q    Do you have a response?

A    What is the question?

Q    How did the metadata change such that it includes a 2025 date in the file?

A    I have no idea.

MR. SERGINIAN:  -- hold on.  Same objections.  I'm also going to add -- well, lacks foundation, but you already said -- okay, go ahead.

MS. ARDALAN:  Okay.  So --

THE WITNESS:  I'm not -- I don't -- I'm

Page 198

not familiar with that format that, you know -- data appears in there.  I've never seen it before.  I -- I think, you know, it -- I think you're creating that to have some claim of illegitimacy or, you know, trying to fraud this process, which I'm certainly not trying to do.

I -- I knew those pictures were not part of this litigation.

BY MS. ARDALAN:

Q   Okay.  Were the files that were submitted with your copyright registration original files that you had from your -- let me start that over.  Were the files that you submitted with your copyright registration files that were on unaltered from your client FlyNet days?

A   I'm not sure which --

MR. SERGINIAN:  Objection.  Vague and ambiguous.

BY MS. ARDALAN:

Q   Were the files that you -- were submitted with your copyright registration, were they the same files that you submitted to FlyNet?

A   Oh, absolutely.  Yeah.  Absolutely.

Q   I'm going to show you another file.  It's called Jenny1.  Does that look familiar to you?

Page 199

A    Yeah, it does.  There were a lot of photographers shooting that night too, and I know I shot some of it and I have some of them on my hard drive, but some pictures are hard to distinguish from other pictures.

Q    Okay.  So is this one of your files?

A    I -- I think so.

Q    Okay.  And I am going to look at the properties of this file.  And the details say Chris Wolf/Hans Castrop [sic] again?

A    I don't know -- I'm not familiar with this format at all.  I don't know where this comes from. I -- I said, I think it's my picture and I think --

Q    Do you see that it says "Authors, Chris Wolf/Hans Castrop" -- Castorp?

MR. SERGINIAN:  Castorp.

THE WITNESS:  I -- I see that, but I think -- are you claiming that this is, like, with my proper attribution -- what you're proving by this?

MR. SERGINIAN:  The question is just if you see that.

BY MS. ARDALAN:

Q    Do you see it?

A    Okay.  Yeah.

Q    Okay.  And do you see that the copyright says

Page  200

Chris Wolf/Hans Castrop?

A     Yeah.

MR. SERGINIAN:  Castorp.

THE WITNESS:  Yeah.

BY MS. ARDALAN:

Q     Do you know why it says Chris Wolf/Hans Castrop [sic]?

A     I don't know what this -- this window is.  I don't know who created this or for what purpose.  I don't know.  I don't know why it says that -- any of that.

Q     Do you know who put in the Hans Castrop [sic] in the --

A     I have no idea.

Q     Let me finish the question, please?

A     I'm sorry.

Q     Do you know who put in the Hans Castrop [sic] in the copyright information?

A     I have no idea.

Q     Do you know who put in the Hans Castrop in the author's position in the -- in this metadata?

A     I have no idea.  I don't recognize this window and this data at all from -- I don't know where this comes from.

Q     Okay.  I'm going to go ahead and print screen

Page 201

and I'm going to make this Exhibit number 5.  Let me start that over because it got chopped up.  Okay.  Exhibit number 5.  Okay.  Now, let's take a look at another photo.  Okay.  There's another photo here with the file name DSC_2896.  Do you recognize this photo?

(Exhibit 5 was marked for identification.)

A    Yeah, I think I recognize that.  I think those are mine.  I think that's mine.  I think so.  I mean, I think these are, sort of, part of the -- yeah.  Go ahead, sorry.

Q    All right.  Let's take a look on the properties here?

A    I think these are problematic pictures in this case because, like I said, I think these were all thrown together as a sort of an aggregate set from any number of different photographers who happened to be at the CUT that night and happened to be at that soccer game.  And so I can't tell, particularly.

And I don't think I'm claiming any of these pictures.  Am I -- is this a picture that's in my -- in our --

MR. SERGINIAN:  Again, you're just here to answer questions.

THE WITNESS:  Sorry.

Page 202

I -- I used either one or the other.  It makes me think that maybe somebody at the agency has added Hans Castorp there for one -- some reason that I'm not aware of.  I don't know.

Q    Is it possible Mr. Mauvilain updated this information?

MR. SERGINIAN:  Objection.  Lacks foundation.

THE WITNESS:  I -- I don't know.

