# Exhibit 25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

THIBAULT MAUVILAIN, an

Individual; HENRI MAZARI, an

Individual; JEREMY DUPLAQUET, an

Individual; ROBERT CHRISTIAN

WOLF, an Individual; MICHEL

BOUTEFEU, an Individual;

STEPHANE KYNDT, an Individual;

and JOSEPH MEHDI, an Individual,

        Plaintiffs,

    v.                     Case No.

FLYNET PICTURES, LLC, a         2:25-cv-2757-FLA-MAA

California Limited Liability

Company; FAMEFLYNET INC., a

California Corporation; BACKGRID

INC., a California Corporation;

BACKGRID USA, INC., a California

Corporation; SHUTTERSTOCK, INC.,

a Delaware Corporation; and DOES

1-10, INCLUSIVE,

        Defendants.

_____

Page 1

VIDEOTAPED DEPOSITION OF MICHEL BOUTEFEU

DATE:            Tuesday, May 26, 2026

TIME:            10:09 a.m.

LOCATION:        Veritext - Los Angeles, CA

                 707 Wilshire Boulevard, Suite 3500

                 Los Angeles, CA 90017

OFFICIATED BY: Jerrick Cajigas

JOB NO.:         8178143

Page 2

Q    Okay.  So how many sets did you submit to Flynet?

A    A lot.  A lot.

Q    Do you have an estimate?

A    Estimate between Flynet and --

Q    I'm just asking --

A    Not -- not -- no, maybe 50, something like 50, 80, or something like that.

Q    So somewhere between 50 and 80 sets to Flynet?

A    Yeah, because I remember for the -- for the -- I need to -- to come back -- like for X17, it was -- it was really more easy because you have target everywhere.  Everywhere.  You go in Montana, you can see two celebrity.  It was like that all the time.  And the system of X17 have a lot of photographer, if we can say photographer in -- in the city.  So you have -- we have -- you have plenty of information, and at this time, we pay fortune the -- the value packing to have information.  Hey, the guy, he call you, he say he -- he know he is going to have 50 or $100 for the information. It was working like that.

Q    Okay.  So you submitted between 50 and 80 sets to Flynet, and when you submitted those sets to Flynet, what was Flynet obligated to do?

A    To license and then to make -- make some sell

Page 109

and, like that, I have some money.

Q    Okay.  And --

A    That's it.  It was simple.  So -- so --

Q    And what was your percentage for Flynet?

A    Flynet, I think it was -- I think it was 60 -- 60 or 40, but like -- like a guy who used to create Flynet, he tell me to say, do you know, I can say I give -- I give you 90 percent depend of -- if I give you.  There was no -- I don't trust these people.

Q    Was there a written agreement between you and Flynet?

A    No.

Q    Was there a written agreement between you and FameFlynet?

A    No.  No agreement at all.

Q    Was there a written agreement between you and BACKGRID?

A    No.

Q    Okay.  With respect to FameFlynet, how many sets did you submit to it?

A    FameFlynet could be -- could be 50 or -- but I -- I change of -- I don't work in the same way because after I work with long, focal -- long, 800 millimeter, if I go to try to have, like, Brad Pitt in -- in Santa Rosa -- not Santa Rosa, Santa -- Santa Barbara, no,

Page 110

Q    Okay.  And with respect to FameFlynet, what obligations did FameFlynet have to you when you submitted a photograph set to it?

A    The same obligation, they accept the -- we send the pictures, they accept the pictures, they -- they need to -- to make some license, some sale.  That's it.

Q    And then they have to pay you; correct?

A    Of course.

Q    And what did they pay you?

A    Pay, like, 60 percent, I think it was.  I think it was this, but never, I believe their -- their percent in this kind of agency.  Do you know?  Because when I sell -- sorry, but when I -- I sell -- several times, I sell myself some -- some picture, and I have much more money.  But it's not easy to sell -- is easy if you just sell in US.  But if you need to sell, like, in Europe, you have nine-hour difference.  You need to sell -- want to sell in -- in Australia, New Zealand, this is user day, so a negotiation.  You arrive, you begin to work after a -- a white night and -- and the people just wake up.  So it is -- it is over for the negotiation, do you know?  So it was much better, in this case, to -- to pass by an agency because they have some agent there, so it's was much logic.  That's it.

