# Exhibit 26

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

THIBAULT MAUVILAIN, an

Individual; HENRI MAZARI, an

Individual; JEREMY DUPLAQUET, an

Individual; ROBERT CHRISTIAN

WOLF, an Individual; MICHEL

BOUTEFEU, an Individual;

STEPHANE KYNDT, an Individual;

and JOSEPH MEHDI, an Individual,

      Plaintiffs,

   v.                    Case No.

FLYNET PICTURES, LLC, a         2:25-cv-2757-FLA-MAA

California Limited Liability

Company; FAMEFLYNET INC., a

California Corporation; BACKGRID

INC., a California Corporation;

BACKGRID USA, INC., a California

Corporation; SHUTTERSTOCK, INC.,

a Delaware Corporation; and DOES

1-10, Inclusive,

      Defendants.

_____

Page 1

VIDEOTAPED DEPOSITION OF JOSEPH MEHDI

DATE:            Thursday, May 28, 2026

TIME:            10:06 a.m.

LOCATION:        Veritext Legal Solutions

                 707 Wilshire Boulevard, Suite 3500

                 Los Angeles, CA 90017

OFFICIATED BY: Jerrick Cajigas

JOB NO.:         8175698


PAGES 54, 61-62, 205 ARE CONFIDENTIAL

Page 2

very well not see that.  So this is my relationship with money in general.  I don't sleep with my bank accounts.

BY MS. ARDALAN:

Q    Prior to November 13, 2017, did you have an overpayment of $1,042, about, from any of the defendants?

MR. SERGENIAN:  Lacks foundation.  Calls for speculation.

THE INTERPRETER (FOR THE WITNESS):  I have to see my bank statement, but if it is for the work I've done, it's possible, yes.  But I cannot confirm if I don't see it on my bank statement.

BY MS. ARDALAN:

Q    Did you ever pay $1,042 back to any of the defendants?

A    It doesn't -- I don't quite -- doesn't resonate with me.

Q    Doesn't raise a what?

A    Resonate with me.

Q    Okay.  It doesn't resonate.  Okay.  So that means not to your recollection?

A    No.

Q    How did your relationship with FlyNet come to an end?

A    The decision of my departure.  It was -- it

Page 143

was obvious, this departure; that I was putting an end to this collaboration we had.

A few months before that happened, I gave him a friendly -- friendly advice that I was leaving -- sorry -- notice that I was leaving.  Yeah, but I -- I didn't have to do a -- a real notice, you know?  And what confirmed was the -- the fact that actually left.

Q    Okay.  When you say "him," are you saying Mr. Cosman?

A    Well, I was talking about that time, specifically.  I remember that he was there with his wife.  I don't know where and how.  I remember his nice wife that was there that appreciated my work.  I think she works in the same type of field.

So I felt that it was -- it was regretted, the fact that I was leaving, but maybe -- maybe that's what I felt.  Since I had good result and I was successful, I think it is also for them.  There was going to be money they were going to lose at that agency.

Q    What did you say when you gave them notice?  When you gave -- let me start that -- what did you say when you gave FlyNet notice?

A    So when we talk about that time before my departure; right?  That's -- you're talking about that; right?

Page 144

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q    Yeah.

A    So I was just saying that I was going to leave, and then as far as I can remember, I had Scott on the phone afterwards, and I told him I -- I landed and everything's good, but -- and then we came to an agreement to stop our collaboration.  And I -- I didn't ask him for his opinion, but, respectfully, I forewarning him before I left.

The day I -- I was in France, there was this conversation, so he was clearly notified that we'll not collaborate together anymore.

Q    Okay.  And what does that mean; that you will not collaborate anymore?

A    That means that I'm -- I'm not in the business and I don't want -- I don't want anyone to represent me.  That I -- I don't want that my picture be sold.  There is no -- the -- the cooperation between us two is over.

Q    Did you have this communication in person, on the telephone, or other means?

A    Last one was on the phone.  And when I forewarned them initially, it was orally.  It was physically, though.

Q    Physically in person?  The -- when you forewarned them?

A    The first time, yes.  When I first announced

Page 145

that I was going to leave, yes.

