**THIBAULT MAUVILAIN**
4605 Sylmar Avenue, Apt. 312
Sherman Oaks, California 91423
Email: tm@forceinaction.com
Telephone: 310.770.3612
Plaintiff, Pro Se

FILED

CLERK, U.S. DISTRICT COURT

08/07/2026

CENTRAL DISTRICT OF CALIFORNIA

BY _____ GSA _____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THIBAULT MAUVILAIN, an individual; HENRI MAZARI, an individual; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FLYNET PICTURES, LLC; FAMEFLYNET INC.; BACKGRID INC.; BACKGRID USA, INC.; SHUTTERSTOCK, INC.; and DOES 1–10, inclusive,<br><br>Defendants. | **Case No. 2:25-cv-02757-FLA-MBK**<br><br>**Hon. Fernando L. Aenlle-Rocha**<br><br>**PLAINTIFF THIBAULT MAUVILAIN'S OPPOSITION TO DEFENDANTS BACKGRID USA, INC., BACKGRID INC., AND SHUTTERSTOCK INC.'S MOTION FOR SANCTIONS**<br><br>**Hearing Date: August 28, 2026**<br><br>**Time: 1:30 p.m.**<br><br>**Courtroom: 6B** |

## TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................4

II. RELEVANT FACTUAL CHRONOLOGY.......................................................7

A. The Pre-Suit Inquiry Identified Missing Works and Suspected CMI Problems Before Any Portal Account or Lawsuit...........................................................7

B. The "Emily Carter" Investigation Used Credentials BackGrid Issued and Located Authentic Portal Records; It Did Not Create the Underlying Evidence.  8

C. Litigation and Court-Authorized Discovery Produced More Specific Evidence; the Court Has Never Found the Action Frivolous...........................................9

D. Defendants' Own Records Prevent Their Aggregate License-Fee Figure from Serving as a Judicial Cap on Harm....................................................................10

E. The Later Portal and Metadata Disputes Were Openly Disclosed and Are Highly Individualized.......................................................................................11

III. GOVERNING LEGAL STANDARDS.........................................................12

IV. ARGUMENT.................................................................................................13

A. Defendants Did Not Move Under Section 1927 Against Mauvilain..........13

B. The Motion Does Not Prove Individualized Bad Faith or Supply a Proper Basis for Joint-and-Several Liability................................................................13

C. The Merits Positions Were Supported by a Genuine Factual Record and Cannot Establish Subjective Bad Faith.........................................................15

1. Defendants' own records establish an objective basis for the attribution and accounting dispute......................................................................................15

2. The Court's prior pleading order did not find frivolousness..................16

3. Defendants' categorical Section 1202 premise is not the governing rule.16

4. Defendants' valuation and unilateral tender did not extinguish the dispute. 17

D. The Emily Carter Conduct Does Not Support Dismissal or a Litigation-Wide Fee Award.........................................................................................................17

E. The December 17 Portal Issue Does Not Establish 7,508 Personal Contempts or Justify Terminating Sanctions...................................................................18

F. Defendants Have Not Established Spoliation Under Rule 37(e) or Metadata Manipulation by Mauvilain.............................................................................19

G. Wolf's Testimony Does Not Establish Witness Tampering, False Coaching, or Willful Orchestration of an Order Violation.................................................20

H. The Fee Request Fails Goodyear's But-For Requirement and Cannot Support Joint-and-Several Liability..............................................................................20

I. Dismissal With Prejudice Is Not Supported by the Required Findings or Nexus. .........................................................................................................................21

V. CONCLUSION..............................................................................................22

# TABLE OF AUTHORITIES

**CASES**

*Chambers v. NASCO, Inc., 501 U.S. 32 (1991)*......................................................12

*Fink v. Gomez, 239 F.3d 989 (9th Cir. 2001)*......................................................12

*Goodyear Tire & Rubber Co. v. Haeger, 581 U.S. 101 (2017)*..........12, 17, 20–21

*Gregory v. State of Montana, 118 F.4th 1069 (9th Cir. 2024)*......................13, 20

*Halaco Engineering Co. v. Costle, 843 F.2d 376 (9th Cir. 1988)*...........13, 19, 22

*Leon v. IDX Systems Corp., 464 F.3d 951 (9th Cir. 2006)*...........................13, 19

*Primus Automotive Financial Services, Inc. v. Batarse, 115 F.3d 644 (9th Cir. 1997)* .................................................................................................................. 12, 14

*Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980)*.........................................12

*Stevens v. CoreLogic, Inc., 899 F.3d 666 (9th Cir. 2018)*....................................16

**STATUTES AND RULES**

17 U.S.C. § 203................................................................................................. 16

17 U.S.C. § 501................................................................................................. 16

17 U.S.C. § 1202............................................................................................... 16

28 U.S.C. § 1927.........................................................................................4, 12–13, 22

Federal Rule of Civil Procedure 37..........................................6, 13–15, 18–20, 22

## I. INTRODUCTION

Defendants seek dismissal with prejudice and an unallocated award of all fees and costs incurred in a seven-plaintiff copyright action against multiple plaintiffs, three former attorneys, and two law firms. Their Notice itself separates the authorities: Section 1927 is asserted against former counsel, while inherent authority is asserted against Plaintiffs and counsel. Notice at 2. As to Plaintiff Thibault Mauvilain, the Motion does not make the findings either remedy requires. It combines attorney pleading decisions, discovery practice, another plaintiff's visa, different photographers' files, Mauvilain's pre-suit use of the "Emily Carter" identity, and a later dispute over browser drag-and-drop into one collective narrative. The governing law requires the opposite: notice and proof tied to the person sanctioned; a specific finding of subjective bad faith; a close nexus between the conduct and the relief; and, for a compensatory fee award, a but-for connection between a particular act and identifiable fees.

Mauvilain does not ask the Court to approve every decision made during this litigation. He acknowledges that he requested a BackGrid client account under a fictitious identity and supplied a production-company description that was not literally true. He also acknowledges that, during the later court-authorized portal review, he used browser drag-and-drop to inspect metadata even though the portal did not provide a formal download function. Candor about those facts is necessary. But neither fact proves that Mauvilain fabricated the underlying photographs, altered BackGrid's records, destroyed evidence, directed anyone to testify falsely, knowingly disobeyed the December 17 order, caused every expense in the case, or litigated the merits in subjective bad faith.

The chronology matters. In June 2024, before the account and before suit, photographer counsel notified BackGrid and Shutterstock that legacy works appeared missing and that copyright-management information ("CMI") may have been removed or altered. Counsel requested an audit because the asserted attribution problem itself made exact identification difficult. Defendants denied an archive-wide problem, challenged the legal premise, and demanded photographer names, exact works, and locations within their own archive. Names were supplied on July 8; photographer-specific estimates and an example followed on July 17. Ardalan later

admitted that the pre-suit discussion included deleted CMI and the possibility of lost licensing revenue where CMI had not been updated and a photograph was not in the portal. Ardalan Decl. Exs. 13, 14, 19.

The later record did not show an imaginary dispute. Defendants' own declarant states that BackGrid inherited the Flynet/FameFlynet archive without clear contributor records, used placeholder contributor codes, licensed legacy sets while the correct contributor remained unresolved, segregated collected money, and made payments only after the litigation identified the photographers. Kantif Decl. ¶¶ 1, 5–8. Defendants' own presentation told the Court that current works uploaded through BackGrid's present contributor system "are not the Copyrighted Works at issue," that BackGrid "Licensed the FameFlyNet Library," that only "some (not all)" legacy photographs were available on the Client Portal, and that every then-identified licensed set lacked photographer information. Ardalan Decl. Ex. 10-2, slides 13–15, 27. The shift from denying a systemic issue to describing the dispute as a few dollars does not prove bad faith by Defendants, but it does show why their present "small claims" characterization is not a neutral adjudication of what the record revealed.

The internal records are more specific. Two sets pleaded as Mauvilain works—BGUS_838717 and BGUS_979019—were actually licensed while BackGrid's internal contributor field identified "FAFL – FameFlynet Pictures Inc.," the commission interface placed FAFL in the seventy-percent photographer position, and the public-facing byline identified FameFlynet/BackGrid rather than Mauvilain. Ardalan Decl. Ex. 11; Dkt. 80-1 at 9–10. By contrast, Defendants' other records show that when BackGrid associated current or legacy transactions with Mauvilain, those transactions appeared under THMA in his ordinary payment history. Ardalan Decl. Ex. 10-3B; Kantif Decl. Ex. A. That comparison supplies an objective basis to investigate attribution, CMI, royalty routing, accounting, and the scope of archive rights even if Defendants ultimately prevail on one or more merits issues.

The Motion's "small claims" valuation is therefore not an adjudication. The repeated $2,931.16 figure aggregates selected recorded license fees across seven photographers; it is not Mauvilain's individual damages, does not trace all archive identifiers or downstream uses, and does not address attribution injury, CMI remedies, profits, current portal visibility, or unresolved transfer and accounting issues. Defendants' own spreadsheet initially assigned BGUS_838717 to another

photographer even though the SAC identifies it as Mauvilain's. Ardalan Decl. Ex. 2; Dkt. 80-1 at 10. BackGrid's unsolicited March 19 payment to Mauvilain was ▋▋▋ not $2,931.16, and included a disputed ▋▋ FAFL-coded component that Mauvilain rejected, attempted to reverse, and prepared to return by check after requesting the proper payee and address. Kantif Decl. ¶ 8 & Ex. B; Ardalan Decl. Ex. 22 at 130:7–131:25, 257:17–259:24; Mauvilain Decl. ¶¶ 17–20 & Ex. B.

Nor does the selected historical spreadsheet capture ongoing commercial consequences. In July 2026, an archive producer at Renowned Films requested Kat Torres/138 Water campaign stills for a documentary on an all-media, worldwide, in-perpetuity basis. Mauvilain's audit identified twenty-three related sets, including sets absent from the commercial-facing Client Portal and sets displaying disputed FAFL attribution; the producer's sample appeared to correspond to a set visible in Mauvilain's contributor records under THMA but missing from the Client Portal. That record does not establish a fixed lost-dollar amount, and Mauvilain does not offer it as a completed damages calculation. It does establish a live licensing opportunity and present business interference not captured by Defendants' retrospective fee spreadsheet. Mauvilain Decl. ¶¶ 21–23 & Ex. C.

The same discipline is required for the Motion's procedural accusations. The December 17 order permitted screenshots, prohibited downloading or otherwise saving or storing portal materials, and required production by January 12. Dkt. 66 at 2. Paragraph 5, however, expressly stated that the order was not a discovery order whose violation would be subject to Rule 37(b), and identified a Rule 37(a) motion to compel as the enforcement mechanism for a violation of the parties' agreement. Id. at 3. Defendants did not seek that adjudication. The files were openly produced on February 25, and Defendants first asserted the challenged method on May 20. Ardalan Decl. ¶ 8. Moreover, Mauvilain had already disclosed drag-to-desktop metadata inspection under oath to Ardalan at his May 18 deposition, two days before his May 20 conversation with Wolf. Ardalan Decl. Ex. 22 at 179:11–180:7. The Motion's implication of unexplained advance knowledge is therefore incomplete.

Finally, Defendants' fee submission confirms the absence of causation and allocation. Exhibit 29 contains 696.7 hours for the entire action, including motions to dismiss, bilateral discovery disputes, IDCs, and depositions of Mazari, Wolf, Boutefeu, Mehdi, Duplaquet, and matters involving Kyndt and former counsel. It also

includes preparation of the sanctions motion itself. Ardalan Decl. Ex. 29 at 16–21. Yet the Motion states no requested dollar amount, no actual discounted hourly rates, no actor-by-actor allocation, and no but-for calculation. A billing system captioned with Mauvilain's name does not make all case-wide work causally attributable to him.

The Court should deny the Motion as to Mauvilain. At minimum, it should deny dismissal and joint-and-several liability, reject any litigation-wide fee award, and require a separate evidentiary and fee proceeding before imposing any narrowly tailored relief based on specifically proven conduct.

## II. RELEVANT FACTUAL CHRONOLOGY

**A. The Pre-Suit Inquiry Identified Missing Works and Suspected CMI Problems Before Any Portal Account or Lawsuit.**

On June 27, 2024, photographer counsel advised BackGrid and Shutterstock that CMI appeared to have been removed or altered from legacy works and requested an audit so affected photographs could be identified and reattributed. Ardalan Decl. Ex. 14. Defendants' July 3 response rejected the legal premise, demanded the photographer identities, exact works, and location of each work within BackGrid's library, and invoked Rule 11. Id. Ex. 15. Counsel explained that exact identification was difficult precisely because of the suspected attribution changes, supplied the photographers' names on July 8, and provided claimant-specific estimates and an example on July 17, including an estimate of approximately 10,000 Flynet-era images for Mauvilain. Id. Ex. 19.

Ardalan's later deposition confirms that the discussion was not confined to works merely being absent from a contributor screen. She acknowledged that photographer counsel discussed deleted CMI and that she asked for the best example of a possible lost licensing fee because CMI had not been updated and a photograph was not in the portal. Id. Ex. 13 at 44–53. She also testified that the separate client-facing portal was not discussed. Id. Those facts do not decide liability, but they establish that missing-work, attribution, and economic concerns predated both the account and the lawsuit.

Mauvilain's July 2 errata clarifies the scale he was describing at deposition: an estimated affected legacy archive of approximately 25,000 images—roughly 10,000 Flynet-era images he believed missing from both portals and roughly 15,000 FameFlynet-era images affected by client-side absence, misattribution, or ingestion problems. Mauvilain Decl. ¶ 9 & Ex. A at 5–7. That is Mauvilain's estimate, not an admission by Defendants and not a presently adjudicated damages universe. It explains why the 3,958 images he documented and the 166 sets pleaded in the SAC were narrowed investigative populations rather than a representation that the selected sets exhausted every potential archive issue.