BY MS. ARDALAN:

Q    When you were talking about Mr. Mauvilain updating ownership information to make clear that it was yours, is it possible that he -- what you meant is that he is updating the copyright information of the ITPC [sic] data so that it reflects Chris Wolf/Hans Castrop [sic]?

MR. SERGINIAN:  Objection.  Misstates testimony.

THE WITNESS:  I have no idea.

BY MS. ARDALAN:

Q    So you don't know one way or the other?

A    I don't.

Q    Okay.  All right.  So let's take a look at this document, which is BackGrid 002882.

MS. ARDALAN:  And I'll mark as Exhibit

Page 204

A    Not seven, six.

Q    Mr. Mauvilain told you to save the photos from the confidential client portal?

A    I don't know that he told me to save them.  He told me to make the -- that sequence of commands and -- and screenshots.

Q    Okay.  And then, how many times did you do that?

A    I did that for each -- like, I did that whole process for -- one time, for each of six sets.

Q    Okay.  So you drag and dropped the photo from the confidential client portal during that three-week period in which you were given access with respect to each of your photos that's at issue in this lawsuit?

A    As I recall, that's what I did, yes.

Q    Okay.  And you apologized for doing this several minutes ago.  Why did you apologize?

A    Well, I think I've heard -- I think --

        MR. SERGINIAN:  Wait, I want to caution the witness not to disclose any attorney-client communications.

        But if you can answer the question without disclosing those communications, please do so.

        THE WITNESS:  I -- yeah.  I -- I certainly can do that without disclosing any

Page 215

attorney-client.

MR. SERGINIAN:  Go ahead.

THE WITNESS:  Because I don't think there is any attorney-client communication about this.

I learned from Thibault that -- that you have a complaint about how we did that process, how I thought I was supposed to do that process.  And I never meant any -- had any ill intent or any -- any kind of -- to do it the wrong way or any kind of, like, way that was, you know, not supposed to be done that way.

And I haven't done anything with those pictures, of course.  And they -- I just submitted them for discovery.

BY MS. ARDALAN:

Q    When did you speak with Mr. Mauvilain about this?

A    Wednesday, when we had coffee.

Q    What time did you meet for coffee?

A    I think we met at one.

Q    At 1 p.m.?

A    One p.m., ten after -- quarter after one.  One --

Q    Okay.  So Mr. Mauvilain advised you that drag and dropping photographs from the confidential client portal during that three-week period in which you were

Page 216

given access violated a court order?  Is that what he said?

MR. SERGINIAN:  Object -- okay.

THE WITNESS:  I don't think he's -- I'm sure he didn't say it violated a court order.  I think he said that wasn't the way we were -- agreed to do it, I guess, or we supposed to do it.  And I -- I haven't done any -- I don't have any intention of doing anything with those pictures.

I'm sorry if they feel like they're their property and they're in my possession, but they're not going anywhere.  I'm not -- I don't have any ulterior motive or any kind of subversive, surreptitious or -- motives to do anything with those pictures and I never have.

And I -- I was only doing what I thought I was supposed to do.

BY MS. ARDALAN:

Q    Did Mr. Mauvilain explain to you why he had this concern?

A    Why he had what?

Q    Why he had a concern to tell you about this?

A    I guess be --

MR. SERGINIAN:  I'm just going to caution the witness not to disclose attorney-client

Page 217

communications.

But if you can otherwise answer, go ahead.

THE WITNESS:  I think he -- I think he said you were complaining about that.  That's what he said.

BY MS. ARDALAN:

Q    Okay.  And this was Wednesday at 1 p.m.?

A    I think I got there at one and Thibault showed up a quarter after, ten after.  Yeah.

MS. ARDALAN:  Okay.  Well, let's go ahead and take a break and go off record.

THE VIDEOGRAPHER:  We're going off the record.  The time is 4:51 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 5:02 p.m.

BY MS. ARDALAN:

Q    Mr. Wolf, when you first recognized that some of the FlyNet era photos belonging to you did not have your contributor code associated with it, why didn't you reach out to BackGrid and ask for them to update it?

A    Because I was already part of this lawsuit by the time I -- I knew that.

Q    So you were a plaintiff in a lawsuit before

Page 218

CERTIFICATE OF DEPOSITION OFFICER

I, JESSICA JURGENSMEIER, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Dated: June 9, 2026

JESSICA JURGENSMEIER

Notary Public in and for the

State of California

Page 228

CERTIFICATE OF TRANSCRIBER

I, CHE HALL, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Dated: June 9, 2026

CHE HALL

Page 229