Page 113

It's simple.

Q    Were there any other things that FameFlynet had to do for you when you submitted the license? Excuse me, let me start that over.  Were there any other things that FameFlynet had to do for you when you submitted a photo set?

A    No, except -- no, like I tell you, except sell the picture what -- if they have information they can give you because they are interest, but the information they prefer to give to their staff 'cause they have some staff.

Q    You're talking about, like, tips on celebrities?

A    Yeah.

Q    Like information?  Okay.

A    Yeah, or -- or movie set.

Q    Understood.  Okay.  With respect to BACKGRID, did you have a written agreement with BACKGRID?

A    No.  No, BACKGRID, I never have a message, nothing.

Q    Never had a -- I'm sorry?

A    A message, that never I have a phone call, never have information, nothing.

Q    Okay.  But you submitted photographs to BACKGRID; correct?

Page 114

A   What does it mean?

Q   No, who came up with MIBO?  Was it BACKGRID, you, or someone else?

A   Me.

Q   You came up with M-I-B-O?

A   No, they tell me -- they tell me MIBO is Michel Boutefeu.

Q   Okay.  Understood.  Okay.  So BACKGRID came up with MIBO?

A   Yeah, I don't -- I don't make the choice.  Do you know?

Q   Okay.  And so with respect to the time when you had access to BACKGRID's client portal for those three weeks during the course of this litigation, did you find instances where your Flynet and FameFlynet era photographs had an updated contributor code associated with it, M-I-B-O?

A   To be honest, I don't -- I don't find too much set, and what I search, I -- I search -- no, I don't -- I don't think there is too much because -- probably some, but I don't -- I -- I was surprised to don't see too much photo and -- and when -- when happened, okay, you say, "Where are my picture?  Where -- I want -- I want to know."

Q   So you wanted your pictures on the client

Page 118

portal; correct?

A    Yes.

Q    You wanted your FameFlynet and Flynet era photographs --

A    Because --

Q    Let me finish the question.

A    Sorry.

Q    You want your FameFlynet and Flynet era photos on the client portal, correct, BACKGRID's client portal?

A    Yeah.

Q    That's a yes?

A    Yeah, I want.  I want.  But they -- they don't take this.

Q    Okay.  Have you reached out to BACKGRID and asked them why your Flynet and FameFlynet era photographs are not on the BACKGRID portal?

A    You need to know, it's difficult to have an answer by these people.  They say, at the beginning -- the beginning and say, "Oh, it's too long. It is going to take time." Of course it's going to take time, but I'm pretty sure that the -- they have another stock image because when they -- they sold the -- the agency like -- like the press release, I -- I read. They have much more picture than they have on the portal when it was open, it was open, I don't know, maybe 2, 3

Page 119

Q    Did you include your full name in the copyright section of every single file you provided to FameFlynet?

A    Yes, I do that C around circle Michel Boutefeu.

Q    Did you do that for every single file --

A    Every single.

Q    You got to let me finish the question.  Did you put your name in the copyright section of every single file you submitted to Flynet?

A    Yes.

Q    Okay.  The photos you submitted to Flynet, were they edited versions or raw versions?

A    Edits.

Q    Okay.  And the photos you submitted to FameFlynet, were they edited or were they raw?

A    Edit.

Q    Okay.  Were you involved in the registration process of the copyright registrations for this case?

A    Involved?  Involved to the --

Q    Did you find the files to submit to the copyright office for the registrations that are issued this case?

A    Yeah, I find the -- yes.

Q    Where were those files stored?

Page 173

MR. CARREON:  Objection.  It's a hypothetical.  It calls for speculation.  You can answer.

THE WITNESS:  If -- if, but does it happen?

MS. ARDALAN:  Okay.  Move to strike as non-responsive.

BY MS. ARDALAN:

Q    I need an answer to my question.

A    Okay.  You -- you are going to have the -- probably the same answer.

Q    Well, I'm entitled to this information, so I need you to respond to it.

A    Yeah.  Okay.

Q    So if you get paid under a license, has the photo agency done what it needs to do under your agreement with it?