Q    Okay.  And then when you said you don't want your pictures to be sold, was that only over the phone or was it communicated by other means as well?

A    No, by phone.

Q    Okay.  How long was your phone conversation with Mr. Cosman?

A    Absolutely no idea.  No idea.  It didn't last three minutes because I wanted to tell him -- talk to him about my new departure.  We were very professional, but we were friendly with one another.  I knew he had a little boy; that he had four dogs; I already saw his wife several times, and I went to his home.  He went to my home.  So it's -- it was limited to that.

But we -- we could -- we could talk to each other in -- in a more friendly way.  And I think the communication was -- was not just three words.  It was more conversation you would have with a colleague, for example.  Hence, while -- while talking about the termination of that, what -- what we had.

Q    Why did you want FlyNet to stop licensing your works?

A    I -- I couldn't see the magazines anymore.  I didn't have anything else.  It was -- it was not even -- it was not worth it any longer.  There was -- the market

Page 146

THE INTERPRETER (FOR THE WITNESS):  Yes. I had many plans.  I had many plans that I put on hold and they're still on hold, actually, because those are images that are -- yeah, it's -- don't -- don't have a price that shows a time period, and I could exploit that in a million ways.

But for now, I am focused on the -- on the business I am working in right now.

BY MS. ARDALAN:

Q    Understood, but back when you had this conversation with Scott Cosman, did you have any specific plans for the photographs you submitted to FlyNet?

A    No.  The -- the only plan was to keep them.

Q    Okay, so you weren't -- did you have any plans to submit them to a different agency?

A    No.

Q    Okay.  Did you ever confirm your conversation with Mr. Cosman in writing?

A    No.  We -- we were always talking orally. It's -- I'm not into emails even though if today I have to get with it with the work I'm doing.  But at the time, we would call each other.

Q    After your call with Mr. Cosman when you asked him to stop licensing the photos through FlyNet, did you

Page 148

have any further communications with him?

MR. SERGENIAN:  Objection.  Misstates testimony.

THE INTERPRETER (FOR THE WITNESS):  The only communication I think that I had outside of the fact that I wish him a happy birthday on Facebook -- I might have done that one time, but I don't go to Facebook for over ten years now -- yes, it was the time when I did the pictures for the Game of Thrones.

BY MS. ARDALAN:

Q    Did you do anything after your conversation with Mr. Scott -- Mr. Cosman to check to see whether FlyNet was continuing to license your photographs?

A    I don't know what I could have done.

Q    Did you ever check any media outlets, magazines, websites?

A    No.  I already answered this question, and I turned the page on the magazines.  And in France we don't have the newsstands the way you have it here.  But I spent way too much time on the newsstands here, so there, I'm -- I'm looking at something else.

Q    Okay.  And when did you spend way too much time looking at the newsstands?

A    When I had pictures that I -- I was sure it would make it, and I was -- I was sure -- convinced.  I

Page 149

A    Okay, so please.

MR. SERGENIAN:  Wait for the question.

BY MS. ARDALAN:

Q    So with respect to the original files that you provided to FlyNet over FTP, do you have a copy of those files -- those exact files you sent to FlyNet over FTP?

A    Maybe.  Maybe.

Q    Do you know whether you have them?

A    I have to look in my hard drive.

Q    Okay.  Do you know whether you have submitted those original files you submitted over the FTP to FlyNet to Defendants in this action?

A    I don't think so.  I'm not sure, but I don't think so.  I think I only sent the RAW photograph and the proof of the fact that they were at Backgrid.

Q    And the RAW files; have they been edited by you in any way?

A    Of course.

Q    How have the RAW files been edited by you?

A    I'm sorry?

Q    How have the RAW files been edited by you?

A    The way I did it.

Q    Was it related to how the photo looks or was it related to other information in the file, such as the metadata?

Page 170

CERTIFICATE OF DEPOSITION OFFICER

I, JERRICK CAJIGAS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JERRICK CAJIGAS

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CERTIFICATE OF TRANSCRIBER

I, PAULA GEWERTZ, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

PAULA GEWERTZ

Page 219