**B. The "Emily Carter" Investigation Used Credentials BackGrid Issued and Located Authentic Portal Records; It Did Not Create the Underlying Evidence.**

Mauvilain acknowledges that he requested access under the fictitious name Emily Carter and associated the request with Hollywood Uncovered and a contemplated documentary project. Ardalan Decl. Ex. 22 at 172:3–173:25. BackGrid's sales department nevertheless issued the username and permitted creation of a password. Kantif Decl. ¶ 3. Defendants do not identify a stolen credential, password cracking, alteration of portal data, or circumvention of a technological access control. They retained the account records and activity logs and authenticated the portal source. Id. ¶ 10.

Mauvilain used the account to investigate his own legacy archive, not to create photographs or insert information into BackGrid's systems. He testified that he identified 3,958 images and did not share the credentials. Ardalan Decl. Ex. 22 at 177:1–24. The account activity and Mauvilain contributor logs strongly connect him to the account; he does not contest that linkage. The relevant issue is what that identity evidence proves. It proves the account was his. It does not prove that the portal content was false, that all discovery delay was motivated by preserving access, or that every merits position was pursued in subjective bad faith. Ardalan's declaration says Plaintiffs were "likely" motivated to delay, expressly revealing inference rather than personal knowledge. Ardalan Decl. ¶ 3.

The later internal records corroborate the substance of what was being investigated. Defendants' records show licensed Mauvilain-pleaded sets under FAFL, while their ordinary Mauvilain payment history shows transactions when BackGrid

associated a work with THMA. Ardalan Decl. Exs. 10-3B, 11. The record for FFN_70016431 also shows the same December 18, 2016 Kourtney Kardashian/Younes Bendjima story under MIBO and THMA, while the related BGUS_838717 record uses FAFL. Kantif Decl. Ex. A; Ardalan Decl. Ex. 11. Mauvilain does not ask the Court to find from this motion record that every image in the two sets is identical. The matching date, subjects, headline, and divergent contributor treatment make the attribution inquiry objectively reasonable.

**C. Litigation and Court-Authorized Discovery Produced More Specific Evidence; the Court Has Never Found the Action Frivolous.**

The Court dismissed the FAC because the alleged contract terms required greater specificity, granted leave to amend, and declined to reach the remaining intertwined issues. Dkt. 79 at 3. That ruling was not a finding of fabrication or bad faith. The SAC added specific registrations, set identifiers, and theories concerning limited contributor arrangements, license scope, attribution, CMI, accounting, and conduct exceeding any permission to claim ownership. Dkt. 80 ¶¶ 27–32, 49–56, 64. Defendants' motion to dismiss the SAC remains a merits dispute; it cannot be converted into an already-adjudicated sanctions premise.

The Court-authorized identification process was productive. The December order directed temporary Client Portal access for the sole purpose of identifying works. Dkt. 66 at 2. After additional sets were identified, Defendants searched their internal records and produced additional licensing transactions in January 2026. Ardalan Decl. Ex. 12. By March 4, Ardalan wrote, "Now that you have identified all of the photos that are at issue in this lawsuit," and renewed a proposal to update portal credit information. Id. Ex. 17. That correspondence confirms that the earlier identification problem had been materially narrowed; it does not establish that Mauvilain personally rejected a complete cure. The proposal addressed portal "credit," but did not on its face promise correction of historical FAFL contributor coding, audit trails, past accounting, sales associations, or every internal royalty-routing record. Defendants' own Motion insists that contributor coding serves an economic function distinct from a publication byline. Mot. 10–11.

**D. Defendants' Own Records Prevent Their Aggregate License-Fee Figure from Serving as a Judicial Cap on Harm.**

The $2,931.16 figure is a defense-generated aggregate across all seven photographers, assembled as the set population and internal searches evolved. Ardalan Decl. Exs. 2, 10-2, 11, 12. It is not a Mauvilain-specific adjudication. Exhibit 2 even places BGUS_838717 in another photographer's column, while the SAC identifies it as Mauvilain's and Exhibit 11 shows it licensed under FAFL. Dkt. 80-1 at 10; Ardalan Decl. Exs. 2, 11. That mismatch illustrates why photographer-specific attribution and accounting were disputed.

Defendants' tender to Mauvilain likewise did not resolve the dispute. Exhibit B shows an unsolicited ██████ ACH through the ordinary ████████████ payment system on March 19, the same date the SAC was filed. Kantif Decl. Ex. B. Mauvilain later discovered that the accompanying report mixed ordinary activity with two Patrick Schwarzenegger entries associated with FAFL, totaling ████ in disputed commissions. He testified that FAFL was not his code, contacted his bank about reversal, and stated that Defendants could expect a refund. Ardalan Decl. Ex. 22 at 130:7–131:25, 257:17–259:24. He then served supplemental discovery expressly rejecting settlement, waiver, cure, release, or satisfaction, prepared a ████ return check, and requested the proper payee name and mailing address. Mauvilain Decl. ¶¶ 17–20 & Ex. B. Kantif himself concedes that Plaintiffs attempted to return the funds. Kantif Decl. ¶ 8.

The July 2026 Renowned Films inquiry further demonstrates why a retrospective list of recorded fees was not the entire controversy. The producer requested a small number of Kat Torres/138 Water campaign stills for an all-media, worldwide, in-perpetuity documentary license and needed assistance identifying the correct set. Mauvilain's audit identified twenty-three related sets, only sixteen shown on the Client Site, seven not shown there, eight with disputed FAFL/CMI treatment, and eight with proper THMA attribution as a comparison baseline. Mauvilain Decl. ¶¶ 21–23 & Ex. C. The sample appeared to correspond to FFN_60085778, shown in Mauvilain's contributor records under THMA but identified in the audit as missing from the Client Site. Id. This evidence does not prove a particular lost fee, but it is

concrete evidence of ongoing demand and the practical importance of accurate visibility and attribution.

Discovery also sought the instruments and records necessary to determine what rights moved through the Flynet/FameFlynet/BackGrid archive and the Shutterstock acquisition, including acquisition, migration, archive, wholesale, bulk, or perpetual-rights records. Dkt. 112-1 at 1–2. Mauvilain does not contend that the present sanctions record proves a bulk sale of his copyrights or an archive-wide transfer in perpetuity. The narrower point is that Defendants' aggregate spreadsheet cannot conclusively value a controversy while the chain, scope, duration, and contributor obligations of the asserted archive rights remained disputed. Kantif states only that BackGrid holds "syndication rights"; he does not identify the instrument, grantor, scope, duration, or accompanying attribution and accounting obligations. Kantif Decl. ¶ 1.

**E. The Later Portal and Metadata Disputes Were Openly Disclosed and Are Highly Individualized.**

Paragraph 3 of Dkt. 66 permitted screenshots, prohibited downloading or otherwise saving or storing portal material, and required all materials created through access to be produced by January 12. Dkt. 66 at 2. Mauvilain does not ask the Court to rewrite that language. His testimony and errata explain that he viewed drag-and-drop as unexpected functionality available during authorized access for metadata inspection; the errata does not claim authorization beyond the portal access or eliminate the question whether local creation of a file constituted prohibited saving. Ardalan Decl. Ex. 22 at 179:11–180:7; Mauvilain Decl. ¶¶ 11–13 & Ex. A at 7.

But the Motion's chronology is incomplete. Mauvilain disclosed the method directly to Ardalan during his May 18 deposition. Id. Two days later, he met Wolf and advised that Defendants had concerns about the process. Wolf Dep. 215:2–218:14. Exhibit 28 shows Mazari's questioning about the issue at approximately 6:07 p.m. on May 20. Ardalan Decl. Ex. 28. Defendants may argue that they first formally characterized the method as an order violation during Mazari's deposition. They cannot fairly imply that Mauvilain's awareness on May 20 required a concealed source when he had openly described the method to Ardalan on May 18.

The metadata evidence is likewise respondent-specific. Wolf testified that he retained original camera JPEGs, repeatedly did not know who inserted "Hans Castorp," and did not know whether Mauvilain did so. Ardalan Decl. Ex. 24 at 164:6–165:25, 196:15–204:22. Exhibit 24-4 is a Windows-properties screenshot of a copy located on Ardalan's One LLP desktop; it displays dates but does not identify who changed what, when in the chain of custody, or whether the displayed "modified" event concerned IPTC data. Id. Ex. 24-4. Duplaquet, when asked directly whether Mauvilain instructed him to change metadata or scrub the Metadata Date, answered "No" to both questions. Id. Ex. 27 at 169:4–25. Those records do not support a collective finding that Mauvilain orchestrated evidence alteration.

**III. GOVERNING LEGAL STANDARDS**

Section 1927 permits an award only of excess costs, expenses, and attorneys' fees caused by unreasonable and vexatious multiplication of proceedings. 28 U.S.C. § 1927. Defendants' Notice expressly files that statutory theory against former counsel Sergenian, Mu, and Carreon—not against Mauvilain—and separately invokes inherent authority against Plaintiffs and counsel. Notice at 2. The Court should evaluate Mauvilain only under the authority noticed against him and should not use lawyer-only Section 1927 allegations as a substitute for the individualized bad-faith findings required under inherent authority.

A court may sanction a party under inherent authority only upon a specific finding of bad faith or conduct tantamount to bad faith. Fink v. Gomez, 239 F.3d 989, 992–94 (9th Cir. 2001); Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 648–50 (9th Cir. 1997). Recklessness alone is insufficient unless combined with frivolousness, harassment, or improper purpose. Fink, 239 F.3d at 994. Because inherent powers are potent, they must be exercised with restraint and discretion. Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991). Due process requires notice of the particular conduct and sanctioning authority and a meaningful opportunity to respond. Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980).

A compensatory inherent-power fee award is limited to fees the moving party would not have incurred but for the sanctioned misconduct. Goodyear Tire & Rubber Co. v. Haeger, 581 U.S. 101, 108–10 (2017). The Court may use reasonable approximation when misconduct permeates an entire case, but it must still identify a

causal link and may not impose a punitive award without criminal procedural protections. Id.

Dismissal is a harsh sanction requiring willfulness, fault, or bad faith and consideration of expeditious resolution, docket management, prejudice, the policy favoring merits decisions, and less drastic alternatives. Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006). The "most critical" requirement is a nexus between the misconduct and the matters in controversy sufficient to interfere with a rightful decision on the merits. Halaco Eng'g Co. v. Costle, 843 F.2d 376, 381 (9th Cir. 1988).

For alleged loss of electronically stored information, Rule 37(e) requires proof that ESI that should have been preserved was lost because reasonable steps were not taken and cannot be restored or replaced. Dismissal is available only upon a finding of intent to deprive another party of the information's use. Fed. R. Civ. P. 37(e)(2)(C). Gregory v. State of Montana holds that Rule 37(e) supplies the governing framework for covered ESI loss and that its intent requirement cannot be avoided by relabeling the sanction as inherent authority. 118 F.4th 1069, 1077–81 (9th Cir. 2024).

## IV. ARGUMENT

### A. Defendants Did Not Move Under Section 1927 Against Mauvilain.

Defendants' Notice is unambiguous. It states that the Section 1927 portion is filed against David Sergenian, Shengmao Mu, and Ryan Carreon, while the inherent-authority portion is filed against Plaintiffs, counsel, and the firms. Notice at 2. Thus, any sanction against Mauvilain must satisfy the standards governing inherent authority; it cannot rest on Section 1927 liability or on counsel-only conduct merely because the Motion discusses the actors collectively. The Court should preserve that noticed boundary and decline any attempt to expand the statutory theory against Mauvilain for the first time in reply.

### B. The Motion Does Not Prove Individualized Bad Faith or Supply a Proper Basis for Joint-and-Several Liability.

The Motion repeatedly substitutes "Plaintiffs," "counsel," or "Plaintiffs and counsel" for proof about Mauvilain. The Kyndt visa issue concerns Kyndt and

counsel. The filing of three Rule 37 joint stipulations, amendment decisions, written-contract allegations, and registration strategy were lawyer acts. Mazari's and Mehdi's termination evidence belongs to them. Duplaquet's address entry and Wolf's uncertain metadata belong to those files and witnesses. Five Plaintiffs' dismissals were their decisions. None establishes Mauvilain's subjective bad faith.

The limited instances involving Mauvilain do not cure the problem. He used the Emily Carter identity; he described drag-and-drop; he met Wolf; and his name appears in attorney-drafted discovery responses. Each requires its own evidence, mental-state finding, causal analysis, and remedy. Defendants instead use one event to color another and then seek one indivisible sanction.

Defendants emphasize an August 2025 verified interrogatory response stating that counsel had terminated licenses. Ardalan Decl. Ex. 18. Mauvilain was not present for the Parant–Ardalan attorney-to-attorney call; the response itself attributes the alleged act to "Responding Party's counsel," and its preliminary statement disclosed that some information had been obtained by attorneys or investigators and might not be within the responding party's personal knowledge. Mauvilain's verification warrants consideration, but a later disagreement between the two attorneys about their own conversation does not establish that Mauvilain knowingly fabricated a call he did not attend.

Mauvilain also does not contend that he received no notice at all. Exhibit 31 warned that Defendants would seek dismissal. His objection is that the eight-item notice combined counsel, seven Plaintiffs, merits theories, metadata, the portal, and discovery practice without a respondent-specific showing. After becoming pro se, Mauvilain asked Defendants to identify, as to him, each ground, authority, act, evidence, mental state, prejudice, remedy, and fee estimate; he attended the July 16 conference and memorialized his position. Ardalan Decl. Ex. 32 at 2–11. That conduct is inconsistent with evasion or obstruction.