MR. CARREON:  Objection, calls for speculation.  Object to the form of the question.  It's an improper hypothetical.  You can answer the question if you understand.

THE WITNESS:  It's not a question if. If.  Doesn't happen.  If -- if -- this is crazy.  It's crazy question because doesn't take this time.  I -- I love to have the best agency.  I love to have people

Page 191

honest.  I love the -- but this is a kind of a dream.

Could be speculation.  You -- you ask me if.

BY MS. ARDALAN:

Q    So I'm going to ask you again because I do want an answer to the question.  If you get paid the percentage you are owed on a real license, does a photo agency owe you anything else?

MR. CARREON:  Object to the form of the question.  Objection, calls for speculation.  You can answer if you understand.

THE WITNESS:  Yeah, if they -- if they pay maybe, but with all the problem we have before -- sorry, this kind of question is not easy to answer because we don't have too much -- we have too much problem with this.  If.

BY MS. ARDALAN:

Q    You said if they pay, maybe.  Maybe what?

A    No, if they pay, but this is -- for me, is a fiction.  You know, when you have an agency who don't -- who don't pay correctly, who don't pay you, who -- who erase your name and put another name for the -- for the copyright, you can expect you are not going to have a dime.  That's it.  This is simple.

Q    Okay.  So I really want you to focus on the question.

Page 192

A       Okay.

Q       Because, you know, every time you don't answer it, it's not helpful.  You know, we are entitled to the information.  And you know, what we could do is show the jury every instance in which you are not responding to it.

MR. CARREON:  Is there a question, Jo?  You're just sort of lecturing him.  Can you ask the question, please, Jo?

BY MS. ARDALAN:

Q       So I'm going to go ahead and ask you again.  If you are paid what you are owed when an agency issues a license and pays you the percentage that you're owed, do you anything else?

MR. CARREON:  Object to the form of the question.  Objection, calls for speculation.  It's an improper hypothetical.  You can answer if you understand.

THE WITNESS:  Yeah, that could be -- you could be -- when you say if you -- this is trying to understand the question -- you speak about which agency?

BY MS. ARDALAN:

Q       Does it change --

A       Because you begin with -- you begin with SIPA Press, and SIPA Press is not like that.  And after,

which agency?  When you ask the question, for BACKGRID, for FameFlynet, for --

Q    Very good.  So does your answer change depending on which agency --

A    No, no, no, no.  Is -- I ask you the question we -- before this question, we -- we spoke about SIPA Press, and after, you ask this question, I have no idea.

Q    Okay.  You got to let me finish the question, though.

A    Okay.

Q    Does your response change to whether you are owed more than a license fee, does it change depending on which agency we're talking about?

A    You have agency you believe.  You have agency you don't believe, but is normal.  That's it.  When you just -- you -- you begin to speak to me about SIPA Press, SIPA Press, I believe.  I know SIPA Press for, like, 50 years.  Fifty years is not -- is not something new.  Never, never problem.  Never.  Never.  And I -- and I know how many hundred people who used to work with this agency.  So after -- after -- if you, if you have a -- a supposition, hypothetic supposition, if, if, if -- if they do a -- if they -- they pay you, everybody could be happy.  But if they don't pay you and they -- they erase your name, you -- and put another

Page 194

A    Majority, not -- it's terrible because I -- you are not going to be happy of my answer.  Not really.  And after that, I go directly to the account service and I can have -- there was a lady of the account service, I don't remember the name, and she -- she can answer but I need to call you back.  At the -- at the time, it was call you back, call you back.  Never it was on time.  Never.  Never.

Q    All right.

A    And then this is difficult, do you know, when you need to be paid, never is on time.  This is really difficult.  The job is easy, and the other is not -- is not easy.  It's like you take a plane is so fast, but to arrive in the plane is another way.

Q    Do you know whether Flynet used a contributor code to track your sales?

A    I don't know how they do.

Q    Okay.  Do you know whether FameFlynet uses a contributor code to track their sales?

A    I have no idea.

Q    Okay.  I am going to mark BACKGRID 002094 to BACKGRID 002096 as Exhibit Number 2.

(Exhibit 2 was marked for

identification.)

A    Okay.

Page 215

country or this country is -- that's it.  This is --

Q    What does it mean to pool a set?