Primus is directly instructive. It reversed sanctions that failed to distinguish responsibility between clients and counsel and emphasized that the bad-faith threshold must be applied to each sanctioned person. 115 F.3d at 648–50. Defendants identify no common plan among all proposed respondents that caused one indivisible injury, and no evidence that Mauvilain chose the challenged pleading theories,

controlled former counsel's Rule 37 filings, or instructed counsel to make a representation he knew was false.

The meet-and-confer record confirms that Mauvilain did not evade the issue after becoming pro se. He asked Defendants to identify, as to him, each ground, authority, act, evidence, mental state, prejudice, remedy, and fee estimate; he also requested the allegedly violated order language and the ESI said to be irretrievably lost. Ardalan Decl. Ex. 32 at 2–11. He participated in the July 16 call and preserved his denial. Id. Defendants plainly gave notice that dismissal was sought; the point is not absence of any notice. It is that broad notice and a collective accusation do not replace the individualized proof required for the requested order.

**C. The Merits Positions Were Supported by a Genuine Factual Record and Cannot Establish Subjective Bad Faith.**

**1. Defendants' own records establish an objective basis for the attribution and accounting dispute.**

Kantif admits unclear inherited contributor data, placeholder codes, licensing while the photographer was unresolved, segregated receipts, later recoding, and post-suit payment. Kantif Decl. ¶¶ 5–8. Exhibit 10-2 admits that the licensed sets then identified lacked photographer information. Exhibit 11 shows FAFL occupying the contributor and seventy-percent photographer position on two licensed Mauvilain-pleaded sets. Exhibit 10-3B shows what Mauvilain's normal accounting looked like when a transaction was actually associated with him. Kantif Exhibit A shows BackGrid could use THMA for legacy works and could place agency-related and photographer-specific codes on the same record. Those facts may have innocent explanations. They cannot fairly be described as no factual basis at all.

The contributor-code evidence must be stated precisely. A code does not invariably prove who pressed the shutter or owns every copyright; pooled sets can allocate economic participation to more than one photographer. Ardalan Decl. Ex. 25 at 243:6–246:9. But the same testimony confirms that pooled participants share the economic credit while each retains ownership of his own image. Id. Defendants' own records show that the contributor field is used to route the photographer share. Thus, FAFL's appearance where THMA was absent was economically operative and

supplied a reasonable basis to investigate attribution and accounting, even if the ultimate Section 1202 analysis requires additional CMI and scienter proof.

The federal claims were therefore not made significant by the size of one spreadsheet entry. The infringement theory under 17 U.S.C. § 501 asks whether continued distribution and licensing exceeded the scope of any permission; the CMI theory under 17 U.S.C. § 1202 asks whether protected identifying information was removed or falsified with the required knowledge. The Court may ultimately reject either theory. But Defendants' own records show concrete works, active licenses, missing photographer information, and FAFL economic attribution, which prevents those claims from being treated as knowingly fictitious merely because Defendants characterize the recorded commissions as modest.

**2. The Court's prior pleading order did not find frivolousness.**

Dkt. 79 required more detail, granted leave, and did not reach the remaining intertwined issues. Dkt. 79 at 3. The SAC's legal sufficiency remains contested. An adverse pleading ruling—or even an ultimate dismissal—does not retroactively establish that a pro se plaintiff acted in subjective bad faith where Defendants' own business records corroborated the factual dispute. Sanctions are not a substitute for adjudicating the pending motion to dismiss.

**3. Defendants' categorical Section 1202 premise is not the governing rule.**

The Motion asserts that a Section 1202 claim "could never prevail without infringement." Mot. 12–13. Stevens explains that Section 1202(b)'s double-scienter language is written in the future tense; a plaintiff must affirmatively show knowledge or reasonable grounds to know that CMI removal or alteration will likely induce, enable, facilitate, or conceal infringement, but need not prove a particular completed downstream infringement as an absolute prerequisite. 899 F.3d 666, 674–75 (9th Cir. 2018). Whether Mauvilain can satisfy Stevens is a merits issue. Defendants' categorical impossibility argument cannot itself establish bad faith.

The same is true of license scope and Section 203. The SAC did not rely solely on statutory termination; it alleged limited oral or implied contributor arrangements, contractual revocation, and conduct beyond any authority to claim copyright ownership or sublicense as owner. Dkt. 80 ¶¶ 27–32, 64, 67–68. Defendants may

prevail on those theories. Their disagreement does not prove that Mauvilain selected or pursued them for harassment.

**4. Defendants' valuation and unilateral tender did not extinguish the dispute.**

The $2,931.16 figure was neither a judicial finding nor a complete plaintiff-specific accounting. It aggregates gross fees across seven Plaintiffs, changes as sets are identified, and depends on correct attribution in Defendants' databases—the very subject in dispute. The only tender to Mauvilain was ███████ partly consisting of FAFL-coded royalties he rejected and attempted to return. A unilateral payment of an amount Kantif calls "owed" does not establish acceptance, release, correction of historical CMI, complete accounting, or resolution of ongoing portal and licensing consequences.

**D. The Emily Carter Conduct Does Not Support Dismissal or a Litigation-Wide Fee Award.**

Mauvilain's use of a fictitious identity is a serious fact and should be evaluated without euphemism. But the sanction must fit what the conduct actually caused. The portal content preexisted the account; BackGrid's sales team issued credentials; Defendants possess the account logs and underlying business records; and the Motion identifies no altered BackGrid data, fabricated image, destroyed portal record, or deception practiced on the Court about the source once discovery addressed it. The conduct may bear on credibility, admissibility, or a discrete sanction. It does not erase the independently existing FAFL records or establish that every legal and factual position in the action was pursued in bad faith.

Defendants also fail to establish their asserted motive. Ardalan says Plaintiffs were "likely" delaying production to keep the account open. Ardalan Decl. ¶ 3. That inference is not personal knowledge. The October production chronology instead shows large prior productions and an iterative mapping process. Defendants' own presentation stated that Plaintiffs had produced 12,972 photographs but complained they were not adequately searchable or mapped. Ardalan Decl. Ex. 10-2, slide 7. The dispute was therefore about identification and organization, not the literal absence of photographic evidence.

Most importantly, Goodyear requires causation. Defendants would have incurred substantial costs litigating standing, registration, license scope, CMI, archive

rights, accounting, and their motions to dismiss even if Mauvilain had never used the alias. They do not isolate fees caused by granting and investigating the account from ordinary merits work. Dismissal and reimbursement of the whole defense are therefore unavailable on this record.

**E. The December 17 Portal Issue Does Not Establish 7,508 Personal Contempts or Justify Terminating Sanctions.**

The complete order controls. Paragraph 3 prohibited downloading or otherwise saving or storing portal materials and required production. Dkt. 66 at 2. Paragraph 5 states that the order was not one whose violation would be subject to Rule 37(b) sanctions and that violation of the parties' agreement could be enforced through a Rule 37(a) motion to compel. Id. at 3. Defendants never sought that ruling. The Court need not decide that the method complied with the order to reject the Motion's conversion of a disputed operation into 7,508 established contempt adjudications.

The aggregate number is not individualized proof. Ardalan says the production contained 7,508 files and "appears" to reflect one file per photograph. Ardalan Decl. ¶ 8. She does not establish that Mauvilain performed 7,508 acts, identify his subset, or prove a separate willful intent for every file. Mazari testified to 1,803 files of his own; Wolf described six sets. Ardalan Decl. Exs. 23, 24. A collective file count cannot be assigned wholesale to Mauvilain.

The chronology also bears on concealment and prejudice. The files were produced on February 25; Defendants did not recover them from deletion or discover them through forensics. Ardalan Decl. ¶ 8. Mauvilain openly described drag-and-drop to Ardalan on May 18. Defendants first asserted violation on May 20. The approximately twelve-week interval does not waive their objection, but it undermines claims that the method caused immediate irreparable prejudice or made a merits decision impossible. Defendants identify no public dissemination, alteration of their source systems, or loss of their ability to compare the produced materials to their own portal and database records.

If the Court finds that Mauvilain understood the browser operation to be prohibited saving, a focused remedy remains available. The Court could address confidentiality, require supplemental production or declarations, exclude a specifically unreliable file, or award fees caused by a narrowly identified corrective

proceeding. The alleged method did not create the legacy archive, FAFL coding, missing photographer information, licensing transactions, or post-suit payments. Halaco's required nexus between misconduct and dismissal of the merits is absent.

**F. Defendants Have Not Established Spoliation Under Rule 37(e) or Metadata Manipulation by Mauvilain.**

The Motion treats "different," "later metadata date," "not the exact FTP file," and "spoliated" as synonyms. Rule 37(e) requires more: identification of ESI that was lost, a preservation duty, failure to take reasonable steps, inability to restore or replace, prejudice, and—before dismissal—intent to deprive. Defendants do not make those findings as to Mauvilain. If Defendants contend no ESI was lost, Rule 37(e) cannot support a spoliation dismissal; if they contend ESI was lost, they have not proved the Rule's threshold elements. Either way, a metadata discrepancy is not itself proof of intentional spoliation.

The record uses "native" for several distinct categories: original camera/source files; edited or exported agency-delivery JPEGs; registration deposit materials; Client Portal-rendered files; and litigation production copies. Mauvilain's errata expressly distinguishes those categories and explains that original/source and agency-delivery versions can represent the same photographic work without being byte-identical. Mauvilain Decl. Ex. A at 7–8. A later metadata date in one copy does not prove destruction of another version.

Defendants identify no Mauvilain original that was wiped or rendered unavailable. Their specific Kantif example concerns Duplaquet, not Mauvilain. Kantif Decl. ¶ 11. Wolf testified that his original camera JPEGs remained available. Ardalan Decl. Ex. 24 at 165:11–15. When asked if Mauvilain inserted the questioned Hans Castorp information, Wolf repeatedly answered that he did not know. Id. at 196:15–204:22. The Windows screenshot of ONE LLP's local copy supplies no forensic attribution. Id. Ex. 24-4. Duplaquet expressly denied that Mauvilain instructed him to change metadata or scrub the metadata date. Id. Ex. 27 at 169:4–25.

That record is unlike Leon, where the plaintiff intentionally deleted and wiped more than 2,200 irreplaceable files after litigation began, severely impairing the defense. 464 F.3d at 959–60. Here, Defendants identify produced copies, originals that remain available, and disputed provenance—not proven unrecoverable loss or

intent to deprive. Gregory forecloses dismissal by relabeling an unproven Rule 37(e) claim as inherent authority.

**G. Wolf's Testimony Does Not Establish Witness Tampering, False Coaching, or Willful Orchestration of an Order Violation.**

Wolf openly disclosed his meeting with Mauvilain. He said they discussed the case and that Mauvilain urged him to be prepared to explain his own payment expectations, copyrights, and reasons for participating. Ardalan Decl. Ex. 24 at 122:24–124:24. When asked whether Mauvilain told him to say BackGrid changed his copyright information, Wolf answered "No." Id. at 137:14–138:25. Nothing in the excerpts shows an instruction to lie, conceal a communication, destroy evidence, or adopt a fact Wolf did not believe.

On portal use, Wolf did not testify that Mauvilain told him to "save" files; he recalled a sequence of commands and screenshots. Id. at 215:2–15. Wolf said he believed he was following the process, lacked improper intent, and used the materials only for discovery. Id. at 216:1–217:15. When Ardalan asked whether Mauvilain told him the conduct violated a court order, Wolf said he was "sure" Mauvilain did not. Id. The testimony does not establish willful orchestration of contempt.

The metadata accusation is weaker still. Wolf repeatedly lacked personal knowledge about who inserted Hans Castorp and retained his original camera files. Id. at 164:6–165:25, 196:15–204:22. Counsel's characterization that Mauvilain "influenced" testimony or "spoliated" files goes beyond what the witness established.

**H. The Fee Request Fails Goodyear's But-For Requirement and Cannot Support Joint-and-Several Liability.**

Defendants request fees and costs but do not state the amount. Ardalan identifies Exhibit 29 as time records, gives "typical" rates, and says she provided BackGrid an unspecified discount. Ardalan Decl. ¶¶ 29–31. The Motion and proposed order contain no actual rate, lodestar, total dollars, or conduct-by-conduct calculation.

Exhibit 29 confirms that the records are case-wide rather than Mauvilain-specific. They total 696.7 service hours and include motions to dismiss, discovery planning and disputes, IDCs, depositions of five other Plaintiffs, preparation concerning Kyndt, work with former counsel, and drafting this sanctions motion.

Ardalan Decl. Ex. 29 at 16–21. They also include work that predates the conduct said to justify sanctions. Nothing identifies which hours would not have been incurred but for a specific bad-faith act by Mauvilain.

Mauvilain expressly requested a good-faith fee estimate and asked whether Defendants sought it from him individually or jointly and severally. Ardalan Decl. Ex. 32 at 2–4. The Motion still supplies neither. Under Goodyear, the Court cannot shift the ordinary cost of defending the entire action merely because Defendants characterize the action as frivolous. It must segregate ordinary merits work, work caused by counsel or other Plaintiffs, and work caused by a proven act of Mauvilain. The current record does not permit that calculation. A dollar amount or allocation first supplied in reply would not afford Mauvilain a meaningful opportunity to respond; at minimum, separate fee briefing would be required.

A joint-and-several award is especially improper. Kyndt's visa, Duplaquet's address, Wolf's files, Mazari's saved images, counsel's joint stipulations, and Mauvilain's alias did not cause one indivisible expense. The Court should deny the fee request outright. At minimum, it should require a separate fee application after liability findings, actual billing rates, unredacted descriptions sufficient for review, and respondent-specific but-for allocation.