A    Pool?

Q    Uh-huh.

A    Okay.  You -- you -- pool is you can do that -- okay.  Different -- different -- I explain you. Sometime you arrive on the -- on the location, and you have -- you'll be at two on this.  So what you want is to save the exclusive because exclusive, at this time -- at this time, you -- you can sell more -- more, but you can have more money with an exclusive now with time change.  So say "Okay.  Which agency do you work? Okay.  Flynet.  Okay.  FameFlynet or BACKGRID." So we make a pool.  Yeah, make a pool.  So we share the benefits at two, but we save the exclusive for the agency.

Q    So in other words, when you pool a set, you and another photographer will put the photographs that you took together in one set and license them as one set as opposed to selling as separate sets.  Is that right?

A    That -- that's it.  That's it.

Q    Okay.  And when you pool a set, do you -- let me start that over.  Do you have any understanding of which contributor codes are used when you pool a set with another photographer?

Page 243

A    Contributor and -- and I think there is both cut and if you -- if you make 6 -- $600 for the sale -- or $1,000 is more -- more easy.  You have 40 percent for the agency, 400, and 600 for two photographers.  So this is -- the cut is like that, but if you -- if you decide to send to another agency, you are not going to make 300 because it's going to be no exclusive.

Q    Okay.  So let's say that you pool a set with Thibault Mauvilain.  Okay?  And you are the only two photographers who pool in that set together.  If the licensing fee for a photo in that set is $100, you and Mr. Mauvilain would split whatever the photographers share would be; right?

A    Yeah.

Q    So is that correct?

A    Yeah.

Q    Okay.  So let's say you have a set that you've pooled with Mr. Mauvilain and your photo gets licensed but his photo does not get licensed.

A    So no, it is a pool, it is a pool.  His, too.

Q    Okay.  So the question is, if you are pooling a set with Mr. Mauvilain and your photo gets licensed, but his photo does not get licensed, you will split the licensing fee on the licensed photo; correct?

Page 244

A      Yeah, we -- we share.

Q      Okay.  So do you also share the byline with Mr. Mauvilain?

A      The byline?  Sorry, I -- I don't --

Q      Do you also share the credit information with Mr. Mauvilain?

A      Of course.

Q      Okay.  So does the copyright information in the metadata get shared with Mister --

A      Yeah, with a pool, I think this is an agency -- I don't make too much pool on -- on -- in my life.  Not really a lot, but the pool is really important by the way sometime you -- if you are alone, you can cover this and this.  So we take the risk one is going to have the picture, the other is not going to have a picture, even don't know what happen.  But you -- you have the story, so you can make money.  After that, the pool is -- the -- the two name, but -- but you say BTF and slash TB or TM or whatever.

Q      So the credit information gets updated with both photographers' codes, even though the photograph might have been just taken by one photo by one photographer?

A      Yeah.  Okay.  Sorry.  Yeah, and -- and I remember when we -- we work on -- on the -- created on

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

the -- the copyright.  You put your copyright, but you put the name in the metadata, both name, do you know, because this is -- this is like that.  Do you know?

Q    So you would put both names in the metadata when you pool a set?

A    Yeah, I do, and he do.

Q    Okay.  So you both put both names in the metadata with respect to the copyright information?

A    Yeah.  Yeah.

Q    Okay.

A    But I -- I tell you like that you understand.  When happened like the case now, each photographer have his own picture.  Like, when I do the pool with -- with Joseph, I have three picture and he have ten, whatever, or nine, but on the -- on the pool, the day of the pool, after we share the benefits, that -- that's it.  But after -- after it is -- he own his picture.  This is normal.

Q    Okay.

A    Okay.

Q    I am going to mark the next Exhibit Number 6, and it's 2014146 to 14149.

(Exhibit 6 was marked for

identification.)

A    Mm-hmm.  Was a -- was a difficult picture,

Page 246

CERTIFICATE OF DEPOSITION OFFICER

I, JERRICK CAJIGAS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Date: June 9, 2026

JERRICK CAJIGAS

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Page 254

CERTIFICATE OF TRANSCRIBER

I, JOSHUA SHEPHARD, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Date: June 9, 2026

JOSHUA SHEPHARD

Page 255