## I. Dismissal With Prejudice Is Not Supported by the Required Findings or Nexus.

The Motion's conclusion requests dismissal without applying the governing factors. First, the record does not establish willful deception of the Court, intentional destruction, or subjective bad faith by Mauvilain. It relies on collective labels, inferred motives, and witness uncertainty.

Second, Defendants have not shown prejudice to the rightful decision of the case. They possess the portal, account, license, and database records. The challenged files were produced. Original or replacement sources have not been shown unavailable. No trial has been distorted by missing evidence.

Third, the public policy favoring merits resolution weighs strongly against dismissal while the SAC's sufficiency remains pending and the factual record includes Defendants' own admissions and FAFL records. The Court can decide the claims on a developed record without approving every discovery method.

Fourth, less drastic remedies are readily available. Defendants did not use the Rule 37(a) mechanism identified in Dkt. 66, did not obtain a prior violation finding, and identify no warning that the disputed conduct would result in dismissal. Confidentiality measures, targeted supplementation, evidentiary exclusion, a focused hearing, or discrete causal fees are all less severe alternatives.

Finally, dismissal lacks the necessary nexus. The merits concern CMI, attribution, license scope, archive migration and asserted syndication rights, accounting, and payment. The alias and drag-and-drop disputes may affect credibility or admissibility. They did not create Defendants' FAFL-coded records or make a merits adjudication impossible. Halaco identifies that nexus as the most critical dismissal requirement. 843 F.2d at 381. It is missing here.

**V. CONCLUSION**

Mauvilain respectfully requests that the Court deny the Motion as to him. Defendants did not move under Section 1927 against him, and the inherent-authority request does not establish individualized subjective bad faith, fabrication of the underlying evidence, spoliation under Rule 37(e), witness tampering, but-for fee causation, a proper basis for joint-and-several liability, or the findings required for dismissal with prejudice.

Alternatively, the Court should deny dismissal and any joint-and-several or litigation-wide fee award; hold an evidentiary hearing before resolving disputed intent or credibility; require Defendants to state an actual fee amount and respondent-specific but-for calculation; and limit any relief to a proportionate remedy tied to specifically proven conduct.

Dated: August 6, 2026

Respectfully submitted,

/s/ Thibault Mauvilain

THIBAULT MAUVILAIN

Plaintiff, Pro Se

# CERTIFICATE OF COMPLIANCE (L.R. 11-6.2)

The undersigned certifies that this memorandum contains approximately 6,502 words, including headings, footnotes, and quotations, and excluding the caption, tables of contents and authorities, signature block, and this certificate, and complies with the applicable word limit under Local Rule 11-6.1.

/s/ Thibault Mauvilain

THIBAULT MAUVILAIN

Plaintiff, Pro Se

# E R R A T A   S H E E T

*(Pursuant to Fed. R. Civ. P. 30(e))*

**Deponent corrections and reasons:**

Note: Transcript pages 13-14 and 148-153 are designated confidential in the transcript. Entries corresponding to confidential transcript pages should be treated consistently with any applicable protective order.

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 15:24-25 | "I believe, in 2006, I started licensing photographs, videos directly to media." | I began licensing photographs and videos directly to media in July 2008. | Corrects factual date to accurately reflect the timeline. |
| 17:5-10 | Estimated testimony regarding first direct sale, including "prior to 2010" and "I could get back to you." | My first direct licensing sale occurred in July 2008. At the deposition, I was estimating from memory and did not recall the exact date. | Corrects the estimate after review of business records; the original testimony was based on recollection and identified as an estimate. |
| 18:24 | "Name -- name, BAC pictures. Yeah." | No, not all of them. BAC Pictures was the trade name I used through Bleu Azur Corporation as a distribution/ licensing vehicle for certain photographs that I personally owned. Bleu Azur Corporation/BAC Pictures did not own the copyrights to my photographs, and I did not assign or transfer the copyrights in the photographs at issue to that entity. During my Flynet relationship, photographs I syndicated through Flynet were licensed through Flynet. Beginning in July 2008, I used BAC Pictures/Bleu Azur Corporation to license new productions directly to media until 2012, but I did not make my previously syndicated Flynet archive available for direct licensing through BAC/ Bleu Azur. | Clarifies an overbroad answer and accurately reflects licensing history and copyright ownership. |
| 19:18-20 | "BAC started in 2004. But I started licensing in 2026." | BAC started in 2004. I began licensing my photographs directly to media independently in July 2008. | Corrects date/transcription error and clarifies the accurate timeline for independent direct licensing to media. |
| 31:13-24 | Discussion of tracking photographs, Backgrid enforcement, and public copyright enforcement activity. | To clarify, I was referring to tracking, documenting, licensing, and protecting my own photographic works and copyrights. I was not describing a law firm, collection agency, law-enforcement agency, or third-party copyright enforcement business. | Clarifies the meaning and scope of the testimony. |
| 33:5-8 | "All my photos are copyrighted in the sense that I always put the metadata in their IPTC information." | To clarify, my photographs are copyrighted because I created and fixed/saved them as photographic works. IPTC/photo metadata identifies creator, credit, copyright, and rights information and can constitute or accompany copyright management information (CMI). I was distinguishing copyright ownership from formal registration with the U.S. Copyright Office. | Clarifies the distinction between copyright ownership, IPTC/photo metadata, CMI, and formal copyright registration. |
| 42:15-19 | Reference to contributing images to a "newly-formed entity since 2006." | At that point, I was referring to photographs I had contributed to Flynet beginning around 2006 and that later moved through successor agency platforms, including FameFlynet and Backgrid. I wanted to understand and document what appeared on the contributor portal after the Shutterstock acquisition. | Clarifies that the testimony referred to predecessor and successor agency platforms, not a single entity existing since 2006. |

Case 2:25-cv-02757-FLA-MBK   Document 145   Filed 08/07/26   Page 24 of 45   Page ID #:4576

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 42:20-25 | Discussion of transitions from company to company, including "first, from FameFlynet." | Throughout those years, I experienced multiple company and platform transitions involving the syndication of my images. The first relevant transition was from Flynet to FameFlynet; later, FameFlynet transitioned to Backgrid, and Backgrid was later acquired by Shutterstock. | Corrects and clarifies the chronology of agency and platform transitions. |
| 43:4-14 | "From FameFlynet, with the Flynet, we went onto to Backgrid" and discussion of Shutterstock transition. | After the earlier transition from Flynet to FameFlynet, the FameFlynet archive transitioned to Backgrid. When Shutterstock later acquired Backgrid, I documented what appeared on my contributor portal because I was concerned that another migration or platform/ownership transition could affect the archive. | Clarifies the chronology of archive transitions and the reason I documented the contributor portal. |
| 47:15-19 | "I have known Alex, Scott, Boris, Steve since that year, 2026, maybe even before. Since -- over 20 years." | I mean, I cannot recall any specific concerns that I had with them at that time. I know they are experienced in what they do. I have known Alex, Scott, Boris, and Steve since approximately 2004, or at least for about twenty years. | Corrects date/transcription error and clarifies the timeline of my prior relationship with the individuals referenced. |
| 48:21-25 | Questions about whether I had ever texted Mr. Kantif or Mr. Cosman. | I did not recall texting Mr. Kantif about these issues. I may have had his number at some point, but we were not really acquainted or in regular contact. As to Mr. Cosman, I did not mean that I had never texted him historically. I meant that I did not text him about the missing-image/contributor-portal issues after Shutterstock acquired Backgrid. | Clarifies that the testimony concerned communications about the issues in dispute, not whether I ever possessed numbers or exchanged texts years earlier. |
| 49:3-10 | "No. No." followed by explanation that I first wanted to see whether I was the only one with the portal issue. | I did not know whether I had a current or active cell phone number for Mr. Cosman at that time. In mid-February 2024, before contacting the company directly, I first wanted to determine whether the missing-image/ contributor-portal issue was isolated to my account or also affected other contributors. | Clarifies the meaning of the answer and the reason I did not contact him directly about these issues at that time. |
| 49:25-50:4 | "At that point, I don't even know if they still worked for the company. I don't know who's in charge..." | At that point, after learning that Shutterstock had acquired Backgrid, I did not know whether Alex, Scott, Boris, or Steve still worked for the company or who was currently responsible for contributor-portal issues. We had only been told that it was business as usual. | Clarifies why I did not contact those individuals directly and explains the uncertainty caused by the Shutterstock acquisition. |
| 53:14-20 | Question asked whether I reached out to Mr. Nicod "to join you"; answer began "Yeah" and referred to contributor knowledge and phone numbers. | No, not to have him join a lawsuit or claim. I contacted Mr. Nicod because I believed he had knowledge of contributors and could help me locate contact information. My purpose was to assess whether the missing-image/contributor-portal issue I observed was an isolated clerical or portal issue affecting only me, or a broader issue affecting other contributors. | Clarifies the purpose of contacting Mr. Nicod and avoids any misunderstanding that I contacted him to recruit plaintiffs or claims. |
| 54:3-6 | "They had been operating with Justin Conway as their source person for two years prior to me becoming involved." | FameFlynet launched in 2012. I joined them in 2014. They had been operating with Justin Smith as their sales person for approximately two years before I became involved. Justin Conway was a separate editor, not the sales person referenced here. | Corrects the name and role to accurately reflect FameFlynet's sales structure before my involvement. |
| 55:21-56:1 | "As a professional photographer, you should retain your actual images. Unedited, non-altered roll with the actual IPTC that was provided to the agency at the time..." | As a professional photographer, you should retain the image files together with the contemporaneous IPTC/ photo metadata and copyright management information (CMI) showing what was entrusted and provided to the agency of record, including the creator, credit, caption, copyright, and rights information supplied with the images. | Clarifies that the testimony refers to preserving files and contemporaneous IPTC/CMI records provided to the agency, not merely unedited originals. |

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 56:12-57:4 | Discussion of editing, entering metadata "automatically," copyright information in the camera menu, and information coming "straight from the camera." | To clarify, by "automatically" I meant consistently as part of my standard professional workflow, not that all IPTC/photo metadata or CMI was automatically generated by the camera. My answer compressed several different concepts: camera-created technical metadata, possible camera-owner-name settings or later camera capabilities, and the IPTC/Image Rights/CMI workflow used before agency submission. For the legacy Flynet/FameFlynet-era submissions, I did not mean that the camera automatically embedded my full name, contributor code, creator/photographer information, copyright-owner information, or complete IPTC/CMI directly from the camera. Before agency submission, I entered or supplemented the creator, byline/contributor identifier, caption, copyright-owner, source, and rights-related IPTC/CMI information, including through Photo Mechanic. | Clarifies the difference between camera-created technical metadata, possible camera-owner-name settings, and IPTC/CMI entered or supplemented before agency submission. |
| 58:1–25; 59:1–25; 60:1–6 | Testimony stating or confirming that the camera metadata included my name, "Thibault Mauvilain," timestamp/date, and serial number before processing. | To clarify, my testimony that the camera itself placed my full name, "Thibault Mauvilain," into the Flynet/FameFlynet-era files before processing was inaccurate to the extent it suggested that my full name, creator/photographer information, contributor code, copyright-owner information, or complete IPTC/CMI was automatically generated by the camera. I was referring generally to professional metadata workflow, possible camera-owner-name settings, and later/current camera capabilities, not to the complete IPTC/Image Rights/CMI information relied on for agency submission. For the legacy submissions at issue, the camera-created metadata before processing was generally technical camera metadata, such as timestamp/date, serial number, and camera-related data depending on the camera body. My full name, byline/contributor identifiers such as BAC/TM, creator/photographer information, copyright-owner information, source, and rights-related IPTC/CMI fields were entered or supplemented before agency submission, including through Photo Mechanic. | Corrects and clarifies that my full name and other rights-related IPTC/CMI information were not automatically generated as complete agency-submission CMI by the camera, but were entered or supplemented before agency submission. |
| 60:15-17 | "And in addition to that, you enter the other IPTC information consisting of, again, a caption, subject, et cetera." | To clarify, the IPTC information I entered before submission was not limited to caption and subject. It also included or supplemented byline/contributor information, creator/photographer information, copyright-owner information, source, rights-related fields, and other metadata expected for agency submission. | Clarifies that IPTC information entered before submission included CMI and rights-related fields, not only caption or subject information. |
| 62:3-5; 62:16-23 | "...an additional byline here confirming my name." / "making sure my name is everywhere when it comes to source, copyright, author, everything." | To clarify, I was referring to including my byline or contributor identifier, such as BAC, together with copyright-ownership information associated with my name in the relevant IPTC/photo metadata fields, including source, creator/author, photographer, copyright owner, and other rights-related fields. | Clarifies that the identification was not merely a file-name byline, but also included contributor/byline and copyright-related IPTC metadata fields used to identify authorship and ownership. |
| 66:5-9 | "We would use bylines. That was the common practice... That was the standard." | To clarify, when I referred to using bylines, I was describing the public or industry credit identifier used in publications or agency dealings, such as BAC, instead of displaying a full personal name. That public byline is different from the contributor code and the IPTC/photo metadata or Image Rights fields, which should accurately identify the contributor, creator/photographer, copyright owner, and related rights/accounting information. | Clarifies the distinction between a public byline and the underlying contributor-code/IPTC/CMI information used to identify authorship, ownership, and accounting. |

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 66:10-14 | "I don't know why someone not use a byline. That would not help identify your work." | I was referring to the usefulness of a public byline or credit identifier. A public byline may sometimes be omitted or changed for privacy or publication reasons, but that is different from the underlying contributor code, creator/photographer information, copyright-owner information, and rights-related IPTC/CMI fields, which should remain accurate. | Clarifies that optional public byline treatment does not mean contributor-code or rights metadata can be omitted or made inaccurate. |
| 66:22-25 | "So we would protect ourself by being referred to as a byline. And I was happy when people would see what BAC did..." | So we would protect ourselves publicly by using a byline or industry identifier such as BAC. Separately, the contributor code and IPTC/Image Rights metadata should preserve the correct contributor, creator/ photographer, copyright-owner, and rights information. | Clarifies that the protective use of a public byline did not replace the need for accurate contributor-code and rights metadata. |
| 67:17-20 | "I wanted Force In Action to be in charge of the distribution of the materials, the IP-related commercial distribution, and so forth, and the trademarking." | To clarify, Force In Action was intended as a business/ operating vehicle for commercial distribution, media/PR work, trademark or brand-related activities, and later certain photo-agency functions. I did not mean that Force In Action owned the copyrights to photographs I personally took, and I did not assign or transfer the copyrights in the photographs at issue to that entity. | Clarifies the difference between using a company as a business/licensing vehicle and transferring copyright ownership to that company. |
| 69:17–19; 70:1–10; 70:18–71:3 | Testimony stating or confirming that the camera itself populated my full name, "Thibault Mauvilain," and copyright-related metadata for FameFlynet-era photographs. | To clarify, I was describing two related but different stages: camera-created technical metadata and the IPTC/CMI workflow before agency submission. My testimony that the camera populated my full name, "Thibault Mauvilain," for FameFlynet-era photographs was inaccurate to the extent it suggested that the camera automatically generated my full name, contributor code, creator/photographer information, copyright-owner information, or complete IPTC/Image Rights/CMI directly from the camera. Before submission to Flynet or FameFlynet, I entered or supplemented the IPTC/photo metadata and CMI using my workflow, including Photo Mechanic, with caption/context, subject, date, location, byline or contributor code, creator/ photographer information, copyright-owner information, source, and other rights-related fields. | Corrects and clarifies the distinction between camera-generated technical metadata and IPTC/photo metadata/ CMI entered or supplemented before agency submission. |
| 73:1-7 | "Your byline does not guarantee your ownership. Your ownership is based on the fact that you own the copyright of the photo because you've taken that photograph." | To clarify, I meant that a public byline alone does not determine copyright ownership. The underlying creator/ photographer identity, contributor code, copyright-owner information, and IPTC/Image Rights or CMI fields are separate from a public publication byline and should accurately reflect the author and copyright owner. | Clarifies the distinction between public byline display and the underlying authorship, ownership, and rights-identification information. |
| 74:4-7 | "Through a dedicated FTP associated with my contributor codes. Q Okay. And what were your contributor codes at FameFlynet?" | Through a dedicated FTP associated with my contributor code(s) or agency account identifiers. Those codes were part of the agency's contributor-identification and accounting workflow and were used to associate the submitted works with me as the contributor/copyright owner and to route licensing and royalty information. | Clarifies that contributor codes were not merely labels, but part of the agency workflow for identifying contributors and associating works with the correct rights/accounting information. |
| 74:21-25; 75:1-2 | "So these codes were mainly not to split ownership, but split revenues associated with the photos..." | To clarify, I did not mean that the codes split copyright ownership. I meant that the codes identified the contributor/account and revenue split while also associating the work with me as the contributor and copyright owner for licensing/accounting purposes. | Clarifies that contributor codes concern contributor identification, rights/accounting association, and revenue routing, not a transfer or split of copyright ownership. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 77:17-22 | "I would just put my name." / "As far as the copyright order, a hundred percent, yes." | To clarify, my process included listing my byline/ contributor code, such as BAC, and my full name, Thibault Mauvilain, in the copyright/creator/ photographer/source or Image Rights-related IPTC fields. The phrase "copyright order" should read "copyright owner" or "copyright-owner/author fields." | Corrects ambiguous wording and clarifies that the testimony concerned copyright-owner/author fields, byline/contributor code, and IPTC/Image Rights-related metadata. |
| 80:18 | "...events where we get what are called "end outs."" | "...events where we get what are called "handouts."" | Corrects transcription wording. The intended term is "handouts," meaning images distributed or supplied to agencies for publication/licensing. |
| 82:13-18 | "...just for that era, over 10,000 images... for me is, I believe, 3,958 photos." | To clarify, my estimate was approximately 10,000 Flynet-era images missing from both my contributor portal and the Backgrid client portal. Separately, the 3,958 figure refers to the specific images I identified on the Backgrid client portal that are tied to CMI/misattribution issues, not the full universe of missing legacy images. | Clarifies the difference between the estimated missing Flynet-era archive and the separately identified CMI/ misattribution image count. |
| 84:6-9 | "First of all, I'm missing 25,000 images. From my contributor portal." | To clarify, when I referred to approximately 25,000 affected/missing legacy images, I meant the overall affected legacy archive: approximately 10,000 Flynet-era images missing from both my contributor portal and the client portal, plus approximately 15,000 FameFlynet-era images affected on the client-portal side, including images missing from the client portal, misattributed, or otherwise not properly reflected there. | Clarifies that the 25,000 estimate was not limited solely to the contributor portal and distinguishes Flynet-era missing images from FameFlynet-era client-portal discrepancies. |
| 86:18-24 | "...as far as the architecture of the Backgrid website, the contributor code is supposed to reflect the rightful owner of the photograph..." | To clarify, my understanding is that a photograph associated with a contributor account should remain tied to the proper contributor code and related identity information, including THMA for my works. The contributor code is not merely a display label; it is part of the information used to identify the contributor/creator, route royalties, and preserve the correct authorship, ownership, and rights information associated with the photograph, including relevant IPTC/photo metadata or CMI fields where applicable. | Clarifies that the contributor code was being discussed as part of contributor identity, rights, authorship, and accounting information associated with the photograph, not merely as a website display label. |
| 89:21-90:2 | "...all the licenses of the work at issue has been resolved." | To clarify, I meant that the licenses/authorizations for the works at issue were disputed and, as I understood it, withdrawn, revoked, or terminated until the missing-image, contributor-code, and CMI issues could be investigated and resolved. I did not mean that the licensing issues had been settled or resolved." | Corrects a confusing word choice and clarifies the licensing status being discussed. |
| 115:21 | "I found 3,953 photos on the Backgrid client website..." | I found 3,958 photos on the Backgrid client website. | Corrects numerical error. |
| 124:16-18 | "...99 percent of my photographs, again, are on the contribute code "FAFL."" | To clarify, I did not mean 99 percent of all photographs I ever created. I meant the overwhelming majority of the client-portal photographs I had identified as misattributed and potentially at issue in this case appeared with the FAFL contributor code or related FAFL/FameFlynet attribution, rather than with my proper THMA/Thibault Mauvilain contributor identity. | Clarifies that the percentage referred to the subset of identified/misattributed client-portal images, not my entire photographic archive. |
| 126:19-23 | "So I've not even realize these pictures were there." | There was no concern prior because I had not yet made the assessment of the full spectrum of my library. I had not yet realized that those legacy pictures were not there on the contributor portal. It was only when I started to dig into the archive that I realized the pictures were missing. | Corrects wording to accurately reflect that the issue was the absence of legacy photographs from the contributor portal, not the discovery that the pictures were present. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 128:13-25 | "...we were able to read the data through a glitch... You take a photo, you drag it to your desktop, you can read it through IPTC... Only on your client." | To clarify, I was referring to metadata inspection during the authorized client-portal access provided in discovery. I did not mean the contributor portal allowed the same inspection. The point was that, unlike the contributor portal, the client portal allowed me to inspect IPTC/photo metadata associated with certain client-portal images, including through Photo Mechanic or similar metadata tools. I used the word "glitch" colloquially to describe unexpected client-portal functionality, not to describe unauthorized access beyond the access provided. | Clarifies that the testimony referred to authorized client-portal access and metadata inspection, not the contributor portal or unauthorized access. |
| 130:11-12 | "The byline doesn't matter. It's the contributor code that matters." | To clarify, I meant that a public publication byline by itself does not determine ownership. The contributor code and the underlying IPTC/photo metadata, CMI, and Image Rights fields matter because they identify the contributor/creator, copyright owner, rights information, and royalty/accounting association. | Clarifies the distinction between a public byline and contributor-code/IPTC/CMI information. |
| 133:1-6 | "I'm going to bring to you my original photos from the time, unedited, unaltered, that you don't even have. And I'm going to show you that I was there." | To clarify, I meant that I can produce original/source files and related images from the same reportages or sets, including files beyond the smaller agency-delivery selection, to establish my authorship, custody, provenance, and that I was the source of the works at issue. I did not mean that I was relying on different works in place of the files originally entrusted or provided to the agencies. | Clarifies that additional original/source files are provenance evidence from the same sets, not substitute works or different files unrelated to what was provided to the agencies. |
| 138:21-139:24; 140:18-142:24; 143:7-9 | Testimony concerning whether and how Ms. Parant communicated revocation/termination or withdrawal of authorization; testimony that counsel told us the licenses were revoked; and testimony using "revocation" as a broad term. | To clarify, I did not personally participate in communications between Virginie Parant and Ms. Ardalan or BackGrid, and I cannot testify from personal knowledge as to the exact words, channel, or timing of any revocation, termination, or withdrawal of authorization communicated by Ms. Parant. My testimony was based on my understanding at the time, including communications through counsel and the surrounding circumstances. What I personally understood was that the photographers, through counsel, were raising missing-image, contributor-code, CMI, attribution, and accounting issues; that Ms. Parant's communications requested investigation, audit, reattribution, and preservation; and that BackGrid/its counsel did not provide a meaningful investigation or resolution. When I used the term "revocation," I used it in a broad practical sense to mean that authorization to continue licensing, distributing, or representing the works at issue was disputed and, as I understood it, withdrawn or terminated unless and until the missing-image, contributor-code, CMI, attribution, and accounting issues were investigated and resolved. I did not intend to testify that I personally knew the exact wording used by Ms. Parant to Ms. Ardalan, or the exact email or phone call in which any such wording was communicated. | Clarifies personal knowledge; avoids overstating the exact content, channel, or timing of attorney-to-attorney communications; and explains that the testimony reflected my understanding and the circumstances, not my personal participation in those communications. |
| 141:22-142:7 | "No, because they were never at issue... Of the one that are correctly attributed on my portal, but now, I can see are not properly attributed on the client..." | To clarify, to the extent I used the terms "revocation" or "termination," I meant that any disputed, withdrawn, or terminated authorization concerned only the works at issue: missing images from the legacy Flynet and FameFlynet archives that did not appear in my current contributor portal or client portal, and works that appeared correctly as THMA in my contributor portal but appeared in the Backgrid client portal and/or IPTC/photo metadata/CMI with FAFL/FameFlynet as the contributor, source, copyright-owner, or rights-related identity. I did not mean that properly attributed, non-issue works should be treated as revoked. | Clarifies the intended scope of the disputed/withdrawn authorization and distinguishes properly attributed non-issue works from missing or misattributed works at issue. |

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 144:7 | "It's between 10,000, 15,000 images." | To clarify, my broader estimate was approximately 25,000 affected legacy images overall: approximately 10,000 Flynet-era images missing from both my contributor portal and the client portal, and approximately 15,000 FameFlynet-era images affected by client-portal missing, misattribution, or ingestion issues. | Clarifies the total affected-image estimate and separates the Flynet-era and FameFlynet-era categories. |
| 145:19 | "...at least 15,000 images..." | To clarify, the approximately 15,000-image figure refers to the FameFlynet-era portion of my affected legacy archive, while the Flynet-era missing-image estimate is approximately 10,000 images, for a combined affected total of approximately 25,000 images. | Clarifies that the 15,000 figure refers to the FameFlynet-era portion and does not replace the separate Flynet-era estimate. |
| **149:4-6 (CONFIDENTIAL)** | | | |
| | REDACTED | REDACTED | REDACTED |
| 158:24 | "...15,000 of image were currently circulating..." | ...approximately 25,000 affected legacy images were expected to remain represented or otherwise accounted for in the agency ecosystem, including approximately 10,000 Flynet-era images and approximately 15,000 FameFlynet-era images. | Corrects the total estimate and clarifies that the expected representation/accounting concerned the broader legacy archive. |
| 164:4-14 | "And again, for my FameFlynet, it's a little bit more complicated... A third has been misattributed... And only one-third of those are actually at my current name." | To clarify, this answer referred to my FameFlynet Pictures contributed images. Those images appear correctly attributed to me in my contributor portal, but I discovered discrepancies in the Backgrid client portal: approximately one-third appeared correctly attributed to me, approximately one-third appeared misattributed with FAFL/FameFlynet reflected in the client portal and/or IPTC/photo metadata, and approximately one-third had not been ingested into the client portal and was missing from the client-facing database. | Clarifies the distinction between the contributor portal and client portal and accurately states the three categories of FameFlynet-era images. |
| 173:20 | "...15,000 images missing..." | ...approximately 25,000 affected legacy images, consisting of approximately 10,000 Flynet-era images missing from both my contributor portal and the client portal, plus approximately 15,000 FameFlynet-era images affected by client-portal missing, misattribution, or ingestion issues. | Corrects and clarifies the total affected-image estimate and the Flynet/FameFlynet breakdown. |
| 176:10; 176:17-20 | "I told you I'm missing 15,000 image... I had to inspect not only the 15,000 images missing from Flynet, but then I went to track down my 35,000 images from FameFlynet..." | To clarify, I was describing the scope of my review and audit, not the final count of images asserted under each legal theory. My current affected-archive estimate is approximately 25,000 legacy images overall: approximately 10,000 Flynet-era images missing from both the contributor portal and client portal, and approximately 15,000 FameFlynet-era images affected on the client-portal side. Separately, I focused substantial effort on documenting the 3,958 images specifically identified on the Backgrid client portal in connection with CMI/misattribution issues because those images were actively available on the client-facing system under the Shutterstock/Backgrid editorial ecosystem. | Clarifies the difference between the broader audit universe, the estimated missing/affected legacy archive, and the specific 3,958-image CMI/misattribution subset. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 179:16-22 | "...metadata had been altered if it wasn't for your glitch... No one should be able to go on a website, drag a photo, and read the metadata... thanks to that, we didn't need your download access." | To clarify, I was referring to unexpected functionality available during the authorized discovery access to the Backgrid client portal that allowed inspection of IPTC/photo metadata associated with client-portal images. I did not mean that I had separate authorization beyond that access or that I accessed materials outside the authorized client-portal access. | Clarifies the meaning of "glitch" and avoids any misunderstanding that I was describing unauthorized access outside the authorized discovery access. |
| 180:1-7 | "...what if I drag it on the desktop? Can I read anything on that photo? And when I realized I could..." | To clarify, I meant that during the authorized client-portal access, I discovered that IPTC/photo metadata associated with certain client-portal images could be inspected using available metadata tools. I did not intend to describe or claim any access beyond the authorized client-portal review. | Clarifies that the testimony concerned metadata inspection during authorized client-portal review and avoids any implication of unauthorized access. |
| 203:16-23 | "CMI and their protective laws exist for a reason... the fact that someone will strip your CMI is wrong. It's criminal, actually." | To clarify, I meant that removing or altering CMI is wrongful and prohibited by laws protecting copyright-management information. I was not offering a criminal-law conclusion or claiming personal knowledge of a criminal charge. | Clarifies the meaning and limits of the testimony regarding CMI removal. |
| 209:11-16; 210:22-211:21 | Questions and answers indicating the registration/produced files were untouched and unchanged versions of what was submitted. | To clarify, the files I produced and used for registration are unchanged/native files from my archive, but that does not mean every produced or registration file is always the exact cropped/exported agency-ready file delivered to the agency in every instance. In some instances, the production or registration deposit included raw/original files or a broader camera sequence containing the submitted images; in other instances, it included the edited, ready-to-submit versions. | Clarifies the distinction between native/original archive files, edited agency-ready files, and files used for copyright registration or litigation production. |
| 213:1-15 | "We registered the actual images that came raw out of the camera... You have whatever small picture I sent you. Okay? It's called a crop." | To clarify, the registration or production materials may include original/native source files and, in some instances, broader source sequences from which the agency-delivery images were selected or derived. The agency generally received ready-to-submit/exported images prepared for licensing, which were derived from my original/source files and carried the relevant IPTC/photo metadata and CMI supplied for agency distribution. | Clarifies the relationship between raw/source files, edited/exported agency-delivery files, and registration/production materials. |
| 214:1-8 | Discussion of the large/raw image and the cropped image used for sale. | To clarify, the large/original file and the cropped/exported file can be different versions derived from the same photographic work. A broader original/native file can establish authorship and provenance, while an agency-delivery file may be cropped or exported for editorial licensing. The existence of both versions does not mean they are different works or that unrelated files were substituted. | Clarifies the relationship between source/original files and cropped/exported agency-delivery versions of the same photographic work. |
| 214:9-15 | Testimony that in some cases the raw/large file was submitted for registration and in some instances the edited version was submitted. | To clarify, registration materials were not identical in every instance. In some instances they included original/native source files or broader source sequences; in other instances they included edited/exported selections. The purpose was to preserve and identify the same photographic works, authorship, and provenance, not to suggest that the registration or production materials were unrelated to the files entrusted to the agencies. | Clarifies why different versions may appear in registration or production materials without undermining authorship, provenance, or the connection to the agency-delivery files. |

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 215:18-24 | "Always ready to use, ready to publish, final, edited picture." | To clarify, my general practice was to submit agency-ready files for licensing, meaning files selected and prepared for editorial distribution with the required IPTC/photo metadata and CMI. In many instances those files were visually edited, cropped, or color-corrected; however, the essential point was that the files were prepared for agency use and included the relevant IPTC/CMI, not that every single image was necessarily visually altered. | Clarifies that "edited" referred broadly to agency-ready preparation and does not mean every file was necessarily visually changed. |
| 216:16-24; 217:1-15 | Discussion of whether cropped/edited files were produced, and testimony regarding registration materials and screenshots/portal records. | To clarify, there are different categories of materials: original/source files, edited or exported agency-delivery files, screenshots or portal records, and registration deposit files. My testimony was intended to explain that I preserved records showing authorship and provenance, and that before agency submission I entered or supplemented IPTC/photo metadata and CMI, including creator/photographer, byline/contributor code, caption, copyright owner, and rights-related information. I did not mean that every registration deposit file, screenshot, and agency-delivery file was the same file format. | Clarifies the distinction among file categories and prevents confusion between screenshots, native/source files, edited agency-delivery files, and registration deposit files. |
| 217:21-218:15 | Question whether editing the file changes the CMI, followed by answer that CMI entry starts at capture and continues when applying metadata to batches before selecting/editing images. | To clarify, visual editing such as cropping or color correction is separate from entering or preserving IPTC/photo metadata and CMI. My workflow was to enter or supplement IPTC/CMI information before agency submission, including at the batch stage when appropriate, and then select and prepare the agency-delivery files. I did not mean that visual edits themselves changed the authorship or rights metadata. | Clarifies the distinction between visual editing and IPTC/CMI entry or preservation before agency submission. |
| 219:10-13 | "What is your best estimate of the percentage of photographs you submitted at Flynet or FameFlynet that were edited as opposed to raw images?" / "A hundred percent I did." | To clarify, "a hundred percent" was an overstatement if understood to mean that every image was visually cropped, color-corrected, or otherwise visually edited. My general practice for agency submissions was to provide agency-ready files with the necessary IPTC/photo metadata and CMI, including accurate subject/caption and rights-related information. Given the volume of approximately tens of thousands of images and hundreds of sets, and the rush of breaking news, I cannot guarantee that every single submitted image was visually edited, but the intended workflow was to submit images with the relevant IPTC/CMI supplied at the time. | Clarifies that the overstatement concerned visual editing, not the practice of providing IPTC/photo metadata and CMI with agency submissions. |
| 223:16-24 | "I did not check on how Flynet pictures had been integrated..." / "So you don't know whether your Flynet photographs had correct attribution or not?" / "I don't know. I didn't check." | To clarify, I meant that I did not check at the time how the Flynet archive had been integrated into the later FameFlynet system. I did not mean that I lacked knowledge of the IPTC/photo metadata and contributor/byline information I originally supplied with my Flynet submissions. My original Flynet submissions were made through my dedicated workflow/FTP with BAC/TM/Thibault Mauvilain authorship, byline, copyright-owner, and rights-related information supplied before submission. | Clarifies that the answer concerned later archive integration, not the original CMI/IPTC information supplied with the Flynet submissions. |
| 234:3-6 | Question suggesting certain updated-code sets were FameFlynet-era or Flynet-era photos; answer: "Uh-huh." | To clarify, yes as to some FameFlynet-era photographs, but I have not found my Flynet-era photographs in the client portal with my proper THMA contributor code, and my Flynet-era photographs also do not appear in my contributor portal. The Flynet-era issue is missing or misattributed works; the FameFlynet-era issue includes a mix of correctly attributed, misattributed, and missing client-portal images. | Clarifies the distinction between Flynet-era and FameFlynet-era works and avoids any misunderstanding that Flynet-era works were properly updated to my contributor code. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 238:18-20 | "No. That's what it should be. I told you. But it hasn't been the case in --" | No, not if payment is the only correction. What I meant was that the photograph/set should also be associated with my contributor code, THMA, and identify me as creator/photographer and copyright owner in the relevant IPTC/photo metadata or Image Rights fields, rather than FAFL/FameFlynet. | Clarifies that payment alone does not resolve incorrect contributor-code or rights metadata. |
| 239:18-20 | "No. I could say, actually, I was a little disappointed as a person. I -- I expected better from them." | By saying I expected better from Shutterstock, I meant that after Shutterstock acquired Backgrid and after our counsel raised concerns about missing photographs, contributor attribution, archive provenance, and metadata, I expected Shutterstock to take those concerns seriously and investigate the origin, ownership, contributor-code, and metadata issues affecting the legacy Backgrid archive. | Clarifies what I meant by "expected better" and ties the statement to missing photographs, provenance, contributor-code, and metadata concerns. |
| 251:14-19; 252:1-13 | Testimony stating "There was an instruction" and describing an instruction to remove the original contributor code and assign FAFL. | To clarify, when I used the word "instruction," I meant that the migration/ingestion process necessarily involved some instruction, workflow, rule, manual action, or system process that selected legacy images and associated them with FAFL rather than my contributor identity. I was not claiming personal knowledge at that moment of every internal communication or the specific person who gave any instruction; I was describing my inference from the repeated pattern I observed across the client-portal metadata and contributor-code assignments. | Clarifies the basis for testimony concerning instruction/intent while preserving that the testimony was based on the observed pattern of FAFL attribution. |
| 256:5-18 | "Everything was correct... however they did the migration, everything was coded properly... A third got misattributed, a third properly credited, and a third missing..." | To clarify, I was distinguishing between the contributor portal and the client portal. None of my Flynet-era photographs appeared in my contributor portal, and I have not found my Flynet-era photographs in the client portal with my proper THMA contributor code. For my FameFlynet-era photographs, my contributor portal displayed them as associated with me and my proper contributor identity. However, my review of the client portal revealed discrepancies: some FameFlynet-era images were missing from the client portal, some appeared correctly attributed, and some appeared with FAFL/FameFlynet as the contributor, creator, photographer, source, or rights-related identity in the IPTC/photo metadata or Image Rights fields. | Clarifies the distinction between the contributor portal and client portal and explains that the problem was not the contributor-portal display, but missing or misattributed images in the client-facing system and underlying metadata/CMI. |
| 259:20-24 | "...that photo shows source of FAFL. I'm THMA. I do not know why someone is sending me money for a contributor code that does not belong to me..." | To clarify, I did not mean that an agency-source label is always improper. My issue was FAFL/FameFlynet appearing as the contributor, creator/photographer, copyright-owner, or rights-related identity where my proper contributor identity, THMA/Thibault Mauvilain, should have appeared based on the information supplied at submission. | Clarifies that the issue is the rights/contributor identity, not the mere presence of an agency-source label. |
| 276:4-8; 276:11-18 | "...there is a need for a sanction here because I do believe there was an intent to screw someone over." / "...to track down my own properties that have been stolen." | To clarify, I was describing my good-faith belief based on the pattern I observed, including missing legacy images, changed or removed CMI, FAFL appearing where my contributor identity should appear, and the resulting loss of control over my works. I was not claiming personal knowledge of every internal instruction before discovery is complete. | Clarifies the basis and limits of the testimony. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 281:12-24 | "I have no claim saying that FameFlynet screwed me of money... I haven't even claimed anything in the matter of FameFlynet not paying me... That is not part of the case." | To clarify, I was referring to FameFlynet while it operated as an independent agency between 2012 and 2017, during the period when I worked with FameFlynet and was involved in sales. I was not referring to later post-2017 legacy-archive issues after the transition to Backgrid, including FameFlynet-era images later appearing in the client portal as FAFL, missing from the client portal, or otherwise misattributed after migration. | Clarifies that the answer was limited to the independent FameFlynet operating period and did not waive or address later claims arising from post-2017 migration, misattribution, missing images, or FAFL-related client portal issues. |
| 296:13-15; 297:1-4; 318:13-20 | Testimony suggesting text messages may disappear after 30 days, followed later by clarification that I was uncertain about my phone settings. | To clarify, I was uncertain about my phone settings and did not mean to testify that I intentionally delete all text messages after 30 days or maintain any litigation-related deletion policy. I was explaining that older texts may not appear on my current device or may be stored elsewhere, such as cloud storage or a service provider. I was not denying historical communications with individuals such as Alex Kantif. | Clarifies uncertainty about device settings and avoids any misunderstanding that I intentionally deleted relevant text messages. |
| 307:1-23; 308:2-14; 308:15-309:6 | Testimony stating or implying that the Exhibit 7 set had the wrong contributor code or that the IPTC metadata showed FAFL rather than THMA. | After reviewing Exhibit 7 and my records, I clarify that I misunderstood the exhibit during the deposition. The photograph/set being discussed in Exhibit 7 was a FameFlynet-era work that I created and own, but it was properly associated with my THMA contributor code in the relevant IPTC/photo metadata. For that reason, it was not included among the works I identified as misattributed in this lawsuit. My testimony that the IPTC for that specific photograph/set listed FAFL was mistaken. My claims concern other Flynet/FameFlynet legacy works where the client-portal image metadata I inspected identified FAFL/FameFlynet rather than THMA/Thibault Mauvilain in the relevant creator, photographer, contributor, source, or rights fields. | Corrects and clarifies testimony after reviewing Exhibit 7 and my records; distinguishes a correctly attributed non-claim example from the works at issue; and clarifies that the relevant issue is the underlying IPTC/photo metadata/CMI, not merely a web-page display. |
| 335:11-16 | Reference to "back in 2008, I had founded BAC Pictures." | To clarify, I meant that I began directly licensing photographs to media through BAC Pictures/Bleu Azur Corporation in July 2008. BAC/Bleu Azur existed earlier; July 2008 is the date of the direct licensing operation, not the original formation date of the company or trade name. | Clarifies the timeline and keeps the testimony consistent with the July 2008 direct-licensing correction. |
| 342:11-22; 343:3-9 | "I've basically set myself up as an independent since day one. So, yeah, all my pictures are under the umbrella of my, you know, personal persona..." / discussion of "corporate umbrella." | To clarify, when I referred to my "personal persona" or discussed a "corporate umbrella," I meant that I have used business names or entities at different times for organization, licensing, distribution, branding, or business operations. I did not mean that those entities owned the copyrights in the photographs I personally created, and I did not assign or transfer the copyrights in the photographs at issue to those entities. | Clarifies the ambiguous "corporate umbrella" testimony and reinforces individual authorship and ownership. |
| 349:13-18 | "Working with clients that would need services in the public relation environment or, you know, producing content for others..." | To clarify, I was describing services and business activities that Force In Action could perform, including public-relations, media, production, or content-related services. That testimony did not mean that Force In Action owned the copyrights in my personal photography or legacy agency submissions. I did not assign or transfer the copyrights in the photographs at issue to that entity. | Clarifies that corporate services or business operations did not automatically transfer ownership of personally authored photographs. |

Errata Sheet - Thibault Mauvilain - Job: 8175694

| Location (Page:Line) | Original Text / Issue (if needed) | Corrected / Clarified Text | Reason |
|---|---|---|---|
| 354:7-16; 355:1-12 | Discussion of using corporations for protection, liability, expenses, advantages, trademarks, and business structure. | To clarify, when I discussed the benefits of using a corporation, I was referring to ordinary business reasons such as liability protection, accounting, taxes, trademarks, operations, or business structure. I was not stating that a corporation automatically owned the copyrights in photographs I personally created, or that using a corporation for business converted my personal photographic works into corporate-owned assets. | Clarifies that corporate structure and business/tax advantages are separate from copyright ownership of personally authored photographs. |
| 361:7-16; 361:23-25; 362:1 | "I run BAC picture as the photo agency licensing my own work directly to magazine..." / "From 2008 to 2011, yes." | To clarify, BAC Pictures/Bleu Azur Corporation was used as a distribution/licensing vehicle for certain new/direct productions after I left Flynet, approximately from July 2008 to 2011. BAC/Bleu Azur did not own my personal copyrights, and I did not transfer my copyrights to that entity. I also did not use BAC/Bleu Azur to directly license prior materials that had already been entrusted to Flynet; those Flynet-submitted photographs remained within the Flynet agency relationship. | Clarifies that BAC/Bleu Azur functioned as a licensing/ distribution vehicle, not the copyright owner, and distinguishes new/direct productions from prior Flynet-entrusted material. |

I certify that the foregoing changes and reasons are my corrections pursuant to Fed. R. Civ. P. 30(e).

Signature: *Thibault Mauvilain*    Date: 07/02/2026

Printed Name: Thibault Mauvilain

Plaintiff Pro Se / Deponent

PUBLIC REDACTED VERSION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THIBAULT MAUVILAIN, et al.,<br>Plaintiffs,<br><br>v.<br><br>FLYNET PICTURES, LLC, et al.,<br>Defendants. | Case No. 2:25-cv-02757 |

### PLAINTIFF THIBAULT MAUVILAIN'S SUPPLEMENTAL DISCOVERY DOCUMENTATION REGARDING DISPUTED ACH PAYMENT, FAFL-CODED PATRICK SCHWARZENEGGER SALES, NON-ACCEPTANCE OF PAYMENT, AND RETURN OF DISPUTED FUNDS

Plaintiff Thibault Mauvilain serves this supplemental discovery documentation to memorialize a narrow but important point: Plaintiff did not accept Defendants' unilateral ACH payment as a cure, waiver, settlement, release, accord and satisfaction, correction, or limitation of his claims or damages. Defendants should not characterize a direct ACH deposit, a FAFL-coded sales report, or any later portal change as Plaintiff's agreement that the disputed Patrick Schwarzenegger sales were properly coded, properly accounted for, properly paid, or legally cured.

This supplement is necessary because Defendants have advanced, including in the discovery joint-stipulation and motion-to-compel context and related opposition positions, the narrative that royalties associated with allegedly misattributed works were limited, insignificant, paid, or accepted. That narrative is incomplete and misleading. The record shows the opposite: the disputed sales were reflected in Defendants' own records as FAFL-coded, Plaintiff objected to payment tied to FAFL, Plaintiff testified that payment tied to the wrong contributor/source code was not acceptable, and Plaintiff has prepared a check returning the disputed amount without waiver.

For avoidance of doubt, Plaintiff is not serving this supplement as a compromise offer. Plaintiff is serving it to preserve the discovery record, reject any assertion of acceptance or waiver, return disputed funds without prejudice, and reserve all rights to test Defendants' accounting, portal changes, contributor-code history, CMI history, audit logs, royalty routing, licensing records, and damages evidence.

### I. The Disputed Records Show FAFL Coding, Not Clean THMA Attribution.

Defendants' produced confidential record for the Patrick Schwarzenegger set reflects Set #979019 / BGUS_979019 and lists the contributor as FAFL - FameFlynet Pictures Inc. The same produced record shows two E! Snapchat sales, each in the amount of ███████ under invoice BGI38036, with a sale date of February 26, 2025 and collect date of April 4, 2025. See Supp. Ex. 1.

Plaintiff's contributor code is THMA - Thibault Mauvilain. FAFL is not Plaintiff. Defendants' own FAFL-coded record is therefore not a neutral accounting detail. It is a party record showing that Defendants' system associated these disputed sales with FAFL/FameFlynet rather than Plaintiff's contributor identity. Plaintiff contends this is direct evidence supporting the CMI removal/alteration, misattribution, contributor-code manipulation, royalty-routing, and damages issues in this case.

The current MyBackgrid records compound the problem. Current gallery results show a Patrick Schwarzenegger record associated with 979019 / BGUS_979019, and a separate record identified as FFN_60090833. See Supp. Exs. 2-3. The current MyBackgrid page for the 979019-related set now displays

THMA attribution, while still showing FAFL and/or FFN source information and two sales with ████ commission entries. See Supp. Ex. 4. By contrast, the separate FFN_60090833 page shows THMA attribution but states no source code, no original filename, and no sales. See Supp. Ex. 5.

Plaintiff does not know when these records were created, duplicated, modified, reassociated, re-coded, or changed; who made those changes; whether the changes were manual or automated; or whether they occurred during discovery, after deposition testimony, or in response to Plaintiff's claims. Those are discovery questions. They cannot be resolved by Defendants' unilateral portal display.

## II. The Disputed Amount Is ██████ and Plaintiff Has Prepared a Return Check Without Waiver.

The current MyBackgrid disbursement/report page shows two Patrick Schwarzenegger entries associated with FAFL source information, each with commission due of ████ See Supp. Ex. 6. The related spreadsheet record reflects BGUS_979019 with a █████ sale notation dated February 26, 2025. See Supp. Ex. 7. Two commission entries of █████ equal ██████

At his deposition, Plaintiff testified that the disputed payment consisted of █████ times two and that he intended to return the FAFL amount. The transcript also reflects an apparent arithmetic estimate of █████ Mauvilain Dep. 258:14-18. The underlying sales records show the correct arithmetic: █████ x 2 = ██████

Plaintiff has therefore prepared a check in the amount of ██████ The memo line identifies the return as disputed BGUS_979019 / FAFL funds and expressly states no waiver. See Supp. Ex. 8. Plaintiff will not mail or deliver the check until Defendants confirm the proper payee name and mailing address. If Defendants contend that a different payee or form is required, Plaintiff will reissue the check accordingly.

The prepared check is a rejection of disputed funds, not acceptance of Defendants' position. It is not settlement. It is not release. It is not accord and satisfaction. It is not a cure. It is not a correction. It is not acceptance that Defendants' accounting is complete, accurate, lawful, or sufficient. It is not a limitation of Plaintiff's claims or damages.

## III. Plaintiff Already Testified Under Oath That He Did Not Accept FAFL-Coded Payment.

This supplement is consistent with Plaintiff's deposition testimony. When asked whether he was okay if the contributor code was wrong but payment was linked to his account, Plaintiff answered: no. He explained that the byline is not the issue - the contributor code is - and that being paid for something listed under the wrong code creates the false impression that he is being paid for material he no longer owns. Mauvilain Dep. 130:7-21.

Plaintiff further testified that Defendants would be receiving a refund from him because he had only recently realized that the payment included two photographs showing source FAFL. Plaintiff stated: FAFL is not me, and he did not want a picture listed as FAFL - as the rightful copyright owner/contributor code - being paid to him. Mauvilain Dep. 130:22-131:11.

Plaintiff also testified specifically about the ACH/direct-wire payment. He explained that he normally receives payment after a request, that it was unusual to receive a direct wire from Backgrid, that he had not noticed it until he saw the bank statement, and that he later reviewed his contributor portal and realized the last two entries were marked FAFL and associated with Patrick Schwarzenegger. Mauvilain Dep. 257:17-258:5.

Plaintiff then testified that he called Bank of America to determine whether he could refund, reverse, or partially return the payment, and was told that he needed the company's wire information or should send a check. Mauvilain Dep. 258:6-13. He also testified that the reason he was upset was that the record showed source FAFL while he is THMA, and that anything with source FAFL would be rejected. Mauvilain Dep. 258:19-259:24.

That testimony forecloses any fair characterization that Plaintiff knowingly accepted the ACH as a cure or payment satisfaction. The payment was unilateral, direct, and mixed into ordinary-course Backgrid payment

PUBLIC REDACTED VERSION

activity. Plaintiff did not knowingly accept it as resolution of any disputed issue. Once Plaintiff recognized that FAFL-coded Patrick Schwarzenegger royalties were included, he objected, contacted his bank, and committed to returning the funds.

## IV. A Post Hoc Contributor-Code Update Is Not a Cure and Was Not Accepted.

Defendants' counsel also questioned Plaintiff at deposition about whether Backgrid had offered to update contributor codes for Flynet/FameFlynet-era photographs. Plaintiff testified that he was not aware that Backgrid had twice offered such an update. Mauvilain Dep. 263:5-264:24.

Plaintiff did not testify that a unilateral contributor-code update during litigation would resolve the case. To the contrary, Plaintiff testified that updating the photographs to reflect correct ownership would be a step in the right direction, but that it would not address all other issues at stake. Mauvilain Dep. 260:12-20, 264:21-25.

That distinction matters. A contributor-code update may confirm that the prior coding was wrong. It does not erase the historical FAFL coding. It does not restore historical CMI. It does not cure prior client-facing display. It does not answer who changed the records, when, why, or under whose instruction. It does not account for prior royalty routing, subagent reporting, acquisition-related valuation, licensing history, missing works, subscription revenue, enforcement activity, or damages. It does not transform a unilateral ACH deposit into an accepted settlement.

Plaintiff therefore rejects any attempt to characterize a post hoc portal change, duplicate set, sales reassociation, or THMA display as a waiver, cure, or damages limitation. Discovery remains ongoing, and the accounting and database history remain disputed.

## V. Defendants Cannot Use the FAFL Record as Payment Evidence While Ignoring Its FAFL Admission.

Defendants cannot have it both ways. If Defendants rely on the Patrick Schwarzenegger sales report to argue that payment was made, then the same sales report is also evidence that the sales were associated with FAFL/FameFlynet, not Plaintiff's THMA contributor identity. The FAFL field is not a stray label. It is the field Defendants' own records used to identify the contributor/source association for the disputed sales and accounting.

Plaintiff testified that, in Backgrid's system, the contributor code goes into accounting, every royalty is associated to a contributor code, and whoever has the contributor code is the person who gets paid. Mauvilain Dep. 131:17-132:2. Plaintiff also testified that contributor code concerns copyright ownership and recognition, not just payment. Mauvilain Dep. 132:3-16.

Accordingly, Defendants' FAFL-coded sales record is, at minimum, an admission that Defendants' accounting/sales system associated the disputed Patrick Schwarzenegger sales with the wrong contributor/source identifier. Plaintiff contends that this is direct evidence of the CMI removal/alteration and royalty-routing issues in this action. Defendants may dispute the legal consequences, but they cannot use the same FAFL-coded record to argue payment and acceptance while denying the significance of the FAFL coding.

## VI. Defendants' Litigation Position Makes the Supplement Necessary.

Plaintiff serves this supplement because Defendants continue to suggest that any royalties associated with misattributed works were minor, that only a small number of licenses were involved, and that payment has been made and accepted. That position is materially incomplete. The case is not merely about two ███████ commission entries. The case concerns the removal or alteration of Plaintiff-identifying CMI, contributor-code reassignment, historical client-facing display, missing works, royalty routing, licensing, accounting, valuation, and damages.

PUBLIC REDACTED VERSION

Plaintiff testified that compensation is not limited to retroactive royalty entries. When Defendants' counsel posed hypotheticals about being paid without the proper contributor-code system, Plaintiff explained that such payment would not include damages for the harm caused, breach, infringement, and removal of copyright ownership, and that Plaintiff seeks compensation to the full extent permitted by law. Mauvilain Dep. 279:3-9.

The disputed ACH payment therefore cannot be used as a litigation tactic. A direct ACH deposit is not an agreed settlement. It is not a negotiated compromise. It is not proof of acceptance. It does not resolve whether Defendants' historical FAFL coding was wrongful, whether CMI was removed or altered, whether royalties were misdirected, whether other sales or revenues exist, whether records were modified during discovery, or whether damages exceed the disputed commission entries.

## VII. Discovery Remains Ongoing; Plaintiff Does Not Accept Defendants' Accounting.

Plaintiff is still investigating how the accounting was generated, why the sales were associated with FAFL, whether and when any contributor code or source code was changed, whether the portal now reflects post hoc modification or duplication, how sales became associated with the current 979019/BGUS record, why FFN_60090833 appears separately, and what database records, audit logs, metadata, and internal records exist.

Plaintiff does not accept the current accounting as complete. Plaintiff does not accept the disbursement report as a complete damages measure. Plaintiff does not accept any present display in MyBackgrid as a reliable historical record without production of the underlying database, audit history, change logs, source-code history, contributor-code history, sales-association history, and disbursement records.

Plaintiff further reserves arguments concerning Defendants' ability or inability to identify Plaintiff's works from his name, contributor history, IPTC/metadata, and historical submissions. This supplement does not depend on that broader argument; it rests on the narrower point that Defendants' own records show FAFL coding for sales they now seek to characterize as paid and accepted.

## VIII. Preservation Demand.

Plaintiff requests that Defendants preserve all records concerning the Patrick Schwarzenegger image set(s), including but not limited to all records concerning BGUS_979019, Set #979019, FFN_60090833, ███████ ███████ FAFL/FameFlynet source or contributor records, FFN source or filename records, THMA contributor records, contributor-code history, source-code history, original filename history, upload and ingestion records, database records, audit logs, change logs, user activity logs, royalty-routing records, disbursement records, sales-association records, client-facing display records, portal display history, and any records concerning the creation, duplication, reassociation, correction, modification, or deletion of the Patrick Schwarzenegger set records.

Plaintiff further requests preservation of all communications and internal records concerning any decision to update, restore, modify, correct, reassign, duplicate, or reassociate Plaintiff's contributor code, source code, metadata, sales information, or royalty routing after Plaintiff asserted claims concerning misattribution, CMI removal/alteration, missing works, or royalty diversion.

## IX. Supplemental Exhibits.

| Exhibit | Description |
| --- | --- |
| Supp. Ex. 1 | Backgrid-produced confidential sales page showing Set #979019, contributor FAFL - FameFlynet Pictures Inc., and two E! Snapchat sales for the Patrick Schwarzenegger set. |
| Supp. Ex. 2 | Current MyBackgrid gallery search result for "Patrick" showing the Patrick Schwarzenegger set associated with BGUS/979019. |

| Supp. Ex. 3 | Current MyBackgrid gallery search result showing a separate Patrick Schwarzenegger record identified as FFN_60090833. |
| Supp. Ex. 4 | Current M      id sales page showing THMA attribution, FAFL/FFN source information, and two sales with ▮▮▮▮ commission each. |
| Supp. Ex. 5 | Current MyBackgrid alternate FFN_60090833 record showing THMA attribution and no sales listed for that record. |
| Supp. Ex. 6 | MyBackgrid disbursement/report page showing the two Patrick Schwarzenegger sales, commission due, and FAFL source information. |
| Supp. Ex. 7 | Spreadsheet entry showing BGUS_979019 with a ▮▮▮ sale notation dated February 26, 2025. |
| Supp. Ex. 8 | Redacted check copy documenting Plaintiff's prepared return of the disputed FAFL-coded royalty funds without waiver. |

## X. Reservation of Rights.

Plaintiff reserves all rights, claims, damages, discovery rights, evidentiary rights, objections, and remedies regarding Defendants' coding, attribution, CMI, licensing, sales, royalty routing, payment, portal display, database modification, post hoc reassociation, and accounting issues.

Plaintiff expressly disputes any contention that the ACH payment, the prepared return check, or any current portal display constitutes acceptance, waiver, cure, correction, settlement, release, accord and satisfaction, satisfaction of damages, or limitation of Plaintiff's claims.

Plaintiff also reserves the right to use this supplemental record in connection with discovery disputes, motions to compel, evidentiary submissions, damages analysis, deposition examination, expert analysis, and any other proceeding in this action.

Dated: July 6, 2026

Respectfully submitted,

Thibault Mauvilain
Plaintiff Pro Se

TM-KAT-SUPP-006 | Supplemental Documentation Memo | Kat Torres / 138 Water

# SUPPLEMENTAL DOCUMENTATION MEMORANDUM

## Current Licensing Inquiry and Ongoing Harm - Kat Torres / 138 Water Images

| | |
|---|---|
| **Prepared by** | Thibault Mauvilain |
| **Date** | July 3, 2026 |
| **Case / Matter** | Mauvilain v. Backgrid USA, Inc., et al. / Backgrid-Shutterstock discovery |
| **Subject** | July 1, 2026 Renowned Films inquiry regarding Kat Torres / 138 Water campaign stills |
| **Related Production ID** | TM-KAT-SUPP-006 |
| **Purpose** | To supplement discovery materials concerning a current licensing inquiry, current harm, Client Portal visibility, CMI / attribution issues, accounting, and damages. |

**Note:** This memorandum is intended to document and organize factual discovery materials. It is not intended as a complete damages calculation, a waiver of any claim or defense, or a concession that any belated payment, accounting, correction, restoration, or attribution change would cure the issues described below.

## I. Summary of Supplemental Event

On July 1, 2026, I received an email inquiry from Rafael Ceribelli, identified in the email signature as an Archive Producer at Renowned Films. The inquiry states that Renowned Films is working on a documentary featuring Kat Torres, who was the face of 138 Water around 2014-2015. The inquiry asks whether 138 Water would be able to grant a documentary license for the campaign photographs of Kat Torres on a worldwide, all-media basis. The sender attached a sample image and stated that he could provide exact image references once pointed to the correct set. *See TM-KAT-SUPP-001 and TM-KAT-SUPP-002.*

This inquiry is significant because it is not a hypothetical or historical issue. It is a current third-party licensing opportunity concerning the same Kat Torres / 138 Water image universe already addressed in my Kat Torres case study and audit. The attached sample image appears, based on my current visual comparison, to correspond to a Kat Torres / 138 Water set that my prior audit identifies as visible in my Contributor Portal but missing from the Backgrid Client Portal. The Client Portal is the commercial-facing portal used for licensing to media clients. The precise asset reference should be updated if Renowned Films provides exact image IDs or file references.

## II. Relationship to Existing Kat Torres Case Study

My Kat Torres case study identifies a body of 23 photographic sets created between 2014 and 2017 by Thibault Mauvilain, featuring Kat Torres, and originally contributed to FameFlynet. After FameFlynet was absorbed into Backgrid, those materials became part of Backgrid systems, including a Contributor Portal and a separate Client Portal used for commercial licensing. *See TM-KAT-SUPP-005.*

The case study identifies the following audit results:

Produced for discovery purposes - rights reserved

TM-KAT-SUPP-006 | Supplemental Documentation Memo | Kat Torres / 138 Water

| Audit Category | Number / Percentage | Discovery Relevance |
| --- | --- | --- |
| Total Kat Torres sets identified in study | 23 sets | Defines the image universe affected by the inquiry and existing audit. |
| Sets visible in TM Contributor Portal | 22 sets / 1 missing | Shows that contributor-facing records differ from other records. |
| Sets featured on Client Site | 16 sets | Shows limited commercial-facing availability. |
| Sets not featured on Client Site | 7 sets / 30.4% | Supports discovery into missing public licensing availability. |
| Sets with CMI removed or incorrect FAFL credit | 8 sets / 34.8% | Supports discovery into metadata / CMI changes and attribution history. |
| Sets with proper TM / THMA attribution | 8 sets / 34.8% | Provides baseline for comparison and confirms that correct attribution was possible. |

These discrepancies are directly relevant to the Renowned Films inquiry because the producer requested help identifying the correct set. If a requested set is missing from the Client Portal, misattributed, or not reliably connected to my contributor records, then the archive problem interferes with ordinary-course licensing, not merely historical accounting.

## III. Specific Issue Presented by the Renowned Films Sample Image

The Renowned Films inquiry includes a sample image. Based on current visual comparison to my audit materials, that sample image appears to correspond to Set # FFN_60085778, titled "Birthday Girl Kat Torres Does A Photo Shoot In Malibu," dated October 24, 2014. My audit marks that set as "MISSING FROM BACKGRID CLIENT SITE" while showing it in my Contributor Portal under THMA / Thibault Mauvilain. *See TM-KAT-SUPP-004, TM-KAT-SUPP-005, and comparison exhibit TM-KAT-SUPP-007.*

This matters because the exact kind of image now being requested by a documentary producer appears to be part of the category of images that my audit identifies as commercially unavailable or not visible through the Backgrid Client Portal. The injury therefore includes present interference with the ability to identify, clear, quote, and license the correct images in the ordinary course of business.

The fact that the producer asked for exact image references only after I point him to the right set is especially relevant. The disputed archive records, portal discrepancies, and attribution / CMI inconsistencies affect precisely that step: identifying the right set and determining the accurate licensing pathway.

## IV. Past Public Usage Already Documented in the Case Study

The current inquiry should be understood in the context of past public uses documented in the Kat Torres case study. The case study states that, since 2017, no sales or royalties have been accounted for despite widespread international media usage of the Kat Torres sets. It identifies continued use in outlets including DailyMail / MailOnline / Femail, BBC World Service, Paris Match, Voici, Index.hr, and other outlets in the U.S., U.K., France, Brazil, Croatia / Eastern Europe, and additional markets. The study also notes that many uses carry generic credit such as "FameFlynet / Backgrid USA" without identifying me as the photographer and without any recorded sale appearing in my contributor records. *See TM-KAT-SUPP-005.*

Produced for discovery purposes - rights reserved

TM-KAT-SUPP-006 | Supplemental Documentation Memo | Kat Torres / 138 Water

I am not presenting every public example in the case study as conclusive proof that a particular use was licensed by Backgrid. Rather, those examples demonstrate the need for discovery into whether the uses were licensed, unlicensed, misreported, unreported, sublicensed, comped, syndicated, or otherwise not reflected in my contributor accounting. The current Renowned Films inquiry adds a new, live example showing that these images continue to have commercial value and that licensing opportunities continue to arise.

The past-use evidence and the current inquiry reinforce one another: the prior uses show ongoing public exploitation and market demand; the current inquiry shows that third parties continue to seek documentary licensing rights; and the zero-sales / zero-royalties records described in the audit create a need for complete sales, licensing, invoicing, download, syndication, and accounting discovery.

## V. Current Harm and Discovery Relevance

This supplemental event documents current harm in several respects:

- **Current licensing opportunity:** A third-party producer is seeking rights for Kat Torres / 138 Water campaign images for documentary use.

- **Impaired set identification:** The producer needs help identifying the correct set, while the relevant archive contains missing Client Portal records and inconsistent attribution / CMI.

- **Commercial unavailability / invisibility:** The sample image appears to correspond to a set marked missing from the Backgrid Client Portal, which is the commercial-facing licensing system.

- **Attribution and CMI concerns:** The broader case study identifies sets with CMI removed or incorrectly credited to FAFL instead of THMA / Thibault Mauvilain.

- **Accounting harm:** The audit identifies zero recorded sales or royalties for the Kat Torres materials since 2017 despite documented press/public usage.

- **Mitigation and business interference:** The dispute and incomplete records interfere with my ability to respond to the inquiry normally, direct the producer through an accurate licensing path, preserve rights, and mitigate damages.

## VI. Requested Preservation and Supplemental Discovery

This supplemental production supports targeted preservation and supplementation concerning:

- Set # FFN_60085778 and all related Kat Torres / 138 Water sets;

- the July 1, 2026 Renowned Films sample image and any corresponding Backgrid / Shutterstock asset IDs;

- Client Portal visibility history, including whether the set was searchable, hidden, removed, suppressed, restored, or otherwise unavailable;

- Contributor Portal records, including THMA records, upload records, image counts, captions, filenames, and any status changes;

- metadata and CMI history, including all changes from THMA / Thibault Mauvilain to FAFL / FameFlynet or any other credit;

- sales, licenses, quotes, invoices, downloads, syndication records, comp licenses, client uses, and royalty/accounting records for the Kat Torres image sets;

- records explaining why documented public uses are not reflected as reported sales or royalties in my contributor records;

- communications with media clients, documentary producers, publishers, distributors, or syndication partners concerning the Kat Torres / 138 Water materials; and

Produced for discovery purposes - rights reserved

TM-KAT-SUPP-006 | Supplemental Documentation Memo | Kat Torres / 138 Water

- all documents necessary to determine whether past public uses were licensed, unlicensed, sublicensed, misreported, unreported, or otherwise omitted from my accounting.

## VII. Reservation of Rights

This memorandum and the related supplemental production are not submitted as a simple request for late payment and should not be treated as limiting the claims, damages, remedies, or discovery issues in this action. Any belated accounting, payment, correction, restoration, re-captioning, metadata change, Client Portal restoration, or attribution change will not be accepted as a cure of prior conduct or as a waiver of claims, damages, objections, discovery rights, remedies, or rights to seek further relief. All rights are expressly reserved.

This memorandum may be supplemented after Renowned Films provides exact image references, after additional portal searches are completed, or after Defendants produce responsive Client Portal, licensing, CMI, and accounting records.

## VIII. Related Production Materials

| Production ID | Description | Purpose |
|---|---|---|
| TM-KAT-SUPP-001 | Original native email / message source from Rafael Ceribelli / Renowned Films dated July 1, 2026 | Preserves original inquiry, headers, and attachment structure. |
| TM-KAT-SUPP-002 | PDF printout of the Renowned Films inquiry | Readable production copy. |
| TM-KAT-SUPP-003 | RTFD / readable copy of the inquiry | Secondary readable copy. |
| TM-KAT-SUPP-004 | Original sample image attached to the inquiry | Image requested / referenced by producer. |
| TM-KAT-SUPP-005 | Kat Torres case study / audit | Existing audit of sets, CMI, Client Portal visibility, past usage, and accounting issues. |
| TM-KAT-SUPP-006 | This supplemental documentation memorandum | Narrative explanation of current inquiry and ongoing harm. |
| TM-KAT-SUPP-007 | Comparison exhibit | Visual comparison of producer sample image to audit materials and Client Portal issue. |

**Prepared by:** Thibault Mauvilain

**Date:** July 3, 2026

Produced for discovery purposes - rights reserved